# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| LORI J. LYNN AND JAVIER GONZALEZ, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>PEABODY ENERGY CORPORATION, PEABODY HOLDING COMPANY, LLC, PEABODY INVESTMENT CORP., BOARD OF DIRECTORS OF PEABODY HOLDING COMPANY, LLC, BOARD OF DIRECTORS OF PEABODY INVESTMENT CORP., GREGORY H. BOYCE, MICHAEL C. CREWS, SHARON D. FIEHLER, WALTER L. HAWKINS, JR., D.L. LOBB, JULIE A. NADOLNY, RETIREMENT COMMITTEE OF PEABODY INVESTMENTS CORP. EMPLOYEE RETIREMENT ACCOUNT, RETIREMENT COMMITTEE OF PEABODY WESTERN-UMWA 401(K) PLAN, RETIRMENT COMMITTEE OF BIG RIDGE, INC. 401(K) PROFIT SHARING PLAN AND TRUST, PATRICK J. FORKIN, JEANE L. HULL, GEORGE J. SCHULLER, JR., ANDREW P. SLENTZ, AND DOES 1-10,<br><br>    Defendants. | CIVIL ACTION NO.:  4:15-cv-00916-AGF<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................................10

PARTIES ...........................................................................................................................11

    Plaintiffs .................................................................................................................11

    Defendants ..............................................................................................................12

        (a)    Company Defendants ................................................................12

             (i)    Peabody ...............................................................12

             (ii)    PIC ......................................................................13

             (iii)    Peabody Holding .................................................14

        (b)    Director Defendants .................................................................16

             (i)    PIC Board of Directors .......................................17

             (ii)    Peabody Holding Board of Directors ..................18

        (c)    Committee Defendants .............................................................19

        (d)    Additional "John Doe Defendants" ..........................................22

THE PLANS .......................................................................................................................22

    (a)    Overview of the Plans ..........................................................................22

    (b)    Eligibility to Participate in the Plans ....................................................23

    (c)    Contributions to the Plans ....................................................................24

        (1)    Contributions Under the PIC Plan .........................................24

        (2)    Contributions Under the Peabody Western Plan ....................25

        (3)    Contributions Under the Big Ridge Plan ...............................26

    (d)    Vesting of Contributions in the Plan .....................................................27

    (e)    Investments Under the Plans .................................................................28

    (f)    Master Trust ..........................................................................................29

(g)    Peabody Energy Stock Fund ........................................................................30

    (1)    The PIC Plan .........................................................................30

    (2)    The Peabody Western Plan.....................................................31

    (3)    The Big Ridge Plan ...............................................................32

CLASS ACTION ALLEGATIONS.................................................................................33

FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES.................................36

Peabody Stock Was an Imprudent Investment During the Class Period Due to the Company's Changed Circumstances ............................................................36

    Overview of Peabody ...........................................................................36

    The Colossal Collapse of the Coal Industry .........................................39

    Well Before the Start of the Class Period, Numerous Red Flags Warned of the Imprudence of Peabody Stock as an Investment Option for the Plans..........46

    What Defendants Should Have Done as of December 14, 2012......................51

    2013 Was a New Year But the Same Old Story for Peabody .............................54

    The Company's Struggles Continued and the Losses Mounted Throughout 2014 .............................................................................................57

    In 2015, Peabody Fared No Better as the Company's Financial Condition Continued to Deteriorate, Losses Continued to Mount and its Stock Price Continued to Plummet ......................................................................64

    Peabody Has Entered 2016 on Life Support With Bankruptcy Ever Closer........76

Special Circumstances During the Class Period Rendered the Market's Valuation of Peabody Stock Unreliable ....................................................81

    During the Class Period, Peabody Withheld Material Information from the Market .................................................................................................81

    During the Class Period, Objective Criteria, Such as the Company's Z-Score and Unserviceable Debt Predicted Peabody Was Likely to Default, Thus Making The Company Stock Price Unreliable...........................................88

    Defendants Failed to Properly Investigate the Continued Prudence of Peabody Stock and/or Employ a Reasoned Decision Making Process in Evaluating Company Stock ...............................................................92

Peabody Stock Was an Imprudent Investment During the Class Period Due to the Artificial Inflation of Peabody Stock ..............................................................93

    Peabody Stock Was Artificially Inflated During the Class Period .....................93

    What Defendants Should Have Done as of December 14, 2012........................93

THE RELEVANT LAW:  CLAIMS FOR RELIEF UNDER ERISA ......................................97

    COUNT I............................................................................................................100

        FAILURE TO PRUDENTLY MANAGE THE PLANS' ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(A)(1)(B) AND 405 BY THE COMPANY DEFENDANTS AND THE COMMITTEE DEFENDANTS) .............................................................100

    COUNT II...........................................................................................................103

        BREACH OF THE DUTY LOYALTY (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405 BY ALL DEFENDANTS) ................................................................................103

    COUNT III .........................................................................................................107

        FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE COMPANY AND DIRECTORY DEFENDANTS)..................107

    COUNT IV .........................................................................................................109

        FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH COMPLETE AND ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE COMPANY AND DIRECTORY DEFENDANTS)....................................................................................109

CAUSATION...................................................................................................................111

REMEDIES FOR BREACHES OF FIDUCIARY DUTY ......................................................113

JURY DEMAND .............................................................................................................114

PRAYER FOR RELIEF ...................................................................................................114

## NATURE OF THE ACTION

1.      Plaintiffs Lori J. Lynn and Javier Gonzalez ("Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Peabody Investments Corp. Employee Retirement Account (the "PIC Plan"), the Peabody Western-UMWA 401(k) Plan (the "Peabody Western Plan"), and the Big Ridge, Inc. 401(k) Profit Sharing Plan and Trust (the "Big Ridge Plan"[1] and, together with the PIC Plan and Peabody Western Plan, the "Plans" or "Plan"), bring this action against the above-named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.

2.      This case is about the abject failure of the Defendants, fiduciaries of the Plans, to protect the interests of the Plans' participants and beneficiaries (the "Participants") in violation of the Defendants' legal obligations under ERISA during the Class Period (December 14, 2012 to the present).  Defendants breached the duties they owed to the Plans, to Plaintiffs, and to the putative class members who are also Participants by, *inter alia*, retaining Peabody Energy Corporation common stock (hereafter, "Peabody Stock" or "Company Stock")[2] as an investment option in the Plans when a reasonable fiduciary using the "care, skill, prudence, and diligence… that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

---

[1] As discussed below, effective as of the close of business on December 31, 2014, the Big Ridge Plan was merged into the PIC Plan and as of such time, the cash, mutual funds and other assets of the Big Ridge Plan were combined with the PIC Plan and held as a single plan.  *See* Amendment No. 16 to the Peabody Investment Corp. Employee Retirement Account ("PIC Plan Amendment No. 16"), attached hereto as Exhibit 8.

[2] Shares of Peabody Stock are held in the Peabody Energy Corporation Stock Fund ("Peabody Stock Fund").

3.      Recently, in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court confirmed that plan fiduciaries violate ERISA when they continue to offer an imprudent plan investment option.  In *Fifth Third,* the Supreme Court considered a case in which plan participants challenged a plan fiduciaries' failure to remove company stock as a plan investment option.  The Supreme Court held that retirement plan fiduciaries are required by ERISA to independently determine whether company stock remains a prudent investment option.  In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence."  *Fifth Third*, 134 S. Ct. at 2463.  The Supreme Court rejected that argument, holding that "no such presumption applies," *id.*, and further held "that the duty of prudence **trumps** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary."  *Id.* at 2468 (citation omitted) (emphasis added).  Accordingly, the Plans' "fiduciaries are subject to the **same duty of prudence** that applies to ERISA fiduciaries in general."  *Id*. at 2463 (emphasis added).  Thus, even if the Plans required that Peabody Stock be offered, the Plans' fiduciaries were obligated by law to disregard that directive once Company Stock was no longer a prudent investment option for the Plans.  More importantly, as instructed by the Court in *Fifth Third*, Defendants had a duty to determine whether Peabody Stock remained a prudent investment option for a retirement plan during the Class Period.

4.      The Supreme Court also declared that "ERISA's duty of prudence [does not vary] depending upon the specific nonpecuniary goal set out in an ERISA plan," and that ERISA benefits "do[] not cover nonpecuniary benefits like those supposed to arise from employee ownership of employer stock."  *Id.*  Not only must ERISA fiduciaries aim towards pecuniary benefits, but the Supreme Court declared that fiduciaries cannot follow plan instructions to invest

in employer stock "if financial goals demand the contrary."  *Id.*  While a "fiduciary is not obligated to break the insider trading laws even if his company is about to fail," (*id.* at 2469) the Supreme Court did not suggest that an ERISA fiduciary whose company is on its way to failure may idly sit by if he can protect his wards without violating insider trading laws.

5.     The Supreme Court recognized that "[t]he proposed presumption makes it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances.  Such a rule does not readily divide the plausible sheep from the meritless goats.  That important task can be better accomplished through careful, context-sensitive scrutiny of a complaint's allegations."  *Id.* at 2470.  Again, it did not suggest that an ERISA fiduciary may idly sit by while watching his/her company fail if he can protect his wards without violating insider trading laws.

6.     The thrust of Plaintiffs' allegations under Counts I (breach of the duty of prudence) and II (breach of the duty of loyalty) is that Defendants allowed the investment of the Plans' assets in Peabody Stock throughout the Class Period despite the fact that Defendants knew or should have known that that investment was imprudent as a retirement vehicle for the Plans for at least two separate reasons.

7.     First, Peabody Stock was imprudent during the Class Period in light of changed circumstances demonstrating Peabody's perilous financial condition which included, among other things, as explained in detail below, a sea-change in the basic risk profile and future business prospects of Peabody caused by:  (a) the collapse of coal prices which drastically and for the foreseeable future compromised Peabody's financial health; (b) indicia that the Company is heading toward bankruptcy, including the Company's deteriorating Altman Z-score ("Z-score") – a financial formula commonly used by financial professionals to predict whether a

company is likely to go into bankruptcy – which indicated that Peabody was and is in danger of bankruptcy; (c) an excessive increase in the Company's debt to equity ratio; and (d) increased costs due to the ill-advised acquisition of Australian company Macarthur Coal Ltd. ("Macarthur") as discussed further below.

8.      Leading up to the start of the Class Period, certain obstacles to the U.S. coal industry's continued growth were apparent.   Among these obstacles were the increasing oversupply of coal, stiff competition from natural gas producers, and the transition of power generation plants to "cleaner" energy sources such as "renewable" and gas-fired thermal plants instead of coal, all of which crashed coal prices to levels not seen in years.[3]

9.      In April 2012, several months before the start of the Class Period, Moody's forecasted "permanent shifts" in the energy sector, as "depressed natural gas prices continue to put pressure on the coal generation sector."   *See Moody's foresees permanent shifts in energy sector over next decade*, SNL Power Week (Canada), Apr. 9, 2012.

10.      Thus, by the start of the Class Period, it was obvious that Peabody was wholly-dependent upon a dying industry.   It is, and should have been at all times relevant hereto, obvious to Defendants that Peabody could not service its massive debt load by mining coal.   Yet, despite predictions that the domestic coal market was facing a long-term, if not permanent, sea-

---

[3] *See* US Coal: the West Coast challenge, *Platts Energy Economist*, Mar. 3, 2011 at 1; Nick Cunningham, Latest Casualty in Energy's Hardest Hit Industry, May 13, 2015.  Norway dropped coal company investments from its $900 billion sovereign wealth fund because of their impact on climate change.  *See* Karl Ritter, Norway's $900 billion oil fund to slash coal investments, *U.S. News & World Report*, May 28, 2015.  And on October 8, 2015, California Governor Jerry Brown signed bill 185, a law that requires the California Public Employees' Retirement System (CalPERS) and the California State Teachers' Retirement System (CalSTRS) to divest from thermal coal companies by July 1, 2017.  *See* CalPERS Gears Up To Drop Coal, Pension 360, Oct. 20, 2015, *available at* http://pension360.org/calpers-gears-up-to-drop-coal/; *see also* John Schwartz, With Coal Industry Under Pressure, Some See Long-Term Decline, *The New York Times*, Dec. 2. 2015 (noting that environmental regulations like the Obama administration's Clean Power Plan has put coal companies under severe pressure.)

change, Defendants allowed Participants to gamble their retirement savings on a "pure coal play."  While some investors may have been willing to stake a portion of some investment portfolios on the irrational upside in Peabody's stock, it was unduly risky for Participant's retirement savings.   Indeed, in 2015 it was reported that analysts "**continue to view** an investment in [Peabody] shares as only appropriate for investors with a high tolerance for risk and uncertainty."  Peabody Energy: Only Appropriate for Investors With a High Tolerance for Risk and Uncertainty, Ben Levisohn, July 1, 2015, available at http://blogs.barrons.com/stockstowatchtoday/2015/07/01 (emphasis added).

11.     Nearly six months after the filing of Plaintiffs' initial complaint on June 11, 2015, which detailed the dire circumstances facing Peabody, Peabody appointed Gallagher Fiduciary Advisors, LLC ("Gallagher") in December, 2015 to serve as independent fiduciary and investment manager of the Plans with respect to the Peabody Stock Fund.  On February 26, 2016, Gallagher informed Participants by letter that it had decided to "restrict the [Peabody] Stock Fund to all participant activity effective as of March 9, 2016 (the "Freeze Date"), and (2) to eliminate the [Peabody] Stock Fund as an investment option in each Plan, on or around March 16, 2016 (the "Sunset Date").  Gallagher had concluded that "maintaining the Stock Fund as an investment option is no longer consistent with the fiduciary responsibility provisions of ERISA. Gallagher further stated that its decision "simply reflects [its] judgment, as a fiduciary, that it is in the interest of the Plans' participants to eliminate [their] exposure within the Plans through the Stock Fund to the risks facing the Company and Peabody Stock."

12.     Gallagher essentially reached a conclusion based on the same public facts Plaintiffs allege herein have existed at least since the beginning of the Class Period. Accordingly, the process initiated by Peabody in December 2015 was too little too late.

Importantly, *Fifth Third* did not make any new law with respect to the-above described basis for Plaintiffs' claim, which is a traditional type of imprudence – that is, the employer's stock has become an imprudent investment not because it is overpriced, but because of adverse changes in the company's basic risk profile, *i.e.*, the totality of circumstances prevailing during the Class Period – and this type of claim remains firmly entrenched in the basic trust law principles from which ERISA is derived.

13.     When an ERISA fiduciary makes investment decisions, the fiduciary's conduct is judged using a "prudent investor" standard.  Restatement (Third) § 90, at 292.  The fiduciary must "invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust."  *Id.*   "[A] trustee's duties apply not only in making investments but also in monitoring and reviewing investments, which is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved."  *Id.* comment b, at 295.

14.     Here, Plaintiffs assert such claim based upon the totality of the circumstances, which rendered Peabody Stock an imprudent Plan investment, given the particular character and aims of the Plans discussed below as a vehicle for retirement savings.

15.     Indeed, the Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  *Tibble* held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the

Uniform Prudent Investor Act (the "UPIA"), treatises, and seminal decisions confirming the duty.[4]

16.     In *Tibble*, the Supreme Court summarized the claims before it, stating "petitioners claimed that a large institutional investor with billions of dollars, like the Plan, can obtain materially identical lower priced institutional-class mutual funds that are not available to a retail investor. Petitioners asked, how could respondents have acted prudently in offering the six higher priced retail-class mutual funds when respondents could have offered them effectively the same six mutual funds at the lower price offered to institutional investors like the Plan?"  *Id.* at 1826.  If offering efficiently priced investment options were sufficient to satisfy *Fifth Third*, *Tibble* would make no sense, as nothing suggests other than that both classes of mutual funds were priced by efficient markets.

17.     Second, Peabody Stock also constituted an imprudent investment for the Plans during the Class Period because it was artificially inflated during at least a portion of the Class Period while the Plans were purchasers of Peabody Stock.  As recently revealed in the Assurance of Discontinuance (attached hereto as Exhibit 1) executed on November 8, 2015, between Peabody and the Office of the Attorney General of the State of New York ("NYAG"), the

---

[4] *Tibble* cites with approval to the UPIA which enshrines trust law and recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)).  The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id.* § 2 comment.  As similarly summarized in the Third Restatement:  "***Changes in a company's circumstances, adaptation to trust- and capital-market developments***, fine-tuning, and the like may, of course, justify the selling and buying of properties as an aspect of a prudent plan of asset allocation and diversification ….  This is consistent with the trustee's ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations, including tax consequences and other costs associated with such transactions."  Restatement (Third) § 90 comment e(1) (emphasis added).

NYAG found in its investigation that Peabody lied in its SEC[5] Form 10-K filings about its ability to predict the effect of the "enactment of laws or passage of regulations regarding emissions from the combustion of coal by the U.S. or some of its states  or by other countries, or other actions to limit such emissions," on its future financial condition.  *See* Assurance of Discontinuance at ¶ 2 (quoting Peabody Form 10-K filings for 2011, 2012, 2013 and 2014).  The NYAG's investigation found that Peabody "has in fact made market projections about the impact of potential climate change regulatory actions [and] [s]ome of those market projections found that certain such actions could have a severe negative impact on Peabody's financial condition." Assurance of Discontinuance at ¶ 3.  These misstatements were material especially in light of recent significant laws and regulations seeking to drastically curb carbon emissions from the combustion of coal, such as the U.S.'s Clean Power Plan, announced on August 3, 2015, and the historic first-ever universal, legally binding global climate deal adopted in Paris by 195 countries, including the United States, in December 2015.

18.      As a result of the Company's concealment of the truth – *inter alia,* that climate laws and regulations with the purpose of cutting carbon emissions from the combustion of coal would have detrimental effects on Peabody's bottom line -– Peabody Stock was artificially inflated during a significant portion of the Class Period.

19.      This claim – that a company's stock is imprudent based on the stock price being artificially inflated, and that the fiduciaries should have understood the overvaluation because of nonpublic information of which they were aware – is squarely endorsed by *Fifth Third*.

20.      Plaintiffs further state in the alternative, pursuant to FED. R. CIV. P. 8(d)(2), that: (a) withholding of material information by Peabody from the public; (b) objective criteria, such

---

[5] The United States Securities and Exchange Commission.

as the Company's Z-Score and derivative markets predicting Peabody's demise, all of which the Plans' fiduciaries have ignored in continuing to offer Company Stock;[6] (c) Peabody's overwhelming unserviceable debt; and (d) Defendants' failure to properly investigate the continued prudence of Peabody Stock and/or employ a reasoned decision-making process in evaluating Company Stock,[7] each, individually and collectively, represents the kind of "special circumstances" that the Supreme Court recognized in *Fifth Third* renders reliance on a company's stock price imprudent and supports a finding of breach of fiduciary duties as alleged herein in Counts I and II.

21.     In an ERISA case such as this, the proper measure of damages is the difference between what the Plan Participants received and what the Plan Participants would have received if the Plans' assets had been invested prudently.  In other words, with respect to the calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants in the plan would not have made or maintained investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the value of the plan's assets to what they would have been if the plan had been properly administered.

---

[6] This type of special circumstance was specifically recognized by the author of *Fifth Third*, Justice Breyer during oral argument of *Fifth Third*.  *See Fifth Third* Oral Argument Transcript at 31:10-18 (describing hypothetical situation where in a fiduciary's "inbox is ten feet of papers telling him about… the corporation's condition.  It's apparent he's never read them.  If he had read them, he would have taken action.  Of course you would have a case, I would think.").  *Available at www.supremecourt.gov/oral_arguments/argument_transcript/2013.*

[7] When enforcing the duties of prudence and loyalty, courts focus not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction.  A pure heart and an empty head are not defenses to breaches of ERISA's fiduciary duties.  With respect to Peabody Stock, as alleged herein, Defendants failed to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity, to review and properly evaluate Company Stock.

22.     As of the start of the Class Period on December 14, 2012, the Plans held an estimated combined $47,622,481 in Company Stock.  The market price of Peabody Stock has fallen from approximately $26.56 on December 14, 2012 to a split-adjusted $6.39 (both adjusted closes) on March 10, 2016, the most recent trading day preceding the filing of the instant complaint.  The $6.39 share price, however, is deceiving because on October 1, 2015, a 1-for-15 reverse split of Peabody Stock went into effect.  *See* Form 8-K filed with the SEC on October 6, 2015.  "As a result of the reverse stock split, every 15 shares of issued and outstanding [Peabody Stock] will be automatically combined into one issued and outstanding share of Common Stock." *Id.* at 2.  Thus, on March 10, 2016, Peabody Stock was trading at a split-adjusted *$.43*– a decline of almost *98%* from the start of the Class Period.  Put another way, using the current pricing scale, Peabody Stock was trading at **$398** at the beginning of the Class Period compared to its price of $6.39 as of March 10, 2016.

23.     Had the Plans' fiduciaries invested the estimated $47.6 million of Peabody Stock in the Plans in a prudent investment option, the Plans and its Participants would have realized a gain of tens of millions of dollars.

## JURISDICTION AND VENUE

24.     ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

25.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

26.     ***Venue.***  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plans are administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and one or more Defendants reside or may be found in this district.

## PARTIES

### Plaintiffs

27.     Plaintiff Lori Lynn is a former employee of Peabody Investment Corporation ("PIC") where she worked from 2005 to 2012.  PIC is a wholly-owned subsidiary of Peabody.

28.     Plaintiff Javier Gonzalez is also a former PIC employee where he worked for over eight years.

29.     Both Plaintiffs are "participants" in the PIC Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and like other employees of Peabody's subsidiaries who participated in the Plans – Peabody Western Coal Company ("Peabody Western"), Big Sky Coal Company ("Big Sky"), Seneca Coal Company ("Seneca Coal"), and Big Ridge, Inc. ("Big Ridge")[8] – held shares of Peabody Stock during the Class Period in their Plan accounts.  During the Class Period, the value of shares in Peabody Stock within Plaintiffs' respective Plan accounts diminished considerably as a result of Defendants' breaches of fiduciary duty described herein.

30.     Both Ms. Lynn and Mr. Gonzalez are no different than thousands of other PIC, Peabody Western, Big Sky, Seneca Coal, and Big Ridge employees who trusted the Defendant-fiduciaries to monitor the Plans' investments in Peabody Stock.  As the Eighth Circuit has recognized, "a plaintiff may be able to assert causes of action which are based on conduct that

---

[8] Employees of Peabody Western, Big Sky and Seneca Coal participate in the same plan.  In particular, employees of these companies who are members of the United Mine Workers of America (UMWA) collective bargaining unit covered by the Western Surface Agreement of 2013 are eligible for participation in the Peabody Western Plan.  *See* Peabody Western Plan Annual Report for Year-End 2014, at 4 (filed June 24, 2014) ("Peabody Western 2014 Form 11-K").

harmed him, but which sweep more broadly than the injury he personally suffered." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009).

**Defendants**

    **(a)**    **Company Defendants**

31.    The Company Defendants are (i) Peabody, (ii) PIC, and (iii), Peabody Holding Company, LLC ("Peabody Holding").   Both PIC and Peabody Holding are wholly-owned subsidiaries of Peabody.   The Company Defendants possessed ultimate decision-making authority concerning whether to retain Peabody Stock as an investment option during the Class Period.

        **(i)**    **Peabody**

32.    Defendant Peabody is a Delaware Corporation with its principal place of business at 701 Market Street, Saint Louis, Missouri.   Peabody owns interests in active coal mining operations both domestically and internationally.   *See* Peabody Annual Report for Year-End 2015, at 2 (filed Feb. 25, 2015) ("2014 Form 10-K").

33.    At all relevant times, Peabody acted through its officers and employees – including the board of directors of PIC ("PIC Board"), and Peabody Holding ("Peabody Holding Board").   Because PIC and Peabody Holding are direct subsidiaries of Peabody, in practical terms, the PIC Board and Peabody Holding Board operate at the pleasure of Peabody.   Thus, Peabody had, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.

34.    Through the PIC and Peabody Holding Boards or otherwise, Peabody had the authority and discretion to hire and terminate officers and employees of Peabody and its subsidiaries.   Additionally, by failing to properly discharge their fiduciary duties under ERISA,

Peabody and its officers, and employee fiduciaries breached duties they owed to the Plans'
Participants.

36. Accordingly, the actions of the individual Defendants named herein, and other
employee fiduciaries are imputed to Peabody under the doctrine of *respondeat superior*, and
Peabody is liable for these actions.

36. Defendant Peabody was a fiduciary of the Plans, within the meaning of ERISA
Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and
control over Plan management and control over disposition of Plan assets and/or authority to
appoint and monitor Plan fiduciaries who had control over Plan management or control over
management or disposition of Plan assets.

**(ii) PIC**

37. As noted above, Defendant PIC is a wholly-owned subsidiary of Peabody.  PIC is
identified as the Plan Administrator of the PIC Plan.  *See* Peabody Investments Corp. Employee
Retirement Account, amended and restated effective January 1, 2014 ("2014 PIC Plan
Document") (attached hereto as Exhibit 2) at § 2.22 ("'Plan Administrator' means Peabody
Investments Corp.").  *See also* PIC Plan 2014 Form 11-K at 4.

38. PIC is also defined in the 2014 Plan Document as the "Company."  *See* 2014 PIC
Plan Document at § 2.8.  As the 2014 PIC Plan Document further specifies, "The Company shall
be the Plan Administrator of the Plan within the meaning of ERISA and, except as otherwise
specifically set forth herein, shall be solely responsible and have sole control of the operation and
administration of the Plan and the establishment of such procedures and processes as may be
necessary for the efficient operation and administration of the Plan."  2014 PIC Plan Document
at § 15.1.

39.     Further, the Master Trust Agreement specifies that PIC is the fiduciary named in the PIC Plan as "having the authority to control and manage the operation and administration of" the PIC Plan.  *See* Master Trust Agreement at 1.

40.     The 2013 PIC SPD identifies PIC as the "Plan Sponsor" (*see* 2013 PIC SPD at 25 (attached hereto as Exhibit 3)),[9] and among the duties the October 2014 Plans' Statement of Savings and Investment Plan Policies and Objectives (the "Investment Policy Statement") (attached hereto as Exhibit 4) assigns to Plan Sponsors, is "appointing members of the Committee."  Investment Policy Statement at 9.

41.     Defendant PIC was a fiduciary of the PIC Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and control over Plan management and control over disposition of Plan assets and/or authority to appoint and monitor Plan fiduciaries who had control over Plan management or control over management or disposition of Plan assets.

### (iii)    Peabody Holding

42.     As noted above, Defendant Peabody Holding is a wholly-owned subsidiary of Peabody.  Peabody Holding is the "Plan Administrator" for the Peabody Western Plan and the Big Ridge Plan.  *See* Peabody Western Plan 2014 Form 11-K at 4; Big Ridge Plan 2014 Form 11-K at 4.  Moreover, the Master Trust Agreement identifies Peabody Holding as the fiduciary named in the Peabody Western and Big Ridge Plans as "having the authority to control and manage the operation and administration of each such Plan."  *See* Amended and Restated Master

---

[9] *See also* PIC Plan 2014 Form 11-K at 4.

Trust Agreement For The Peabody Energy Corporation Stock Fund, dated March 26, 2010, ("Master Trust Agreement") (attached hereto as Exhibit 5) at 1.[10]

43.      Both the Peabody Western-UMWA 401(k) Plan document effective January 1, 2011 (the "Peabody Western Plan Document") (attached hereto as Exhibit 6) and the Big Ridge, Inc. 401(k) Profit Sharing Plan and Trust plan document effective July 1, 2007 (the "Big Ridge Plan Document") (attached hereto as Exhibit 7)[11] further confirm Peabody Holding was a fiduciary of the Plans.

44.      Specifically, both Plan Documents define Peabody Holding as the "Company" (*see* Peabody Western Plan Document § 2.4, Big Ridge Plan Document § 2.4) and identify the Company – Peabody Holding – as the respective Plan Administrators for the Plans.  *See* Peabody Western Plan Document § 2.17, Big Ridge Plan Document § 2.18.

45.      The Plan Documents specifically note:   "The Company shall be the Plan Administrator of the Plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA) and, except as otherwise specifically set forth herein, shall be solely responsible for and have sole control of the operation and administration of the Plan and the establishment of such procedures and processes as may be necessary for the efficient operation and administration of the Plan."  *See* Peabody Western Plan Document § 16.1, Big Ridge Plan Document § 15.1.

---

[10] The Master Trust Agreement was entered into as of March 26, 2010 by and between Vanguard Fiduciary Trust Company (the "Master Trustee') and Peabody Western Coal Company, Peabody Investments. Corp, and Big Ridge, Inc., and thus upon information and belief governs all three Plans.

[11] These documents were attached to Defendants' motion to dismiss.  *See* Dkt. Nos. 57-2, 57-1.

46.     Further, both Plan Documents define the "Board" to be the board of directors of the Company, meaning the Peabody Holding Board.  *See* Peabody Western Plan Document § 2.1, Big Ridge Plan Document § 2.1.

47.     Both Plan Documents further specify that "the Board shall appoint a Committee" to, *inter alia*, "monitor such funds as are made available from time to time under the Plan…." *See* Peabody Western Plan Document § 16.6, Big Ridge Plan Document § 15.6.

48.     Accordingly, Defendant Peabody Holding was a fiduciary of both the Peabody Western Plan and Big Ridge Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and control over the management of the Plans and control over disposition of the Plans' assets and had the authority to appoint and monitor the Plans' fiduciaries who had control over the management of the Plans or control over the disposition of the Plans' assets.

**(b)     Director Defendants**

49.     As alleged above, at all relevant times, Peabody acted through the (i) PIC Board, and (ii) Peabody Holding Board to the extent members of the PIC and Peabody Holding Boards worked at the pleasure of Peabody.

50.     As explained below, the Retirement Committee for each of the Plans was responsible for selecting and monitoring the Plans' investment options.  The PIC Board and Peabody Holding Board appointed the Retirement Committee members for the PIC Plan and Peabody Western Plan and the Big Ridge Plan, respectively.

51.     As outlined in the 2014 PIC Plan Document, the "[PIC] Board shall appoint a Committee of one (1) or more persons who shall serve without remuneration at the pleasure of the Board to select and monitor such funds as are made available from time to time under the Plan."  2014 PIC Plan at § 15.6.

52.     Further, as outlined in the Peabody Western Plan Document, "a Committee consisting of two (2) persons, one of whom will be selected by the Company [Peabody Holding] and one of whom will be selected by the Union, shall be appointed to select and monitor such funds as are made available from time to time under the Plan."  Peabody Western Plan Document § 16.6.

53.     The Big Ridge Plan Document has similar language, noting that the "[Peabody Holding] Board shall appoint a Committees consisting of one (1) or more persons who shall serve without remuneration at the pleasure of the Board to select and monitor such funds as are made available from time to time under the Plan."  Big Ridge Plan Document § 15.6.

54.     Because the PIC and Peabody Holding Boards appointed the Retirement Committees, they had the concomitant duty to monitor the activities of the Retirement Committees.  As a result, the PIC and Peabody Holding Boards had the ultimate responsibility for removing Retirement Committee members if necessary.

(i)     **PIC Board of Directors**

55.     During the Class Period, each PIC Board member identified below was a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

56.     Defendant Gregory H. Boyce ("Boyce"), served as Chairman, Chief Executive Officer, and Director of Peabody during the Class Period.  Defendant Boyce served as a PIC Board member during the Class Period.

57.     Defendant Michael C. Crews ("Crews") served as Executive Vice President and Chief Financial Officer until his departure in July 2015.  Defendant Crews served as a PIC Board member during the Class Period.  Defendant Crews was also a member of the Retirement Committee during the Class Period.

58.     Defendant Sharon D. Fiehler ("Fiehler") served as Executive Vice President, and Chief Administrative Officer of Peabody during the Class Period.  Defendant Fiehler was named Executive Vice President and Chief Administrative Officer in January 2008.  Defendant Fiehler served as a PIC Board member during the Class Period.

59.     Defendant Walter L. Hawkins, Jr. ("Hawkins") served as a PIC Board member during the Class Period.

60.     Defendant D.L. Lobb ("Lobb") served as a PIC Board member during the Class Period.

61.     Defendant Julie A. Nadolny ("Nadolny") served as a PIC Board member during the Class Period.

62.     Defendant Andrew P. Slentz ("Slentz") served as Executive Vice President and Chief Human Resources Officer during the Class Period.   Defendant Slentz was named Executive Vice President and Chief Human Resources Officer in April 2014.  Defendant Slentz served as a PIC Board member during the Class Period.  Defendant Slentz was also a member of the Retirement Committee during the Class Period.

63.     Defendants Boyce, Crews, Fiehler, Hawkins, Lobb, Nadolny, and Slentz are collectively referred to herein as the "PIC Board Defendants."

(ii)     **Peabody Holding Board of Directors**

64.     The individual members of the Peabody Holding Board are unknown to Plaintiffs at this juncture.

65.     Members of the PIC Board, together with members of the Peabody Holding Board, are collectively referred to herein as the "Director Defendants."

**(c)     Committee Defendants**

66.     The Investment Policy Statement refers to the "Retirement Committees for each of the Plans" (*see id.* at 1) collectively as the "Committee."   Accordingly, hereafter, the Retirement Committee for the PIC Plan, the Retirement Committee for the Peabody Western Plan, and the Retirement Committee for the Big Ridge Plan shall be referred to collectively as the "Committee."   The Committee is a juridical entity under ERISA and is named as a Defendant.

67.     The Investment Policy Statement specifies that the Committee will be responsible for:

a.      Establishing and maintaining the IPS (Investment Policy Statement);

b.      Selecting investment options;

c.      Periodically evaluating the Plans' investment performance and recommending investment option changes; and

d.      Providing for the Plans' participant education, as warranted, and not specifically provided for by the recordkeeper, including changes to existing fund options.

Investment Policy Statement at 9.

68.     The 2014 PIC Plan Document specifies that "the [PIC] Board shall appoint a Committee of one (1) or more persons who shall serve without remuneration at the pleasure of the Board to select and monitor such funds as are made available from time to time under the Plan."   2014 PIC Plan Document § 15.6.   The section continues, noting "the Committee shall appoint its own Chairman from among the regular members of the Committee and shall also

19

appear a Secretary who may be, but need not be, a member of the Committee."  *Id.*  "The Committee" the 2014 PIC Plan Document notes, "shall be the 'named fiduciary' for purposes of ERISA Section 402(a)(1)."  *Id.*

69.     The Peabody Western Plan specifies "a Committee consisting of two (2) persons, one of whom will be selected by the Company and one of whom will be selected by the Union, shall be appointed to select and monitor such funds as are made available from time to time under the Plan."  Peabody Western Plan Document § 16.6.

70.     The Big Ridge Plan has similar language, noting "the [Peabody Holding] Board shall appoint a Committee consisting of one (1) or more persons who shall serve without remuneration at the pleasure of the Board to select and monitor such funds as are made available from time to time under the Plan."  Big Ridge Plan Document § 15.6.

71.     Further, in a section titled "Delegation of Authority by Employer," both the Peabody Western Plan Document and the Big Ridge Plan Document provide "whenever the Employer [Peabody Holding], under the terms of this Plan, is permitted or required to do or perform any act, it shall be done and performed by any Committee or officer duly authorized by the Board of Directors of the Employer.  If no such Committee or officer has been so authorized, such act shall be done and performed by resolution of the Board of Directors of the Company."  Peabody Western Plan Document § 19.3, Big Ridge Plan Document § 18.3.

72.     Accordingly, the Committee fulfilled this named fiduciary role for each of the Plans.

73.     During the Class Period, each Committee member identified below was a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A)

because each exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

74.     Defendant Crews, who served as Executive Vice President and Chief Financial Officer until his departure in July 2015, was a member of the Committee during the Class Period.

75.     Defendant Fiehler, who served as Executive Vice President, and Chief Administrative Officer of Peabody during the Class Period, and was named Executive Vice President and Chief Administrative Officer in January 2008, served as a member of the Committee during the Class Period.

76.     Defendant Eric Ford ("Ford") served as Executive Vice President – Office of the Chief Executive Officer and Director of Peabody during the Class Period.  Defendant Ford was named Executive Vice President, Office of the Chief Executive Officer in August 2013. Defendant Ford retired from Peabody on January 31, 2014.  Defendant Ford served as a member of the Committee during the Class Period.

77.     Defendant Patrick J. Forkin ("Forkin") serves as Vice President of Strategy and Global Energy Analytics for Peabody.  Defendant Forkin served as a member of the Committee during the Class Period.

78.     Defendant Hawkins served as a member of the Committee during the Class Period.

79.     Defendant Jeane L. Hull ("Hull") served as Executive Vice President and Chief Technical Officer of Peabody during the Class Period.  Defendant Hull was named Executive Vice President and Chief Technical Officer in March 2011.  Defendant Hull served as a member of the Committee during the Class Period.

80.     Defendant Lobb served as a member of the Committee during the Class Period.

81.     Defendant George J. Schuller, Jr. ("Schuller, Jr.") served as a member of the Committee during the Class Period.

82.     Defendant Slentz who served as Executive Vice President, Chief Human Resources Officer for Peabody also served as a member of the Committee during the Class Period.

83.     Defendant Committee, as well as all individual members of the Committee during the Class Period, including, but not limited to Defendants Crews, Fiehler, Ford, Forkin, Hawkins, Hull, Lobb, Schuller, and Slentz, are collectively referred to herein as the "Committee Defendants."

(d)     **Additional "John Doe Defendants"**

84.     To the extent that there are additional Company officers, directors, and employees who were fiduciaries of the Plans during the Class Period, including members of the Committee, the PIC Board, and/or the Peabody Holding Board, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including, but not limited to, Company officers, directors, and employees, who were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLANS

(a)     **Overview of the Plans**

85.     Each of the Plans is a defined contribution plan.  In essence, defined contribution retirement plans confer tax benefits on participating employees to incentivize saving for retirement.

86.     The PIC Plan is for non-represented employees of PIC and certain of its participating subsidiaries and affiliated companies.  *See* PIC Plan 2014 Form 11-K at 4.

87.     The Peabody Western Plan is for employees and former employees of Peabody Western, Big Sky Coal, and Seneca Coal, who are members of the United Mine Workers of America (UMWA) collective bargaining unit covered by the Western Surface Agreement of 2013.  *See* Peabody Western Plan 2014 Form 11-K at 4.

88.     Lastly, the Big Ridge Plan is for employees of Big Ridge who are represented by the United Mine Workers of America under a labor agreement that is effective through December 14, 2014.  *See* Big Ridge Plan 2014 Form 11-K at 4.  As noted above, as of December 31, 2014, the Big Ridge Plan was merged into the PIC Plan, with its assets combined with those of the PIC Plan.  *See* PIC Plan Amendment No. 16, Exhibit 8.

### (b)     Eligibility to Participate in the Plans

89.     The 2014 PIC Plan Document specifies that each participant who was a Participant in the Plan on December 31, 2013, shall continue to be a Participant on January 1, 2014.  2014 PIC Plan Document at § 3.1.

90.     As for new participants, the 2014 PIC Plan Document notes that "on or after January 1, 2014, each Employee not described in Section 3.1 (a prior participant) shall become a Participant hereunder as of his or her date of hire."  2014 PIC Plan Document at § 3.2.  "If a person is not an Employee as of his date of hire, he or she shall not become a Participant until the day he or she becomes an Employee."  *Id.*

91.     Absent an employee affirmatively electing not to participate in the Plan, all employees were automatically enrolled in the PIC Plan approximately 30 days after becoming eligible to participate.  *See* 2013 PIC SPD at 1.

23

92.     The Peabody Western Plan and the Big Ridge Plan Documents have identical language with respect to eligibility of prior participants and new participants in their respective Plans.  Specifically, each person who was a participant on December 31, 2010 for the Peabody Western Plan and June 30, 2007 for the Big Ridge Plan shall continue to be a participant on January 1, 2011.  Peabody Western Plan Document § 3.1, Big Ridge Plan Document § 3.1.

93.     With respect to new participants, both Plans note that provided that the new participant enrolls in the Plan in accordance with the procedures established by the Plan Administrator [Peabody Holding], new employees shall be come a Participant as of his/her date of hire.  Peabody Western Plan Document § 3.2, Big Ridge Plan Document § 3.2.  If a person is not an employee when he/she satisfies these requirements, both Plans provide that he/she shall not become a participant until the day he/she becomes an employee.  Peabody Western Plan Document § 3.1, Big Ridge Plan Document § 3.1.

94.     Both Plans also contain nearly identical language with respect to the establishment of accounts, noting "the Plan Administrator [Peabody Holding] shall establish and maintain for each Participant a Pre-Tax Matched Account, a Pre-Tax Unmatched Account, a Company Pre-Tax Matching Account, and a Rollover Account."   Peabody Western Plan Document § 9.1, Big Ridge Plan Document § 7.1.

95.     The only difference is that the Big Ridge Plan Document also includes a Discretionary Account in the list of accounts the Plan Administrator shall establish and maintain for each Participant in the Big Ridge Plan.  Big Ridge Plan Document § 7.1.

     **(c)**     **<u>Contributions to the Plans</u>**

        **(1)**     **Contributions Under the PIC Plan**

96.    The PIC Plan provides for both participant contributions and matching contributions from PIC, as well as "transition contributions" from PIC, and discretionary "performance contributions" at the direction of the Peabody Board.  *See* PIC Plan 2014 Form 11-K at 5-6.

97.    Each year participants may contribute on a pre-tax, traditional after-tax, or Roth after-tax basis any whole percentage from 1% to 60% of eligible compensation as defined in the Plan.  PIC Plan 2013 Form 11-K at 4.  With respect to matching contributions by PIC, for participants other than those performing services in the Colorado, Wyoming, and New Mexico regions, PIC makes matching contributions equal to 100% of the first 6% of eligible compensation.  *Id.*  PIC Plan participants in the Colorado, Wyoming, and New Mexico regions are eligible for matching contributions by PIC up to 8% of such participant's eligible compensation, adjusted for the participant's age and years of service.  *Id.*

98.    Moreover, the PIC Plan also provides for discretionary "performance contributions" as established by the Peabody Board.  PIC Plan 2014 Form 11-K at 5. Specifically, the Peabody Board establishes desired minimum and maximum performance targets that require PIC to pay a performance contribution between 0% and 6% of eligible compensation into the accounts of active, eligible employees as of the end of the fiscal year, based upon Peabody's financial performance.  *Id.*  If the minimum targets set for a fiscal year are not met, the Peabody Board may authorize PIC to contribute a discretionary amount to the accounts of active, eligible employees.  *Id.*  If the maximum performance targets set for a fiscal year are exceeded, the Peabody Board, at its discretion, may authorize PIC to contribute additional incremental percentages of eligible compensation to the accounts of active, eligible employees. *Id.*

### (2)   Contributions Under the Peabody Western Plan

99.   The Peabody Western Plan provides for both participant contributions and matching contributions from the companies participating in the Peabody Western Plan – Peabody Western, Big Sky Coal, and Seneca Coal.  *See* Peabody Western Plan 2014 Form 11-K at 4.

100.   A participant may elect to have a minimum of 2% and a maximum of 50% of his/her compensation contributed by their employer to the Peabody Western Plan on a pre-tax basis a through payroll deductions.  Peabody Western Plan Document § 4.1(a).

101.   In addition, a participant in the Peabody Western Plan may elect to make an Elective Vacation Deferral of up to the equivalent in cash of 10 personal, floating or graduated days per calendar year to be credited to his/her pre-tax matched account.  *Id.* at § 4.1(b).

102.   The Plan further specifies that the Employer will contribute to the Plan an amount equal to 25% of the amount of each participant's Elective Vacation Deferral under Section 4.1. *Id.* at § 4.4.  *See also* Peabody Western Plan 2014 Form 11-K at 4.

### (3)   Contributions Under the Big Ridge Plan

103.   The Big Ridge Plan provides for both participant contributions and matching contributions from Big Ridge, Inc.  *See* Big Ridge 2014 Form 11-K Plan at 4.

104.   Specifically, a participant may elect to have up to 90% of his/her compensation contributed by the Employer to the Plan on a pre-tax basis through payroll reductions.  Big Ridge Plan Document § 4.1(a).

105.   Further, beginning on or after September 1, 2007, a participant may elect to have the amount of $125, $150, or $175 of his/her WIP Bonus, a discretionary bonus determined under Big Ridge's Wage Incentive Program each month (*see id.* § 2.25) for each month contributed by the Employer to the Plan on a pre-tax basis through payroll reductions. *Id.* at § 4.1(b).

106.   The Plan further provides that the Employer will contribute to the Plan an amount equal to 100% of the amount of the WIP Bonus which his actually contributed to the Plan on behalf of a Participant for each month beginning on or after September 1, 2007 under Section 4.1(b).  Big Ridge Plan Document § 4.4.

107.   Further, the Plan provides for Discretionary Employer Contributions, noting that for each Plan Year, the Employer will contribute to the Plan an amount which shall be determined by a resolution of the Board as a per capita contribution.  *Id.* § 4.5.

**(d)   Vesting of Contributions in the Plans**

108.   Participants in the PIC Plan are vested immediately in their own contributions and the realized and unrealized earnings or losses thereon.  *See* 2014 PIC Plan Document at § 11.2(a).  *See also* PIC Plan 2014 Form 11-K at 4.

109.   Vesting of PIC matching contributions occurs ratably based on years of continuous service (20% per year after one year of service with 100% vesting after five years) as follows:

| Years of Service | Percentage of Account Vested |
| --- | --- |
| Less than 1 | 0% |
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 or more | 100% |

2014 PIC Plan Document at § 11.2(b).

110.   Moreover, a PIC Plan participant's accounts "shall be 100% vested and nonforfeitable upon such participant's death, normal retirement date, or disability retirement date, as defined in the PIC Plan.  *See* 2014 PIC Plan Document at § 11.2(d).  *See also* PIC Plan 2014 Form 11-K at 4.

111.    PIC transition, performance and discretionary contributions, if any, are immediately vested 100%.  *See also* PIC Plan 2014 Form 11-K at 4.

112.    A Peabody Western Plan Participant's Pre-Tax Matched Account, Pre-Tax Unmatched Account, Company Pre-Tax Matching Account, and Rollover Account shall be 100% vested and nonforfeitable at all times.  Peabody Western Plan Document § 12.2.  *See also* Peabody Western Plan 2014 Form 11-K at 5.

113.    With respect to the Big Ridge Plan, pursuant to PIC Plan Amendment No. 16, participants in the Big Ridge Plan became 100% vested and nonforfeitable on December 31, 2014.  *See* PIC Plan Amendment No. 16.

114.    Accordingly, a Big Ridge Plan Participant's Pre-Tax Matched Account, Pre-Tax Unmatched Account, Company Pre-Tax Matching Account, Discretionary Account, and Rollover Account shall be 100% vested and nonforfeitable at all times.   Big Ridge Plan Document § 11.2.  *See also* Big Ridge Plan 2014 Form 11-K at 5.

(e)    **Investments Under the Plans**

115.    The Plans' Participants direct the investments of all contributions into various investment options offered by the Plans.  *See* PIC Plan 2014 Form 11-K at 4; Peabody Western Plan 2014 Form 11-K at 4; Big Ridge Plan 2014 Form 11-K at 4.

116.    One investment option in the PIC Plan is the Peabody Energy Stock Fund which is "an investment fund made available under the Plan" and which "up to 100% of the assets of such fund may be invested and held in Peabody Energy Corporation common stock."  2014 PIC Plan Document at § 2.21.

117.    The Peabody Western Plan and Big Ridge Plan similarly note that "a Participant may direct the investment of his or her accounts in the Peabody Energy Stock Fund made

28

available under this Plan," and that "up to 100% of the assets of the Peabody Energy Stock Fund may be invested and held in Peabody Energy Corporation common stock."  Peabody Western Plan Document § 9.1, Big Ridge Plan Document § 8.1.

118.    Thus, each Plan allows participants to "invest in a selection of mutual funds, a common/collective trust, and the Peabody Energy Stock Fund, which is a participating investment in the Amended and Restated Master Trust Agreement for the Peabody Energy Corporation Stock Fund (the Master Trust)."  *See* PIC Plan 2014 Form 11-K at 4; Peabody Western Plan 2014Form 11-K at 4; Big Ridge Plan 2014 Form 11-K at 4.

**(f)**    **Master Trust**

119.    The Peabody Western Plan Document and Big Ridge Plan Document specify "the Company [Peabody Holding] shall select a Trustee or an insurance company to hold and administer the assets of the Plan and shall enter into a trust agreement or an insurance contract with such Trustee or insurance company."  Peabody Western Plan Document § 15, Big Ridge Plan Document § 14.

120.    The Master Trust was established to hold investments in the Peabody Energy Stock Fund for each of the Plans.  *See* Master Trust Agreement at 1-2.  *See also* PIC Plan 2017 Form 11-K at 7; Peabody Western Plan 2014 Form 11-K at 6; Big Ridge Plan 2014 Form 11-K at 6.

121.    Pursuant to the Master Trust Agreement, the "Master Trustee shall invest and reinvest the Fund primarily in common stock of Peabody Energy Corporation ('Peabody Energy Stock')."  Master Trust Agreement at 3.

122.    "Total investment income (loss) of the Master Trust is allocated to each plan investing in the Master Trust based on the units held in the Master Trust by each plan."  *See* PIC

Plan 2014 Form 11-K at 7; Peabody Western Plan 2014 Form 11-K at 6; Big Ridge Plan 2014 Form 11-K at 6.

### (g)   Peabody Energy Stock Fund

123.    The Peabody Energy Stock Fund is "valued at its unit closing price (comprised of publicly quoted market prices for Peabody Stock held plus uninvested cash position, if any) as reported on the active market on which the security is traded, and is classified within Level 1 of the valuation hierarchy."  PIC Plan 2014 Form 11-K at 9; Peabody Western Plan 2014 Form 11-K at 8; Big Ridge Plan 2014 Form 11-K at 8.

124.    Upon information and belief the three Plans' holdings in the Peabody Energy Stock Fund combine to comprise 100% of the Master Trust.  The PIC Plan comprises between 98% and over 99% of the Master Trust, whereas the Peabody Western Plan and Big Ridge Plan each equal approximately 1% or less of the Master Trust.  *See* PIC Plan 2013 Form 11-K at 12 (noting that the PIC Plan's interest in the Master Trust was 98% in 2012 and 99% in 2013); PIC Plan 2014 Form 11-K at 11 (noting that PIC Plan's interest in the Master Trust was 99% in 2014); Peabody Western Plan 2013 Form 11-K at 11 (noting that the Peabody Western Plan's interest in the Master Trust was 1% for 2012 and less than 1% in 2013); Peabody Western Plan 2014 11-K at 10 (noting that the Peabody Western Plan's interest in the Master Trust was less than 1% in 2014); Big Ridge Plan 2013 Form 11-K at 10 (noting that the Big Ridge Plan's interest in the Master Trust was 1% for 2012 and less than 1% for 2013); Big Ridge Plan 2014 Form 11-K at 9 (noting that the Big Ridge Plan's interest in the Master Trust was -% for 2014).

125.    The value of the Peabody Energy Stock Fund has diminished significantly for each of the Plans during the Class Period as Follows:

### (1)   The PIC Plan

126.    As of December 31, 2012, the PIC Plan had $46,712,000 in the Peabody Energy Stock Fund.  *See* PIC Plan 2013 Form 11-K at 11.  As of December 31, 2013, the PIC Plan had $38,735,000 in the Peabody Energy Stock Fund, a decline by almost $8 million in just one year. *Id.*  Based on the Peabody Stock price of $19.06 as of December 31, 2013, the amount of Peabody shares in the PIC Plan as of year-end 2013 was approximately 2,032,266.53.

127.    On June 24, 2015, the PIC Plan filed its Form 11-K for 2014.  As of December 31, 2014, the value of the PIC Plan's investment in Peabody Stock was $15,382,520.01.  *See* Plan Annual Report (Form 11-K) filed June 24, 2015, at 11.  This means that during 2014 alone the Plan lost a staggering $23,352,479.99, which represents a decline of 60.29% from year-end 2013. Based on the Peabody Stock price of $7.73 as of December 31, 2014, the amount of Peabody shares in the PIC Plan as of year-end 2014 was approximately 1,989,976.72 shares.

128.    Given the October 1, 2015 reverse stock split where every 15 shares of issued and outstanding Peabody Stock was automatically combined into one issued and outstanding share of Peabody Stock, assuming the PIC Plan did not purchase additional shares of Peabody Stock since year-end December 31, 2014, the number of shares of Peabody Stock in the PIC Plan as of March 10, 2016 would be 132,665.12.

129.    Accordingly, the value of Peabody Stock as of the filing of the instant complaint would be roughly $847,730.12 based on the Peabody Stock price of $6.39 as of March 10, 2016. Thus, the Peabody Energy Stock Fund in the PIC Plan is worth just a fraction of its value from the start of the Class Period.

### (2)   The Peabody Western Plan

130.    As of December 31, 2012, the Peabody Western Plan had $360,480 in the Peabody Energy Stock Fund.  *See* Peabody Western Plan 2013 Form 11-K at 10.  As of

December 31, 2013, the Peabody Western Plan had $190,252 in the Peabody Energy Stock Fund, a $169,955 or 47.2% decline in just one year. *Id.* Based on the Peabody Stock price of $19.06 as of December 31, 2013, the amount of Peabody shares in the Peabody Western Plan as of year-end 2013 was approximately 9,981.74.

131. On June 24, 2015, the Peabody Western Plan filed its Form 11-K for 2014. As of December 31, 2014, the value of the Peabody Western Plan's investment in Peabody Stock was approximately $155,378.99. *See* Plan Annual Report (Form 11-K) filed June 24, 2015, at 10. This means that during 2014 alone the Plan lost a $34,874.01, which represents a decline of 18.33% from year-end 2013. Based on the Peabody Stock price of $7.73 as of December 31, 2014, the amount of Peabody shares in the Peabody Western Plan as of year-end 2014 was approximately 20,100.77 shares.

132. Assuming the Peabody Western Plan has not purchased additional shares of Peabody Stock since year-end December 31, 2014, and taking into consideration the October 1, 2015 reverse stock split, the value of Peabody Stock in the Peabody Western Plan as of the filing of the instant complaint would be roughly $8,563 based on the Peabody Stock price of $6.39 as of March 10, 2016 (1,340 shares multiplied by $6.39).

133. Accordingly, the value of the Peabody Energy Stock Fund in the Peabody Western Plan is worth just a fraction of its value from the start of the Class Period.

**(3)     The Big Ridge Plan**

134. As of December 31, 2012, the Big Ridge Plan had $550,001 in the Peabody Energy Stock Fund. *See* Big Ridge Plan 2013 Form 11-K at 9. As of December 31, 2013, the Big Ridge Plan had $194,750 in the Peabody Energy Stock Fund, a decline of $355,251, or 64.5% in just one year. *Id.* Based on the Peabody Stock price of $19.06 as of December 31,

2013, the amount of Peabody shares in the Big Ridge Plan as of year-end 2013 was approximately 10,207.73.

135.    On June 24, 2015, the Big Ridge Plan filed its Form 11-K for 2014.   As of December 31, 2014, the value of the Big Ridge Plan's investment in Peabody Stock was approximately $0, due the Big Ridge Plan's merger with the PIC Plan.  *See* Big Ridge Plan 2014 Form 11-K at 9. However, assuming no additional shares of Peabody Stock were purchased during 2014, the value of Peabody Stock in the Big Ridge Plan at year-end 2014 just prior to the merger would be $78,905.75 based on the Peabody Stock price of $7.73 as of December 31, 2014.

136.    Thus the value of the Peabody Energy Stock Fund in the Big Ridge Plan was worth just a fraction of its value from the start of the Class Period until the Big Ridge Plan merged into the PIC Plan.

## CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this action derivatively on the Plans' behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans, Plaintiffs, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plans at any time between December 14, 2012 and the present (the "Class Period")[12] and whose Plan accounts included investments in the Peabody Stock Fund.

---

[12] Plaintiffs reserve their right to modify the Class Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which Peabody Stock was an imprudent investment option for the Plan.  Notwithstanding the apparent attempt to eliminate Company Stock as an investment option from the Plans on or around March 16, 2016, as of the filing of the instant complaint Company Stock remains a Plan investment option.

138.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds of employees of the Plans who participated in, or were beneficiaries of, the Plans during the Class Period and whose Plan accounts included investment in Peabody Stock.

139.    For example, in 2012, there were 6,763 participants in the PIC Plan.  *See* 2012 PIC Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.  In 2013, the number of participants in the PIC Plan was 6,626.  *See* 2013 PIC Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.

140.    In 2012, there were 363 participants in the Peabody Western Plan.  *See* 2012 Peabody Western Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.  In 2013, there were 358 participants in the Peabody Western Plan.  *See* 2013 Peabody Western Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.

141.    Lastly, in 2012, there were 540 participants in the Big Ridge Plan.  *See* 2012 Big Ridge Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.  In 2013, there were 476 participants in the Big Ridge Plan.  *See* 2013 Big Ridge Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.  As noted above, effective December 31, 2014, the Big Ridge Plan was merged into the PIC Plan.  *See* PIC Plan Amendment No. 16, Exhibit 8.

142.    At least one common question of law or fact exists as to Plaintiffs and all members of the Class.  Indeed, multiple questions of law and fact common to the Class exist, including, but not limited to:

(a)    whether Defendants each owed a fiduciary duty to the Plans, Plaintiffs, and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plans, Plaintiffs, and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' Participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans, Plaintiffs, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

143.    Plaintiffs' claims are typical of the claims of the members of the Class because the Plans, Plaintiffs, and the other members of the Class each sustained damages arising out of Defendants' uniform wrongful conduct in violation of ERISA as complained of herein.

144.    Plaintiffs will fairly and adequately protect the interests of the Plans and members of the Class because they have no interests antagonistic to or in conflict with those of the Plans or the Class.  In addition, Plaintiffs have retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

145.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

146.    Class action status is also warranted under Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

147.    There were several red flags leading up to the start of the Class Period that alerted or should have alerted the Plans' fiduciaries that Company Stock had become an imprudent Plan investment option for two independent reasons:  (1) based on publicly available information, the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment; and (2) Peabody Stock was artificially inflated during the Class Period.  With regard to the "public information claim," there were special circumstances that existed during the Class Period that made it imprudent for the Plans' fiduciaries to rely on the market price of Peabody Stock.

148.    As explained below, under either basis, the Class Period begins no later than December 14, 2012.  From the start of the Class Period until the present, the Plans' fiduciaries have failed to cure their fiduciary breaches because, upon information and belief, Peabody Stock remains an investment option under the Plans and the fiduciaries have not frozen the Peabody Energy Stock Fund, or taken any other action, consistent with ERISA and the federal securities laws, to prevent the Plans and its Participants from investing any more money in imprudent Peabody Stock.

**Peabody Stock Was an Imprudent Investment During the Class Period Due to the Company's Changed Circumstances**

**Overview of Peabody**

149.    The company that would become Peabody began in 1883, but did not formally incorporate until 1998.  It became a public company in 2001 though an initial public offering.  *See* 2014 10-K, at 2.  Peabody owns both mines and mining operations in the United States and Australia.  The Company also "market[s] and broker[s] coal from other coal producers, both as principal and agent, and trade[s] coal and freight-related contracts."  *Id.*

150.    Peabody's IPO in 2001 capitalized on two major factors:  (1) a new energy plan by then President George W. Bush which called for increased coal production and (2) soaring coal prices in the previous six month period.  *See Peabody raises $420 mln in IPO, more than expected*, Reuters, May 21, 2001; *see also Peabody Energy IPO Spotlights Resurgent Coal*, Pittsburgh Post-Gazette, May 23, 2001.  Other factors helping Peabody's value that first year included limited coal supplies and "limited flexibility for producers to increase production quickly," which supported higher coal prices, as well as low inventories at utilities.  *See Research Alert – JP Morgan starts Peabody as a buy*, Reuters, July 13, 2001.

Peabody's success is thus heavily reliant on high coal prices and strong demand for coal.  Based on this criteria, the last several years have been disastrous for Peabody specifically, and the coal industry in general, with no respite in the foreseeable future.  Summed up, "[p]rices have been sliding, political opposition growing and demand dropping."  *See Coal Mining, In the Depths*, The Economist, Mar. 28, 2015 at 65.

151.    The Dow Jones Total Coal Market index for the past five years, through March 2016, has fallen nearly **95%.**  *See http://www.google.com/finance?cid=4931635*.

152.    Worldwide, "the tide is turning against coal."  *See Coal Mining, In the Depths*, The Economist, Mar. 28, 2015 at 65.  In America, coal use peaked in 2007.  *Id.*  One of the reasons is that in the United States, "coal now struggles to compete with natural gas, which has

fallen 80% in price since 2008." *Id.* Other coal industry experts have similarly opined that "the industry faces something historic – persistently low natural gas prices – a reality that caps the level of potential price improvement in U.S. coal markets." *See Weak 2014 Numbers Worsen An Already Bad Outlook For Coal Companies*, Institute for Energy Economics and Financial Analysis ("IEEFA"), Feb. 2, 2015 at 1, available at http://ieefa.org/weak-2014-numbers-worsen-already-bad-outlook-coal-companies/.

153.    This downturn for the coal industry is not simply a temporary blip. "The fear now is of a structural shift" in which coal is phased out. *Coal Mining, In the Depths*, The Economist, Mar. 28, 2015 at 65. The Economist predicts "new coal-mining investments would risk becoming stranded assets, and older deep mines would be even more uneconomic than now." *Id.* According to the Economist, "Carbon Tracker, a non-profit group, reckons that more than $100 billion worth of planned capital spending risks being stranded by 2035. A prospect as black as a miner's lungs." *Id.*

154.    The fact is that the "U.S. coal industry has decoupled from the broader, gradually recovering economy and its spiral has deepened." *See Weak 2014 Numbers Worsen An Already Bad Outlook For Coal Companies*, Institute for Energy Economics and Financial Analysis, Feb. 2, 2015 at 1, available at http://ieefa.org/weak-2014-numbers-worsen-already-bad-outlook-coal-companies/. It appears that "more pragmatic leaders and champions of the industry acknowledge the severity of its financial conditions, and have conceded a reality that is more in line with analysts who see weak prices through 2015 – and then little upside potential thereafter." *Id.*

155.    Predictably, the severe and historic downturn of the coal industry has devastated Peabody's financials. For full-year 2015, Peabody reported a staggering net income loss of *$2*

**billion dollars**; for 2014, Peabody reported a net income loss of $777,300,000; for full-year 2013, it reported a net income loss of $512,600,000, and for full-year 2012, it reported a net income loss of $575,100,000.

156.     The Company's financial condition, when viewed through the lens of objective financial metrics, plainly indicates the Company's deterioration over the last several years.  Not surprisingly, the Company's stock price reflects the struggling company's condition.  The price of Peabody Stock reached its highest peak on June 1, 2008 at $88.05 per share ($1,320.75 split-adjusted).  The next highest peak was $71.96 per share ($1,079.40 split-adjusted) on March 1, 2011.  The Company has seen its share price steadily decline ever since.  As one observer noted about Peabody after it posted a new 52-week low of $3.86 on May 18, 2015, "The company had no news today, and it's still mining coal which is no way to please investors these days."  Paul Ausick, The 52-Weel Low Club for Monday, May 18, 2015, available at: http://247wallst.com/investing/2015/05/18/the-52-week-low-club-for-monday-35/.     That was nearly a year ago.  Since then, the Company Stock has continued to collapse now trading at a split-adjusted $6.39.  A decline of over 98%.

157.     In light of the Company's diminished financial prospects, resulting in a dramatic shift in the Company's basic risk profile, the Peabody Energy Stock Fund was not a prudent Plan investment option during the Class Period.  The Plans' fiduciaries knew or should have known this fact and should have taken steps to protect the Plans and their Participants.  Sadly though, as set forth below, the Defendant-fiduciaries did nothing while the retirement savings of the Plans' Participants simply evaporated as a result of these inactions.

### The Colossal Collapse of the Coal Industry

158.     Modern coal use around the world is largely divided into two types: thermal coal, used for the production of electric power generation whether by power plants or industries

producing and consuming their own power, and metallurgical coal, which is used by industries in the production of other materials, such as iron and steel. *See The Coal Facts: thermal coal vs. metallurgical coal*, Global News, June 10, 2013, available at http://globalnews.ca/news/627069/the-coal-facts-thermal-coal-vs-metallurgical-coal/.

159.    Beginning in 2007, certain obstacles to the U.S. coal industry's continued growth started to become apparent. In that year, coal plants had severely slowed production, reducing their use from between 50 and 80% capacity on average to less than 30% on average. This is in addition to the number of coal plants which either had or were scheduled to be completely retired. *See Bank of America and Citigroup Biggest Lenders to Coal*, Bloomberg Business, Apr. 29, 2013, available at http://www.bloomberg.com/news/articles/2013-04-29/bank-of-america-and-citigroup-biggest-lenders-to-coal.

160.    By the end of 2007, in addition to increased pressure from the natural gas market as a competitor to thermal coal, regulatory uncertainty about increased emissions standards had "stalled plans for many new coal plant builds," needed to replace aging plants which were due to be retired. *See Fitch: Regulatory Challenges and Beneficial Fundamentals for U.S. Coal Industry*, Business Wire, Dec. 19, 2007 at 1. While U.S. electric consumption was growing, certain coal-plants were aging and due for retirement, and industry uses and exports were expected to remain flat. "As a result, the US coal industry's fortunes are inextricably linked with the development of new U.S. coal-fired plants." *See Uphill struggle for new US coal plant*, Platts Energy Economist, Aug. 1, 2008 at 1.

161.    In 2008, the Dow Jones U.S. Coal Index hit a high of 700. This was driven in large part by strong demand for metallurgical coal in the developing world, including China and India. As a result, a number of coal companies whose core business was thermal coal acquired

metallurgical coal companies in an attempt to diversify via debt-heavy deals.  *See Are coal stocks ready to make a comeback?*, CNBC, Jul. 9, 2014, available at http://www.cnbc.com/id/101816298.  The 2008 high is in stark contrast to today's Dow Jones U.S. Coal Index which stands just under 30 as of March 11, 2016.

162.    By 2012, there was a marked decline in U.S. coal demand.  In April 2012, Moody's forecast "permanent shifts" in the energy sector, as "depressed natural gas prices continue to put pressure on the goal generation sector."  *See Moody's foresees permanent shifts in energy sector over next decade*, SNL Power Week (Canada), Apr. 9, 2012 at 1.

163.    On June 25, 2012, the U.S. Energy Information Administration ("EIA") predicted continuing U.S. coal production declines through 2015.  *See Annual Energy Outlook 2012*, U.S. Energy Information Administration, Jun. 25, 2012 at 98.  Long term, the outlook for coal was similarly poor:

> Over the next 25 years, the share of electricity generation from coal falls to 38 percent, well below the 48-percent share seen as recently as 2008, due to slow growth in electricity demand, increased competition from natural gas and renewable generation, and the need to comply with new environmental regulations.

*Id.* at 4.

164.    On July 13, 2012, the EIA released the results of a study about competition between coal, natural gas and petroleum in the energy generation sector which clearly showed the decline of coal as a fuel for energy production in the face of natural gas competition.  Noting that coal's share of power generation historically "varied in response to changes in the cost and availability of competing fuels," the EIA cited the lower cost of natural gas as well as a 96% growth of natural gas generating capacity between 2002 and 2012 as key factors in coal's declining use as illustrated by this chart:

41



*See Competition among fuels for power generation driven by changes in fuel prices*, EIA, July 13, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7090.

165.   In late July 2012, the EIA announced that plant owners and operators were planning to retire 8.5% of the total 2011 coal-fired plant capacity.  *See 27 gigawatts of coal-fired capacity to retire over next five years*, EIA, July 27, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7290.   This was more than four times the number of retirements of the preceding five year period:



*Id.*

166.    The EIA also predicted that coal would not recapture its 45% share of the power generation market over the next 25 years.  *See Fuel used in electricity generation is projected to shift over the next 25 years*, EIA, July 30, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7310.  In fact, coal's share of power generation, already historically low, was predicted fall to fall 38% over the next quarter century.  *Id*.

167.    In keeping with projections, in August 2012, the EIA released the results of a survey of new electric capacity additions by fuel source, showing that new coal-plants were being far outpaced by natural gas and wind-plants:

43



*See Natural gas, renewables dominate electric capacity additions in the first half of 2012*, EIA, Aug. 20, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7610.

168.   By September 2012, Moody's had already seen that any growth in exports for the U.S. coal industry would be insufficient to offset domestic declines.  *See Moody's: Growing export opportunities for US coal industry insufficient to offset domestic declines*, Moody's Investors Service, Sep. 14, 2012 at 1.  The industry "is going through a long-term shift in market fundamentals, pressured by abundant, cheap natural gas and ever-stringent environmental regulations, and has shrunk coal's share of the US power market by over 10% in the last four years." *Id*.

169.   The situation was clear by the fall of 2012:

> Once mighty, the US coal industry's domestic market appears to be in **terminal decline**.  New power generation is made up almost entirely of natural gas plant or renewable energy sources.   Old coal plant closures as being hastened by environmental regulation.  In the face of shale gas, coal no longer seems cheap. On a variety of fronts, coal has been left standing on the starting line, outpaced by innovation in other sectors of the energy world.

*See US Coal in decline*, Platts Energy Economist, Oct. 1, 2012 at 1 (emphasis added).

170.   Coal exports to Canada were also expected to continue their decline, begun in 2007, as depicted in the below chart:



*See Canada Week: Canada is a declining market for U.S. coal*, EIA, Nov. 29, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=8970.  This was the result of Canadian policies aimed at reducing coal-fired electric generation as contributors of greenhouse gases.  *Id.*

171.   Long-term prospects for exports to Europe were also dim.  With nearly half of U.S. exports headed to European coal-fired power plants, Laszlo Varro, head of gas, coal and power markets for the IEA stated that, "regulations in Europe will eventually lead to a substantial decommissioning of coal-fired generation capacity outside of Germany, similar to what is happening in the U.S. now."  *See IEA head: European coal renaissance 'not going to be permanent'*, SNL Daily Gas Report, Jan. 28, 2013 at 1.  Varro also expressed doubt that the U.S. industry would be a strong competitor for Chinese and Indian markets, with Indonesia being a closer low-cost supplier and China improving its railroad infrastructure to move coal from its own mines to power plants.  *Id.* at 2.

**Well Before the Start of the Class Period, Numerous Red Flags Warned of the Imprudence of Peabody Stock as an Investment Option for the Plans**

172.     In addition to the above objective indicia that the coal industry was undergoing a historic downturn that would last for the foreseeable future, other objective factors demonstrated the imprudence of investing retirement savings in Peabody Stock.

173.     The Company itself acknowledged that the outlook for 2012 was not good, with Peabody forecasting a weak outlook in the first quarter of the new year, citing construction issues, flat U.S. demand, and investments and upgrades a number of mines.   As a result, "Peabody shares lost more than 4 percent or more than average volume." *See Peabody Q4 Profit Up, Details Weak Outlook; Stock Down – Update*, RTT News, Jan. 24, 2012.   The stock was down 37% over the past year, over declining optimism as prices fell on weakened demand related to competing, lower-cost natural gas and utility customers allow their stockpiles of coal to deplete somewhat before purchasing more.  *See Market Talk: Miss At Peabody Energy Pressures Shares Anew*, Dow Jones News Service, Jan. 24, 2012.

174.     In March 2012, Peabody shares fell 5% after a mining rival, BHP Billiton said it expects weaker demand from China.  On March 20, 2012, Peabody was the ***worst-performing*** stock in the S&P 500 index for the day.  *See Peabody Energy: S&P Intraday Laggard*, TheStreet.com, Mar. 20, 2012 (emphasis added).   Peabody also announced that storms and flooding in Australia were affecting its operations, as port and rail movements were halted, "curtailing production and restricting access to underground operations." *Queensland flooding to drag Peabody Q1'12 earnings to low end of guidance*, SNL Daily Coal Report, Mar. 26, 2012. With more than half of its consolidated earnings coming from Australian operations, this was a significant blow to Peabody.  *Id*.  On March 26, the adjusted close share price for Peabody Stock was $28.89.

175.    On April 19, 2012, Peabody announced that its first quarter profits "slipped on weaker U.S. coal demand for electricity generation because of a mild winter and utility switchovers to cheaper natural gas," and that it was cutting production for the year. *Coal miner Peabody 1Q earnings slip*, The Associated Press State & Local Wire, Apr. 19, 2012. April also saw the news of coal-fire power plant projects being cancelled or put on hold indefinitely in response to tightening emissions standards and public outcry. *See Challenges Face U.S. Coal-Fired Power Plant Projects, an Industrial Info News Alert*, Marketwire, Apr. 25, 2012.

176.    Probably the most eye-popping red flag was the incredible wave of bankruptcy filings by U.S. coal producers that began in 2012 and continued into 2013, in the wake of calls that 2013 would see "trough" pricing of coal. *See Bankruptcy filings by US coal companies accelerate as markets flounder*, SNL Daily Coal Report, Mar. 1, 2013 at 1. Facing slower economic growth in countries such as China, thus decreasing demand for metallurgical coal, and competition from shale gas and stricter environmental regulations hitting thermal coal, the downturn appeared "more chronic" rather than cyclical. *Id.* Coal-fire plants, too costly to retrofit with better pollution control technology in the face of cheap natural gas, were forced to close, which lead to lower demand for coal especially from Central Appalachian producers. The largest company to file was Patriot Coal Corporation ("Patriot Coal") on July 9, 2012, with assets of nearly $4 billion. *Id.*

177.    Patriot Coal's bankruptcy is of particular relevance to the Defendants' breach of fiduciary duty to the Plans and their Participants. In 2007, Peabody spun off Patriot Coal giving the new company Peabody's Appalachian mines and operations. *See Was Patriot Coal Doomed to Fail?*, SNL Daily Coal Report, July 24, 2012.

178.    Like Peabody, Patriot Coal sponsored a defined contribution plan.  Prior to June 28, 2012, the Patriot Coal plan invested in common stock of Patriot Coal through the Patriot Coal Stock Fund.  The Patriot Coal plan fiduciaries, who were operating under a similar backdrop of dire circumstances as Defendant-fiduciaries were and are today, appointed an independent fiduciary on June 21, 2012 (prior to filing for bankruptcy) to oversee the Patriot Coal Stock Fund.  *See* Patriot Coal 2012 Form 5500, Notes to Financial Statements For the Years Ended December 31, 2012 and 2011 at 7.  Upon information and belief, the Defendant-fiduciaries have not even taken such a minimal step toward protecting the Plans and their Participants.

179.    Significantly, "[b]ased on a number of considerations, the independent fiduciary determined that it was in the best interest of Plan participants and beneficiaries to stop purchasing Patriot Coal Stock under the Plan and to sell all shares of Patriot Coal held in the Patriot Coal Stock Fund.  On June 28, 2012, all of the shares were sold and participants can no longer invest in Patriot Coal Stock through the Plan."  *See* Patriot Coal 2012 Form 5500, Notes to Financial Statements For the Years Ended December 31, 2012 and 2011 at 7.

180.    The action taken by the Patriot Coal plan fiduciaries along with the numerous other bankruptcy filings by coal companies should have alerted the Defendant-fiduciaries to take steps to protect the assets of the Plans and their Participants invested in the Peabody Energy Stock Fund.

181.    In late July 2012, Peabody announced that its second quarter 2012 income had fallen 29 percent from second quarter 2011, with its revenue nearly flat.  *See Peabody Q2 profit falls 29 percent*, St. Louis Business Journal, July 24, 2012.  This result came from both lower realized prices and higher costs from its Australian operations.  Peabody also reported lower ships due to production cutbacks made in response to lower market demand.  *Id*.  Peabody then

cut production and earnings forecasts for the remainder of the year, calling for up to $100 million in lower net income for the third quarter. *Peabody warns of coal cuts: Falling Prices, Rising Costs and Carbon Tax Spell Trouble*, The Australian, July 26, 2012. Thermal coal prices had slumped about 30 percent in the past year, "because of increased coal experts from the US as low-priced shale gas is favored by power stations, unexpectedly low demand from China and India, and more exports from Indonesia." *Id.*

182.    On August 3, 2012, Peabody reported its financial results for the second quarter of 2012, ending June 30, 2012.   For the 6 months ended June 30, the Company's net income decreased $84.8 million from 2011 to 2012, falling from $470.9 million to $386.1 million.  *Id.* Adjusted EBITDA[13] also showed declines in the production and sale segments, dropping 15.7% from the comparable quarter of 2011 to 2012, mostly attributable to the 39.4% decrease in the Australian Mining segment, a decline of $156.1 million.  *Id.* at 45.

183.    Poor coal demand forced Peabody to shut the Air Quality Mine in Vincennes, Indiana in September 2012.  Peabody spokeswoman Beth Sutton said, "We expect U.S. coal to decline as much as 100 million tons or more this year, primarily due to gas switching." *Peabody Energy to close mine*, Evansville Courier & Press, Sept. 6, 2012.  Shortly thereafter, in November 2012, Peabody subsidiary Big Ridge Inc. announced the permanent closure of the Willow Lake Mine in southern Illinois following the death of a worker who was trapped by a machine.  Big Ridge cited "fail[ure] to meet acceptable standards for safety, compliance and operating performance," as factors in the closure.  *See Peabody to close willow Lake Mine, lay*

---

[13] EBITDA, a common accounting term, is Earnings Before Income Tax, Depreciation and Amortization. Adjusted EBITDA is defined by Peabody as "income from continuing operations before deducting net interest expense, income taxes, asset retirement obligation expense and depreciation, depletion and amortization." *See* February 27, 2012 Form 10-K at F-61.  The Company further reports that the "chief operating decision maker uses Adjusted EBITDA as the primary measure of segment profit and loss." *Id.*

*off 400 workers*, St. Louis Business Journal, Nov. 27, 2012.  The Willow Lake Mine had a previous fatality in July 2010, and had been cited repeatedly for safety violations.  The mine closure resulted in a onetime charge to the fourth quarter results of $40 to $60 million.  *Id.*

184.   On November 7, 2012, Peabody reported its financial results for the third quarter of 2012, ending September 30, 2012.  As reported therein, the Company's net income had declined 80% from the previous quarter.  *See* Nov. 7, 2012 Form 10-Q at 1.  Indeed, for the first three quarters ended September 30, the Company's net income declined 43.2%, from 2011 to 2012.  *Id.*  The Australian Mining segment was a significant contributor to the Company's declines.

185.   In a December 14, 2012 press release, the Company provided news of what lay ahead for the Company in the first quarter of 2013.  Among other things, the Company warned of "lower realized metallurgical coal pricing compared with the fourth quarter of 2012."  *See Peabody Energy Provides Comments Regarding First Quarter 2013 Outlook*, PR Newswire, Dec. 14, 2012.  Further, the Company stated it expected to be impacted by "an increase in Australian unit costs," "a decline of approximately 2 million tons in U.S. sales based on market-related demand, as well as decrease of approximately 5 percent in average realized pricing due to the expiration of higher-priced contracts," and "higher depreciation, depletion and amortization expenses as recently completed capital projects fully begin operations and production increases from higher-cost reserves acquired in recent years."  *Id.*

186.   Shares dropped 2.2% on the news, and 18% over the course of the year.  *See Peabody Warns on 2013 Sales, Capex; Cites High Costs, Lower Prices*, Dow Jones Factiva Newswires, Dec. 14, 2012.

**What Defendants Should Have Done As of December 14, 2012**

187.   The Class Period begins on December 14, 2012 because by the time of this announcement a plethora of red flags, including the action taken by the Patriot Coal plan fiduciaries, indicated that given the deteriorating financial condition of the Company and the coal industry, Peabody Stock was not a prudent investment option for retirement savings.[14] Additionally, the Company itself was predicting that the future financial prospects for the Company was not promising.  On this day, the Company Stock was trading at $25.56, which was **71% below** the all time high of $88.05 on June 1, 2008 when coal prices were at their peak. Further, $25.56 was the Class Period high for the Company Stock price.

188.   At this point in time, that is, on December 14, 2012, it was patently clear, or should have been clear, to the Plans' fiduciaries, that a permanent structural shift in the only true business segment that comprised Peabody's business, *i.e.*, coal, was irreparably compromised for the foreseeable future given, *inter alia*, the depressed prices of coal prices and drastically reduced demand for coal over the last several years.   Because of these and other factors delineated above, by December 14, 2012, the basic risk profile and future business prospects of Peabody had so dramatically changed, that continued deterioration of the price of Peabody Stock was inevitable, making Peabody Stock an imprudent Plan investment option.

189.   Trust law states that "if the trustee holds property which when acquired by him was a proper investment, but which thereafter becomes an investment which would not be a proper investment for the trustee to make, it becomes the duty of the trustee to the beneficiary to dispose of the property within a ***reasonable time***."  *See* Restatement (Second) of Trusts § 231

---

[14] Plaintiffs reserve their right to modify the Class Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which Peabody Stock constituted an imprudent investment option for the Plans.

(1959) (emphasis added).  Given what was at least known publicly to the Plans' fiduciaries, including the Investment Committee, by December 14, 2012, these fiduciaries should have taken action to protect the Plans and its Participants.

190.    Because Defendants could and should have concluded that Peabody Stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation and or transfer of the Plans' holdings of Peabody Stock.

191.    A prime example of a Company eventually doing exactly what Defendants should have done occurred recently when struggling coal company Arch Coal, Inc.'s ("Arch") analogous 401(k) plan, after its stock price had fallen approximately by 99% in 3 years, liquidated its holding of company stock without any discernible ripple effects in the market.  In particular, on or after November 12, 2015, Arch's 401(k) plan filed a Form 144 with the Securities and Exchange Commission indicating that the retirement plan's investment in Arch stock had been forcibly liquidated.  Plaintiffs understand that the proceeds thereof were placed into the plan's default investment fund, which was the target date fund associated with each participant's estimated retirement date.  Plaintiffs do not allege that Arch's timing was proper, but only that the procedure that it used was available to Defendants herein.  Arch Coal subsequently filed for bankruptcy on January 11, 2016.

192.    Peabody appears to be following the example of Arch Coal.  As noted above, it hired an independent fiduciary for the Peabody Stock Fund in December 2015 and as of March 9, 2016, investments in the Peabody Stock Fund have been frozen with an expected liquidation date of March 16, 2016.  This action is far too late to have any meaningful impact for the Plans and their Participants because the Plans' holdings in Peabody Stock has been decimated by over

98%.  Any action taken by the independent fiduciary was available to the Plans' Defendant-fiduciaries by the start of the Class Period.

193.    Additionally, by the start of the Class Period, Defendants had several options available to them.  Defendants could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for Peabody Stock as they belatedly did in December 2015.

194.    Post-December 14, 2012, Peabody Stock continued and continues to be imprudent due to the Company's changed circumstances.

195.    Just a few short weeks after its December 14, 2012 press release, Peabody announced that it had a loss of *$1.01 billion* in the fourth quarter of 2012, both from write downs and losses from continuing operations.  *See Peabody Energy Swings to 4th-Quarter Loss on Write-Downs*, Dow Jones Factiva Newswires, Jan. 29, 2013.  The write-downs for Australian operations and non-core assets accounted for $884 million, amid the significant price declines in coal including the 50% drop in global metallurgical coal prices since its high in 2011.  *See Peabody writes down $884 million in Australian and non-core assets*, Platts Coal Outlook, Feb. 4, 2013.  Approximately $357 million of the write-downs in Australia were related to the Macarthur acquisition.  *Id*.  Peabody CEO Defendant Boyce also stated that U.S. coal exports for the industry could drop by 30 million short tons, with two thirds of the decrease attributable to metallurgical coal.  *Id*.

196.    The Company reported a net loss of $575.1 million for the year.  *See* Dec. 31, 2012 Annual Report, Form 10-K at 41.

**2013 Was a New Year But the Same Old Story for Peabody**

197.    Peabody reported a net loss of $19.4 million for the first quarter of 2013, compared to $178.3 million net income for the same quarter of 2012, a decline of 110.9%.  *See* May 8, 2013 Form 10-Q at 1.  Adjusted EBITDA for the sale and production segments declined 39.2% compared to the first quarter of 2012, decreasing from $639.9 million to $389.2 million in 2013.  Australian Mining itself declined 66% percent, from $295.6 million to $100.4 million, while Western U.S. Mining declined 22.5%, from $207 million in 2012 to $160.5 million in 2013.  *Id*. at 43.  Peabody's D/E Ratio decreased incrementally to 1.262.

198.    On April 15, 2013, Peabody shares fell 7%, to $19.26 a share, on the news of a predicted slowdown in Chinese growth which could lead to weaker coal demand.  *See Coal shares tumble on concerns of dropping demand in China*, St. Louis Business Journal, Apr. 15, 2013.

199.    Analysts continued to forecast bleak conditions for the coal industry stating that "Weak economic conditions in Europe, slower growth in Asia and readily available supply across the globe are impacting the international markets for both thermal coal and metallurgical coal."  *Get ready for drop in US coal exports, industry official say*, SNL Daily Coal Report, Apr. 29, 2013.  Citigroup Global Markets Inc. in particular predicted that 2013 would see price declines in almost all commodities, including thermal coal.  *Id*.  Domestic thermal coal prices were also expected to fall, particularly in the Illinois Basin where Peabody has significant operations.  *See Illinois Basin producers could be looking at some slipping prices*, The U.S. Coal Review, Apr. 29, 2013.

200.    In June 2013, Peabody announced plans to cut 450 contractor jobs at its Australian mines for both thermal and metallurgical coal.  *See Peabody to cut 450 jobs at Australian coal mines*, St. Louis Business Journal, Jun. 25, 2013.  Reuters reported that thermal coal prices had dropped 30 percent in the last two years, while metallurgical coal prices had fallen 40 percent in just the last year.  *Id.*  In fact, coal saw its biggest quarterly decline in prices in a year, falling 7.5 percent.  *See Coal hit by year's worst quarter*, St. Louis Business Review, Jun. 26, 2103.

201.    At the end of July 2013, Peabody announced its net income had dropped again for the second quarter of 2013, with revenue falling 12.9 percent compared to the same period in the previous year driven by lower pricing from mining operations and lower trading and brokerage results.  *See Peabody Q2 profit drops 58 percent*, St. Louis Business Journal, July 23, 2013.  Prices were impacted by higher supplies from Indonesia and Australia, and the U.S. and China both cutting production.  *Id.*  Peabody also announced plans to eliminate 170 permanent jobs in Australia, about 5.7 percent of its workforce, in addition to the 230 vacancies it did not plan to fill in a cost-tightening measure.  *See Peabody cutting 170 jobs in Australia*, St. Louis Business Journal, July 23, 2013.

202.    Peabody had a net loss of $19.1 million for the three months ended September 30, 2013.  *See* Nov. 8, 2013 Form 10-Q at 1.

203.    In October 2013, another alarm sounded for the U.S. coal industry, with the release of a study noting that most of the coal estimated to exist in the U.S. is "buried too deeply," or was otherwise too unprofitable to extract, and thus unlikely to be mined.  Speaking for the Institute for Energy Economics and Financial Analysis ("IEEFA"), Tom Sanzillo stated that the country will undergo a shift in its energy mix, leading to an industry that would "be

smaller with less producers, fewer mines and higher prices." *See New reports say US has reached 'peak coal'*, SNL Daily Coal Report, Oct. 31, 2013.

204.    On December 9, 2013, Peabody announced the closure of the Wilkie Creek mine, affecting 200 employees and contractors. *See Peabody Energy closes Australian mines it had tried to sell*, St. Louis Business Journal, Dec. 9, 2013. The job losses were in addition to the 70 employees that had already lost their jobs in September, as well as the 620 jobs it had already cut in Australia during the summer. *Id.* Charges for closing the mine, including potential contractual liabilities and reclamation and rehabilitation of the mine, were expected to cost between $115 million and $130 million. *See Closing mine in Australia to cost Peabody up to $130 million,* St. Louis Business Journal, Dec. 12, 2013.[15]

205.    There were other mine closures, including a domestic mine in Indiana affecting 70 jobs. *See Area Mine closing: Viking Mine to shut down soon*, The Washington Times-Herald, Dec. 18, 2013. Local business officials predicted more mine closings in the area, citing higher regulatory standards. *Id*.

206.    Peabody suffered a net loss of $512.6 million for all of 2013, the second year of net income loss of at least half a billion dollars. *See* February 21, 2014 Annual Report Form 10-K at 43. Every sale and production business segment recorded a year-to-year decline in Adjusted EBITDA, falling nearly a billion dollars, or 38.9%. Australian Mining continued its poor performance, declining 66.3% or $622.3 million from year-end 2012. *Id*. at 48.

---

[15] Peabody eventually found a buyer for the Wilkie Creek mine, inking a deal in May 2014 to sell the property to Bentley Resources for $70 million in cash, as well as the assumption of transportation obligations and other liabilities, a far cry from its initial $500 million asking price in 2012. *See Peabody Energy Enters Into Agreement With Bentley Resources To Sell Wilkie Creek Mine In Australia*, PR Newswire, May 13, 2014.

**The Company's Struggles Continued and the Losses Mounted Throughout 2014**

207.    In the first half of 2014, Citigroup published three reports which reiterated the major structural decline in the coal industry caused by new, stricter emission standards, increasing competition by renewable energy sources and limited feasibility in opening new coal plants in the wake of older plant retirement.  "In short, Citigroup says, the evolution in electricity markets is being driven by a combination of regulatory and technology changes."  *See Beginning of the end for coal?  Citi sees structural decline*, Renew Economy, May 15, 2014, available at http://reneweconomy.com.au/2014/beginning-end-coal-citi-sees-structural-decline-30396.

208.    On April 9, 2014, the Wall Street Journal published an interview with Defendant Boyce, who extolled the benefits of coal as a fuel source, particularly for those who live in poverty.  *See In Defense of Coal: Peabody Energy's CEO on with it isn't going away*, WSJ, Apr. 9, 2014.  Interestingly, Boyce called for "a balanced portfolio of energy – we need solar, wind, renewables, gas, coal.  The only way to reduce risk in these energy portfolios is to make sure we're using all forms of energy."  *Id*.  The irony is that Defendant Boyce implicitly acknowledged the high risk profile of the Company because of its **sole** reliance on coal.

209.    On May 12, 2014, Peabody reported its financial results for the first quarter of 2014, ending March 31, 2014.  As reported therein, the Company lost $44.1 million for the three months ended March 31, 2014.  *See* May 12, 2014 Form 10-Q at 1.  This is almost two and half times the already significant loss posted for the same quarter in 2013.  *Id*.  The Australian Mining segment continued its precipitous decline, posting only $1.8 million in Adjusted EBITDA, compared to $100.4 million for the first quarter of 2013, a startling 98.2% decrease.  *Id*. at 32.  The Company's D/E ratio decreased slightly to 1.510.

210.    May brought more bad news for the coal industry, at least from Peabody's perspective.  In May 2014, IEEFA noted that there was a global shrink in the demand for thermal coal.   Increasing Chinese coal production would further limit the ability of American and Australian mines to offset shrinking domestic use through exports, as well as China's own environmental initiatives and move to more efficient energy generation.  *See Briefing Note: Thermal Coal Outlook*, May 15, 2014 at 6, available at http://ieefa.org/thermal-coal-outlook-may2014/. United States thermal coal capacity would continue to fall, with newer natural gas and solar power plants vastly outnumbering new coal plant additions.  *Id*. at 6-7.  Further, Europe and Japan were increasingly relying on stronger output from renewable energy sources, including off-shore wind farms and new solar power capacities.  *Id*. at  7-8.

211.    In June 2014, the Environmental Protection Agency ("EPA") announced new regulations for curbing carbon dioxide emissions from power plants, with major implications for both power plants and their suppliers.  *See Carbon rules loom large for coal-heavy Missouri, Illinois*, St. Louis Post Dispatch, Jun. 1, 2014.   Peabody released a statement in response to the proposals, calling climate change a "modeled crisis" that should not be guiding American policy and declaring the "proposed regulations will make energy more scarce and more expensive without any material improvement in emissions."  *See Statement of Peabody Energy on National Carbon Target*, PR Newswire, Jun. 2, 2014.  Both the EPA and analysts agreed that there would be coal tonnage declines in response to the so-called Clean Power Plan, particularly in the Powder River Basin of as much as 34% for thermal coal, where Peabody was heavily invested. *See Trio of coal stocks hit 52-week lows, but some see positives in EPA proposal*, SNL Daily Coal Report, Jun. 3, 2014.

212. In July 2014, Peabody share prices fell in response to interest rate hike fears. *See Stock prices fall amid fears of interest rate hikes*, Portland Press Herald, July 8, 2014. "Peabody Energy fell 3.7 percent, as energy stocks lost 0.6 percent as a group." *Id*. Next came news of the retirement of an Ameren Corp. coal-fired plant in Missouri, "the company's oldest and least efficient base load power plant," and a significant customer for Peabody which provided 1.4 million tons of coal to the company in 2013 and over 1 million tons of coal so far in 2014. *See Peabody Energy primary supplier of Ameren coal plant slated for 2022 retirement*, SNL Daily Coal Report, July 9, 2014. This was a bellwether for more coal plant retirements that would affect Peabody's bottom line over the next decade.

213. On August 8, 2014, Peabody reported its financial results for the second quarter of 2014, ending June 30, 2014. As reported therein, the Company's net income continued to suffer dramatically. Specifically, for the three months ended June 30, 2014, the Company reported a net loss of $71.2 million, the fourth straight quarter of loss. *See* August 8, 2014 Form 10-Q at 1. Indeed, for the six months ended June 30, 2014, Peabody reported a net loss of $115.3 million. *Id.* Although Australian Mining segment posted better Adjusted EBITDA results than the first quarter of the year, rising to $12.2 million, it paled in comparison to the $112.5 million earned during the same quarter the year before, an 89.1% decline. *Id*. at 35. In fact, total Adjusted EBITDA for the Company was down $144.4, or 27%, for the six months ending June 30, 2014, when compared the same period the previous year. *Id*.

214. September brought more bad news for the U.S. coal industry in general and Peabody in particular. In the first half of 2014, 4,350 megawatts of new generation capacity came online, completely attributable to natural gas, solar, wind and other sources. No coal capacity was added. Even the 1,500 megawatts of coal-fired capacity added in 2013 was

minimized by the 4,500 megawatt capacity added by natural gas-fired plants that same year, as

demonstrated by this chart:



*See Natural gas, solar, and wind lead power plant capacity additions in first-half 2014*, EIA,

Sept. 9, 2014, available at http://www.eia.gov/todayinenergy/detail.cfm?id=17891.

215.    In the same month, Peabody reached a new low point in its relentless descent.  On

September 19, 2014, Peabody was officially removed from the S&P 500 index, a result of its

stock falling 22 percent over the year compared to only 2 percent by the SNL Coal Index and an

18 percent increase by the S&P index.  *See Peabody Energy replaced in S&P 500 index after*

*market capitalization swoon*, SNL Daily Coal Report, Sept. 16, 2014.    Peabody's market

capitalization had dropped from $19.68 billion on April 1, 2011 to $4.32 billion on August 13,

2014. *Id.*

216.    Interestingly, at the time of its bankruptcy filing, Patriot Coal had assets worth

nearly $4 billion.  *See Bankruptcy filings by US coal companies accelerate as markets flounder*,

SNL Daily Coal Report, Mar. 1, 2013 at 1.

217.    Peabody was not the only coal company to experience stock market declines due to the downturn in the industry as a whole.  As explained by SNL Daily Coal Report:

> Under assault from almost every direction, U.S. coal equities saw their value shrink to historic lows, with some equities hitting all-time lows.  Since Monday, Peabody shares are down more than 8% and were trading Sept. 26 at $12.09

*See Peabody hits back at coal critics, calling for rejection of 'climate alarmism'*, Sept. 29, 2014.

218.    On October 20, 2014, Peabody revealed that third quarter revenue was down 4.2 percent, primarily due to continuing weak pricing on the Australian market.  *See Peabody posts $154 million loss in Q3*, St. Louis Business Journal, Oct. 20, 2014.

219.    As outlined by Tom Sanzillo, director of finance studies for the IEEFA, Peabody was an increasingly bad investment and pointed out major weaknesses in the Company which continued to pay out yearly $92 million in dividends despite quarter after quarter of losses. Some of the key problems for Peabody were:

(a)     year-to-date net losses of $272 million, following two years of net losses;

(b)     shares down 62 percent over the last two years as opposed to the S&P 500 Index, which was up 30 percent over the same time frame, while over five years, Peabody shares were down 75 percent while S&P 500 was up 80 percent;

(c)     falling revenue, due to "stalling global demand" and a suggested structural decline for thermal coal; and

(d)     seriously declining debt-to-equity ratio with $3.7 billion of take or pay liabilities, $5.5 billion of net debt, $700 million of not fully funded mine rehabilitation provisions and $700 million of accrued but unfunded post retirement pension liabilities for workers, as opposed to management[16].

---

[16] The source notes an inconsistency between the "zero funding of the post-retirement pension plan, in contrast to the 90 percent funding of the $947 million defined benefits plan."

*See Rating Peabody: A coal giant on the ropes*, Business Spectator, Oct. 24, 2014; *see also Pressures on coal sector likely to persist*, Canberra Times, Dec. 29, 2014. Unsurprisingly in light of these financials, Fitch downgraded Peabody's IDR from 'BB' to 'BB-' on October 28. Their other ratings, for secured and unsecured debts, were also downgraded. *See Fitch Downgrades Peabody Energy Corp's IDR to 'BB-'*, Dow Jones Institutional News, Oct. 28, 2014.

220.    By November 2014, IEEFA noted the sharp decline of U.S. coal stocks relative the positive performance of the stock market:

> While the overall U.S. stock market has risen dramatically since 2010, U.S. coal stocks have collapsed, and the U.S. coal industry is in its fourth year of decline. Third-quarter earnings reports show the trend continuing. The four largest producers in the Power River Basin (Alpha, Arch, Cloud Peak, and Peabody) continue to see their stock prices drop as they report declining revenues, tighter margins, and distressed asset sales.

*See 20 Fourth-Quarter Questions for Powder River Basin Coal Producers*, Nov. 11, 2014 at 1, available at http://ieefa.org/20questions/.

221.    The article further detailed that each producer reported declining revenues ranging from 10 to 30 percent from 2011 through 2013. *Id*. Noting a "fundamental structural coal-industry change," due in part to increased, constant competition from cheap natural gas as well as a diminishing likelihood with the industry's ability to offset domestic losses with exports, the article saw "little true likelihood of a significant turnaround." *Id*.

222.    In November, Peabody reported its financial results for the third quarter of 2014, ending September 30, 2014. As reported therein, the Company recorded a net loss of $149 million for the three months ended September 30, 2014, significantly worse than the $19.1 million net loss recorded for the same quarter in 2013. *See* Nov. 6, 2014 Form 10-Q at 1. This loss compounded the problems for the Company's dismal bottom line, resulting in a net loss of

$264.3 million for the nine months ended September 30, 2014.  *Id.*  Adjusted EBITDA continued to flag, with the Australian Mining segment earning just $16.9 million for the quarter, compared to $74.8 million for the third quarter 2013.  *Id*. at 36.  Overall, Adjusted EBITDA for the Company fell to $216.3 million for the quarter, a 30.7% decline from the previous year's quarter, and only $606.3 million for the nine months ended September 30, 2014, a decline of 28.5% from the previous year.  *Id*.

223.   By December 2014, more entities were beginning to take a stand against coal on environmental grounds.  This was not good news for Peabody or the coal industry in general.  In December 2014, Norwegian pension fund KLP announced it sold off $386 million worth of stocks and bonds from 27 companies that derive revenue from coal mining or coal-fired energy production, including Peabody.  Nathan Fabian, CEO of the Investor Group on Climate Change, said that more funds would likely follow suit due to climate impacts.  "It's not really a question of whether it is a good or bad thing to do; it's simply a result of responding to the investment risks."  *Norwegian fund's exit from coal investment ramps up divestment trend*, SNL Metals & Mining Daily: West Edition, Dec. 5, 2014.

224.   Thus, 2014 was another highly disappointing year for Peabody.  The Company suffered a dramatic $777.3 million net loss for the year, losing $513 million in the fourth quarter of 2014 alone.  *See* February 25, 2015 Annual Report Form 10-K at 43.  This marked the sixth straight quarter and the third year in a row of net losses.

225.   Year-end Adjusted EBITDA[17] for the sale and production segments of the Company declined 18.4% compared to the previous year, down $262.2 million, with continuing

---

[17] Beginning with the year end results of December 31, 2014, Peabody modified its definition of "Adjusted EBITDA" to be "(loss) income from continuing operations before deducting net interest expense; income taxes; asset retirement obligation expenses; depreciation, depletion, and amortization; asset impairment and mine closure costs; charges for the settlement of claims and

weak results from the Australian Mining segment which declined from $316.6 million to $74.4 million, or 76.5%, compared to the previous year's results. *Id*. at 48.

226.    As a result of a single quarter's loss of half a billion dollars, Moody's downgraded Peabody's ratings, amid expectations that earnings would continue to fall in 2015. *See Moody's downgrades Peabody Energy, sees coal market recovery out 18 months*, SNL Daily Coal Report, Mar. 2, 2015.

227.    The price of Peabody Stock continued its steady decline throughout 2014:

| 2014 Quarter | High | Low |
|---|---|---|
| First Quarter | $19.94 | $15.18 |
| Second Quarter | $19.63 | $15.79 |
| Third Quarter | $16.71 | $11.88 |
| Fourth Quarter | $12.41 | $7.23 |

**In 2015, Peabody Fared No Better as the Company's Financial Condition Continued to Deteriorate, Losses Continued to Mount and its Stock Price Continued to Plummet**

228.    On January 5, 2015, Peabody posted a new 52 week low in share price, falling to $6.92 a share.  A few days later on January 14, 2015, Barclays Capital Inc. opined on the outlook of five coal producers, including Peabody.  Noting the weakness in the coal sector, it stated that "[t]here is not really much these companies can do except curtail marginal mines, conserve liquidity, and hope for a price upturn." *Barclays offers grim coal industry outlook, says recent supply cuts not enough*, SNL Daily Coal Report, Jan. 16, 2015.  But of course, any meaningful price upturn is not in the foreseeable future.  As one analyst stated, "The world is swimming in

---

litigation related to previously divested operations; and changes in deferred tax asset valuations allowance and amortization of basis difference related to equity affiliates." *See* Peabody Energy Announces Results For The Year Ended December 31, 2014, Jan. 27, 2015 News Release, available at http://www.peabodyenergy.com/investor-news-release-details.aspx?nr=869.  The Company reiterated that "[m]anagement uses Adjusted EBITDA as the primary metric to measure segment operating performance." *Id*.

cheap BTUs (gas in the U.S., oil everywhere, nuclear in China, etc.)," which would not help weak coal prices. *See 'The world is swimming in cheap BTUs': Oversupply heaps pressure on coal sector*, SNL Daily Coal Report, Jan. 23, 2015.

229.   On January 22, 2015, Peabody announced that Defendant Boyce would step down as CEO on May 4, 2015.  Boyce, however, would remain as chairman. *See Boyce to step down at Peabody*, St. Louis Business Journal, Jan. 22, 2015.  Five days later, Peabody announced that 2014 revenue was down 3 percent from 2013, due to weaker Australian pricing.  Australian revenue dropped 16 percent in revenue per ton, only partly offset by a rise of 9 percent in shipments. *See Peabody posts $749 million loss for 2014*, St. Louis Business Journal, Jan. 27, 2015.  Despite this, the Company also declared a dividend of $0.0025 per share.  Shares fell on the news, dropping to their lowest level in 12 years. *See Stock Move: Peabody Energy Shares Drop to Nearly 12-Year Low on Wider-Than-Expected Q4 Loss; Sees Q1 Loss, Cuts Dividend*, Midnight Trader Live Briefs, Jan. 27, 2015.

230.   On April 20, 2015, Peabody reported that its outgoing CEO Defendant Boyce would take a cut to his base salary "in light of current business conditions."  However, the cut totaled only $238,000, a fraction of the $10.99 million Defendant Boyce was paid in the previous year. *See Those Executive 'Pay Cuts' at Peabody Energy? Mostly a Charade*, Institute for Energy Economics and Financial Analysis, Apr. 29, 2015, available at http://ieefa.org/those-executive-pay-cuts-at-peabody-energy-mostly-a-charade/.

231.   On May 5, 2015, Peabody reported its financial results for the first quarter ending March 31, 2015.  As reported therein, the Company experienced a net loss of $173.3 million for the three months ended March 31, 2015, marking the ***seventh straight quarter*** the Company posted a net loss. *See* May 5, 2014 Form 10-Q at 1.  This was a precipitous decline from the net

loss of $44.1 million of the first quarter 2013.  *Id*.  The Company's Adjusted EBITDA fell to $165.6 million, with the Australian Mining segment posting an earnings loss of $24.5 million. *Id*. at 32.

232.    Just a day later on May 6, 2015, Bank of America published a new coal policy, attached hereto as Exhibit 9, that cemented the generally held view that the coal industry was an unduly risky segment in which to invest.  Following a due diligence review, the bank announced:

> Over the past several years, Bank of America has significantly reduced our exposures to coal extraction companies.  Going forward, Bank of America will continue to reduce our credit exposure to coal extraction companies.  This commitment applies globally, to companies focused on coal extraction and to divisions of diversified mining companies that are focused on coal.

*Id*. at 1.

233.    The dire outlook for the coal industry shows no signs of abating.  On May 12, 2015, Patriot Coal filed for bankruptcy protection for the second time in three years, the results of competition from natural gas, high emission standards and weakened demand for metallurgical coal in China.  It had emerged from the previous bankruptcy in December 2013, having reduced its debt from $3.07 billion to $545 million through the sale of assets and the closure of some mines.  *See Patriot Coal Files for Second Bankruptcy in Three Years Amid Commodity Price Slump*, BNA's Bankruptcy Law Reporter, May 12, 2015, available at http://www.bloomberg.com/news/articles/2015-05-12/patriot-coal-files-for-bankruptcy-after-commodity-price-slump.  Not surprisingly, "**Patriot's woes are indicative of the wider malaise in the coal industry**."  *See* Nick Cunningham, *Latest Casualty In Energy's Hardest Hit* Industry, Yahoo Finance, May 25, 2015, available at http://finance.yahoo.com/news/latest-casualty-energy-hardest-hit-202728319.html (emphasis added).

234.    Other coal companies to file for bankruptcy in 2015 were Walter Energy and Alpha Natural Resources Inc., the second-largest coal producer by sales.  As noted above, Arch Coal also filed for bankruptcy in January 2016.

235.    Of note, a May 12, 2015 article highlighted four coal companies that were seen as distressed: Walter Energy, Inc.; Alpha Natural Resources, Inc., Arch Coal and Peabody, each of which had lost over 75% of their share value to date.  *See Patriot Coal Files for Second Bankruptcy in Three Years Amid Commodity Price Slump*, BNA's Bankruptcy Law Reporter, May 12, 2015, available at http://www.bloomberg.com/news/articles/2015-05-12/patriot-coal-files-for-bankruptcy-after-commodity-price-slump.  Of the four coal companies mentioned, three of the four have filed for bankruptcy.  Peabody is not far behind.

236.    Other coal companies to file for protection recently include Longview Power LLC, Dynegy Inc., Edison Mission Energy, James River Coal Co., America West Resources Inc., Trinity Coal Corp., Americas Energy Co., Clearwater Resources LP and Consolidated Energy.  *See Patriot Coal Files for Second Bankruptcy in Three Years Amid Commodity Price Slump*, BNA's Bankruptcy Law Reporter, May 12, 2015, available at http://www.bloomberg.com/news/articles/2015-05-12/patriot-coal-files-for-bankruptcy-after-commodity-price-slump.

237.    Another blow to Peabody and the coal industry was the recent revelation in an article that the Office of Surface Mining Reclamation and Enforcement (OSMRE), "the nation's leading coal industry regulator" is examining whether coal companies, including Peabody, still qualify for a government program that allows coal companies to self-insure or "self-bond" for clean-up costs in case of bankruptcy.  *See* Patrick Rucker, *Coal Giant Peabody Faces Federal Scrutiny Over Clean-Up Insurance*, *Yahoo! Finance*, June 4, 2015, available at

http://finance.yahoo.com/news/coal-giant-peabody-faces-federal-174047899.html.   The reason
for the examination is OSMRE's concern that "slumping coal prices and declining demand have
put industry balance sheets under stress, raising questions about whether Peabody, the world's
largest private coal company, and other coal firms meet the financial criteria to self bond." *Id.*
Importantly, as the article notes, "the shares of many major coal companies – including Peabody
– have fallen by more than 90 percent in the last four years **and industry analysts warn that
near-term bankruptcies are a real danger**." *Id.* (emphasis added).

238.    According to Greg Conrad, director of the Interstate Mining Compact
Commission which speaks for coal producing states, "[t]his is the first time we've see [sic] this:
a downturn in the coal industry raising questions about self bonds." *Id.*

239.    If Peabody were to be disqualified from the government program, it would be
subjected to substantial cost increases as it "would have to pay market rates to insure the billions
of dollars required to restore old mines and ravaged landscapes back to health." *Id.*  Currently,
"[n]o mining company taps the self-bond program more extensively than … Peabody." *Id.*

240.    By the end of 2014, it appeared that Peabody would no longer qualify to self-
bond.  In order to maintain its qualification for self-bonding, Peabody "must have a ratio of total
liabilities to net worth of 2.5 times or less, and a ratio of current assets to current liabilities of 1.2
times or greater." *Id.*  However, a review of securities filings "found that Peabody failed both
those tests at the end of 2014." *Id.*

241.    More evidence of Peabody's financial woes came on June 8, 2015, when the
Company announced it would "cut 250 corporate and regional positions in the coming months"
due to escalating costs for the Company.  *See* Jacob Kirn, *St. Louis Business Journal*, *Peabody
Cutting 250 Corporate, Regional Jobs*, June 8, 2015, available at:  http://www.bizjournals.com/.

"The Company said the reductions represent about 25 percent of corporate and regional support positions." *Id.*

242.   All of the above contributed to Peabody's falling share price, a part of the larger collapse of the value of the coal industry.  In fact, by June 2015, the market value of U.S. coal companies had fallen almost 50% since August 2014, sliding from $25.73 billion to $12.94 billion, with those who relied heavily on metallurgical coal particularly hard hit.  *See US coal industry market value plummets by nearly half in under a year*, SNL Daily Coal Report, June 11, 2015.

243.   Peabody's market value as of June 8, 2015 had declined dramatically to $850 million, a precipitous fall from its $4.32 billion value in August 2014.  *Id.*  Luke Sussams, a researcher at the Carbon Tracker Initiative, said "Economic struggles like these are not temporary ailments but are ingrained within the U.S. coal sector."  *See Steep slump in coal stocks, as investors bail, began before CO2 concerns*, ClimateWire, June 11, 2015.

244.   In June, Norway's $890 billion sovereign wealth fund, the largest in the world, announced it would divest the shares of coal companies in its portfolio, including Peabody, following the June 5th approval of the Norwegian Parliament.  *See* David Gelles, *Fossil fuel divestment movement tries to harness the power of shame; Revalued*, International New York Times, June 15, 2015.  Norway joined other well-known funds in coal divestiture, including AXA, the Rockefeller philanthropic fund, and the endowments of a number of universities, including Stanford and Syracuse.  *Id.*

245.   On June 24, 2015, S&P Dow Jones announced it would remove Peabody from the S&P 400 MidCap index as of the close of June 30.  *See Peabody shares hit as it's booted from index and divestment measure advances*, St. Louis Post-Dispatch, June 25, 2015.

246.    The next day, Moody's downgraded Peabody's credit ratings from "B2" to "B3", citing the ongoing decline in the seaborne metallurgical coal markets had eroded the company's credit metrics at a "more precipitous" rate than previously forecast.  *See Moody's downgrades Peabody, citing 'precipitous' erosion of credit metrics*, SNL Daily Coal Report, June 29, 2015. Moody's also downgraded Peabody's rating on its senior secured credit facility.  *Id*.

247.    Even a favorable Supreme Court ruling striking down EPA rules targeting coal which boosted Peabody's share price nearly 10% was insufficient to reverse the company's fortunes.  By the time of the ruling, the price gain only amounted to a few dimes per share, with shares climbing to $2.51 adjusted close from $2.29.  A single favorable ruling would not prevent more coal-fired capacity plants from retiring in favor of more efficient, natural gas plants and falling coal prices.  *See Supreme Court Gives Little Consolation for Coal*, Dow Jones Institutional News, June 29, 2015.

248.    In fact, on June 30, 2015, Peabody warned investors of a bigger loss than expected for the forthcoming second quarter results, blaming bad weather which impacted production and lower metallurgical coal prices.  *See Peabody Warns of Worse than Expected Quarterly Loss*, The Wall Street Journal Online, June 30, 2015.

249.    Also on June 30, 2015, Defendant Crews was also announced to be stepping down.  *See Peabody Energy CFO Michael Crews to Step Down; Coal company names Amy Schwetz as replacement*, The Wall Street Journal Online, July 1, 2015.

250.    On this day, Peabody's share prices fell 18.7% to $1.78 at the close of business.

251.    By early July, natural gas overtook coal as the biggest producer of electricity in the U.S.  Citing a variety of factors, including environmental concerns, Luke Sussams stated,

"We see no signs that this trend from coal power to gas and renewable alternatives will change." *See Gas surges ahead of coal in US power generation*, The Guardian, July 15, 2015.

252.     Peabody also faced a potential addition of $800 million in liabilities when the United Mine Workers of America 1974 pension plan filed suit against it and Arch Coal, demanding the coal companies assume the responsibilities they had originally passed onto Patriot Coal when it was spun off.

253.     On July 27, 2015, one day ahead of Peabody Energy's earnings report for the second quarter, Fitch Ratings downgraded the Company's credit ratings.   Although Fitch believed coal prices had bottomed out, the excess of supply would prevent prices from rising. *See Peabody Energy Downgraded Again*, Factiva Newswires, July 27, 2015.  Peabody's share prices fell again, down 16.5% to $1.03 a share.  *Id.*

254.     The next day, Peabody reported that it had lost more than $1 billion in the second quarter of 2015, with revenue sliding nearly 24 percent, due to volume declines and lower realized pricing.   This was "reflecting slower global economic growth, declining steel demand and weak U.S. natural gas prices."  *See Peabody's loss widens as it cuts costs*, St. Louis Business Journal, July 28, 2015.   In order to increase liquidity, Peabody suspended quarterly dividends and revealed that its Board of Directors had authorized a reverse split of common stock, pending shareholder approval.   *Id*.   It also announced that it would further cut Australian metallurgical coal production by 3 million tons a year and cut 300 jobs.   *See 300 Jobs to Go In Peabody Cutbacks of Australian Met Coal Operations*, Factiva, July 28, 2015.

255.     The dividend suspension, coupled with news from the EIA that coal-generated electricity had risen to 32.6% of output in May, sparked a small rally in Peabody share prices,

which closed at $1.21 on July 28, 2015.  *See Tuesday's Energy Stocks: As investors assess earnings, coal sector rebounds with EIA report*, SNL Energy Finance Daily, July 29, 2015.

256.    The news in August did not improve for Peabody.  That month the EPA announced new tougher-than-expected rules aimed at limiting carbon emissions from power plants.  As detailed by *The New York Times*, such regulations "will accelerate an already huge shift from coal to natural gas and other alternatives" in the power generation sector.  *See King Coal, Long Besieged, Is Deposed by the Market*, Aug. 6, 2015, available at http://www.nytimes.com/2015/08/07/business/energy-environment/coal-industry-wobbles-as-market-forces-slug-away.html?_r=0.  Although the regulations would impact coal the hardest, as the largest source of carbon emissions, "collapsing prices and heavy debt loads" were also cited as key forces driving the wave of bankruptcies.  "Market forces have accomplished in just a few years what environmentalists and social advocates have struggled for decades to achieve."  *Id*. As a result, the article noted, "the demise of the two biggest surviving publicly traded coal companies" – one of which is Peabody – "may just be a matter of time."  *Id*.  The EPA's "Clean Power Plan" has an explicit goal of reducing coal-fired power generation, predicting it will only make up about 27% of U.S. generation by 2030.  *See CCP would drop US coal generation to 27%, reduce production*, Platts Coal Trader, Aug. 3, 2015.

257.    By mid-August, Peabody had hired Bank of America Merrill Lynch to "divest its entire portfolio of Australian coal assets, as one of the world's largest mines of the commodity plans to stage an exit from" the Australian market.  *See Dataroom*, The Australian, Aug. 14, 2015.  Whether a buyer could be found is an open question, as the value of the assets, once worth several billion dollars, would only at best be worth $1 billion.  *Id.*

72

258.     Peabody also faces continuing problems from the bankruptcy of its spin-off, Patriot Coal.   On August 18, 2015, Patriot Coal asked the federal bankruptcy court for permission "to terminate a series of coal supply and other contracts with" Peabody.   *See Patriot Coal looks to end coal supply pacts with Peabody as asset bidding date nears*, SNL Daily Coal Report, Aug. 20, 2015.   Patriot Coal also wished to "reject obligations for the administration of certain retiree and other benefits associated with Peabody retirees and employees assumed in the spin-off," obligations that those beneficiaries would look to Peabody to assume.   *Id.*

259.     September brought yet more bad news for the Coal industry and Peabody, specifically.   On September 9, 2015, "[t]he federal appeals court in Washington, D.C.... turned down the emergency request from 15 states and Peabody Energy to temporarily block the proposed rules requiring states to cut carbon emissions from existing power plants by 32% nationwide by 2030."   *See Sector Update: Energy Stocks Ending Higher; Peabody Energy Sinks After Federal Appeals Court rejects Stay of EPA Proposals*, Midnight Trader Live Briefs, Sept. 10, 2015.   This sent Peabody shares down more than 11% to $1.79 each, or just 4 cents above their session low.   The stock already had fallen more than 86% over the past 12 months before this additional decline.   *Id.*

260.     Peabody announced that effective at the close of business September 30, 2015 it would conduct a 1-for-15 reverse stock split.   *See* Jacob Kirn, *Peabody Energy plans reverse stock split*, St. Louis Business Journal (Missouri), Sept. 16, 2015.   "After the split, every 15 shares of common stock owned by a shareholder will be combined into one share of common stock, and the number of Peabody's outstanding shares will be reduced from about 278 million to about 19 million."   *Id*.   The Split took effect on October 1, 2015.

261.    On September 23, 2015, Peabody fell another 2.52% to $1.16 after Goldman Sachs' "bearish outlook" for coal was released.  *See* Amanda Gomez, *Peabody Energy (BTU) Stock Declines as Coal Futures Slide*, TheStreet.com, Sept. 23, 2015.  "Coal futures hit $50 a metric ton for the first time in 12 years after Goldman Sachs said coal will never recover."  *Id*.  According to Reuters, "The [coal] industry does not require new investment given the ability of existing assets to satisfy flat demand, so prices will remain under pressure as the deflationary cycle continues."  *Id*.  "Coal began to struggle when developed countries turned to natural gas and renewable energy sources.  The downfall continued this year as China reduced imports due to an economic slowdown."  *Id*.

262.    As noted *supra*, on October 8, 2015, California Governor Jerry Brown signed bill 185, a law that requires the California Public Employees' Retirement System (CalPERS) and the California State Teachers' Retirement System (CalSTRS) to divest from thermal coal companies by July 1, 2017.  *See CalPERS Gears Up To Drop Coal*, Pension 360, Oct. 20, 2015, *available at* http://pension360.org/calpers-gears-up-to-drop-coal/; *see also* John Schwartz, *With Coal Industry Under Pressure, Some See Long-Term Decline*, *The New York Times*, Dec. 2. 2015 (noting that environmental regulations like the Obama administration's Clean Power Plan has put coal companies under severe pressure.)

263.    On October, 27, 2015, Peabody, reported a third-quarter loss of $302 million, which was almost double the $149 million loss in the prior year.  *See* Jacob Kirn, *Peabody's loss doubles in Q3*, St. Louis Business Journal (Missouri), Oct. 27, 2015.  Revenue was down 17.4% compared with the prior-year quarter falling to $1.42 billion from $1.72 billion.  *Id*.  Economic weakness in China was cited as a reason for the decline.  *Id*.  Peabody stock was down nearly 225 to $16.93 a share.  *Id*.

264.    On November 9, 2015, Peabody was rated one of the worst dividend stocks because of, "its deteriorating net income, generally high debt management risk, disappointing return on equity, poor profit margins and generally disappointing historical performance in the stock itself."  *See* Laurie Kulikowski, *3 High-Yield Dividend Stocks You Should Sell Now*, TheStreet.com, Nov. 9, 2015.  Peabody was rated a "D" with analysts citing that, "[t]he net income has significantly decreased by 10.3% when compared to the same quarter one year ago, falling from -$150.60 million to -$304.70 million."  *Id*.  The article also noted that Peabody's, "net profit margin of -21.47% is significantly below that of the industry average" and the Company's debt-to-equity ratio was very high at 4.8.  *Id*.

265.    According to Zacks Investment Research, the coal industry is ranked in the lower third of all industries, which corresponds with a negative outlook moving forward.  *See Zacks Industry Outlook Highlights: Peabody Energy, Arch Coal, Cloud Peak Energy and Alliance Holdings*, Zacks Investment Research, Nov. 17, 2015.   One of the factors affecting the outlook for coal is the Clean Power Plan announced by the EPA in August 2015 which calls for carbon dioxide ($CO_2$) reduction levels that "will certainly see more coal based units going out of production" as they are idled or converted to natural gas based units.  *Id*.  These changes will affect the long-term prospect of coal stocks.  *Id*.  Already, Peabody has "incurred losses in the last four quarters.  Consequently, stock prices…have been hit so hard, so much so that they had to resort to a reverse stock split to increase the price of their shares and maintain listing on the NYSE." *Id*.

266.    On Friday, November 20, 2015, Peabody announced, "that it will sell its coal assets in New Mexico and Colorado to Louisville, Ky., coal producer Bowie for $358 million in cash and the assumption of about $105 million in liabilities."  *See* Lisa Allen, *Bowie Resource*

*Partners to buy coal assets from Peabody Energy*, The Deal Pipeline, Nov. 23, 2015.  The article

noted that analysts believe that Peabody will use the proceeds from the sale to address its $6.31

billion debt load.  *Id*.   However, the article further noted that a "report warned that the asset sale

won't be enough to solve Peabody's liquidity and cash burn issues."  *Id.*

267.    Speaking on the state of the coal industry, Murray Energy Corp. spokesman Gary

Broadbent noted that, "the United States coal industry will be significantly smaller in five to 10

years as American coal markets will shrink."  *See* Taylor Kuykendall, *Restructuring has changed

the coal sector dramatically and it's not over yet,* SNL Daily Coal Report, Dec. 8, 2015.  He

followed, "[further], a study by McKinsey and Co., which was just released, shows that the coal

industry, as a whole, taking all producers together, is now ***bankrupt***.  Indeed, all coal companies

together currently lack the $45 billion to fund their debts and employee and reclamation

liabilities."  *Id.* (emphasis added).

### Peabody Has Entered 2016 on Life Support With Bankruptcy Ever Closer

268.    Soon after the revolutionary Paris agreement noted above, was ratified, the

negative effect its regulations would have on the coal industry in general and Peabody

specifically began to be realized.  A January 3, 2016 Financial Times article titled "Coal: The

king is dead," singled out Peabody, noting "[w]ith an equity capitalism of just $150m against a

total enterprise value of $6bn, Peabody's shares resemble deep out-of-the-money call options

over its assets."  *See* "Coal:  The king is dead," Financial Times, Jan. 3, 2016.  As the article

aptly summarized the situation, "the Paris agreement adds but another heavy nail into King

Coal's already well-hammered coffin."  *Id.*   "Peabody has $6bn of debt to repay before the

equity holders recover a cent," the article continued, concluding, "[i]t is hard to see how they

will."  *Id.*

269.    In the midst of the decline of its primary industry, Peabody also faced financial pressure from the United Mine Workers of America (UMWA) union.  On January 5, 2016, it was announced that Peabody and UMWA reached an agreement requiring Peabody to "pay $75 million into a health-care fund for Patriot Coal retirees affected by the company's 2012-2013 bankruptcy."  *See* Tyrone Richardson, *Peabody Energy, Union Agree on Retiree Benefits Funding*, Pension & Benefits Daily, Jan. 6, 2016.  Specifically, the article explained that Patriot Coal, which was spun off from Peabody and Arch Coal in 2007, filed for a second bankruptcy in 2015 which threatened to put an earlier 2013 agreement from Peabody to provide funding for a voluntary employees' beneficiary association (VEBA) in jeopardy.  *Id*.  Accordingly, the January 4th agreement amended the 2013 accord for health-care funding and Peabody agreed to pay $7.5 million for 10 months into the Patriot VEBA.  *Id*.

270.    On February 11, 2016 Peabody announced results for the year ended December 31, 2015.  The results were dismal.  The Company had a net loss of $519 million for the fourth quarter of 2015.  For the year, the Company had a net loss of $2 billion.

271.    Given the unsustainable distress being suffered by Peabody, it reported in a filing in late February that its lenders are pushing it to restructure its $6 billion in debt through bankruptcy. *See* Form 8-K filed on Feb. 29, 2016.

272.    On March 7, 2016, Peabody announced more layoffs of employees at its downtown St. Louis headquarters and elsewhere as the Company negotiates with a lender that wants Peabody to file for bankruptcy.  *See* Jacob Kim, "More Layoffs At Peabody's Downtown Headquarters," St. Louis Business Journal, Mar. 7, 2016.

273.    The reality is that Peabody is heading for bankruptcy.  Indeed, "Financial information services firm Fitch Ratings released a forecast for [Peabody] on [March 8, 2016],

saying the coal producer's current liquidity issues could lead to bankruptcy filing in the short term."  Vince Sullivan, "*Fitch Predicts Grim Outlook, Bankruptcy For Peabody*," Mar. 8, 2016, Law360.  The aforementioned cited article further stated:

> Peabody, the world's largest producer of coal, said in a Feb. 29 filing with the U.S. Securities and Exchange Commission that it is aggressively pursuing debt buyback talks with its noteholders in response to the falling prices of energy commodities like coal, oil and natural gas.  Fitch said these talks, combined with an overall declining domestic market for coal, could force the company into a restructuring through bankruptcy.  'A restructuring is really in the cards at this point,' Fitch Senior Director Monica Bonar told Law360.

*Id.*

274.    Since the beginning of the Class Period through the filing of the instant complaint, the Plans' imprudent investments in Peabody Stock have been decimated, as indicated below:



Source: http://bigcharts.marketwatch.com.

275.    Further, as the below graph of Peabody's performance relative to the S&P 500 index, of which it was a part until September 2014, makes clear, the Company has severely underperformed the general market:



276.   Peabody is radically underperforming compared to the oil and gas sector as well as the S&P 500 Index, having lost 99% of the share price in three years compared to a sector decrease of 26%:



Source:                              Fidelity                              Research

https://eresearch.fidelity.com/eresearch/markets_sectors/sectors/industries.jhtml?tab=learn&industry=101020.

277.    Even compared to the Dow Jones U.S. Coal Index, Peabody has lost more market capitalization than its peers:



Source:  https://www.google.com/finance?cid-4931635

278.    The Company's financial condition, when viewed through the lens of objective financial metrics, plainly indicates the Company's deterioration over the last several years.

279.    Under basic trust law principles, the above factors indicating Peabody's drastic changed circumstances rendered Peabody Stock an imprudent investment for the Plans.  Prudent investment management demands, *inter alia*, that Defendants not merely rely upon the fact that Peabody's Stock price remained above $0 and that it has not yet filed for bankruptcy in determining whether investing in Company Stock was appropriate for the Plans.  ERISA requires Defendants to scrutinize the risk of the Plans' investment in Peabody Stock – based upon, *inter alia*, the public information upon which the stock price is based and the risk inherent in the stock – to protect the Plans' Participants' retirement savings.

**Special Circumstances during the Class Period Rendered the Market's Valuation of Peabody Stock Unreliable**

280.    In addition to Defendants' failure to take *any* prudent fiduciary action by the start of the Class Period and during the majority of the Class Period, based *solely* on Peabody's changed circumstances, there were indicia of special circumstances that made reliance on Peabody's stock price unreliable throughout the Class Period.

**During the Class Period, Peabody Withheld Material Information from the Market**

281.    On November 9, 2015, New York Attorney General Eric T. Schneiderman announced "that a first-of-its-kind investigation by his office found that Peabody Energy Corporation (Peabody) – the largest publically traded coal company in the world –violated New York laws prohibiting false and misleading conduct in the company's statements to the public and investors regarding financial risks associated with climate change and potential regulatory responses." *See* November 9, 2015 Attorney General's Press Release, *available at* http://ag.ny.gov/press-release/ag-schneiderman-secures-unprecedented-agreement-peabody.

282.    The Attorney General stated that "[a]s a publicly traded company whose core business generates massive amounts of carbon emissions, Peabody Energy has a responsibility to be honest with its investors and the public about the risks posed by climate change, now and in the future." *Id.*   The Attorney General continued, stating that "I believe that full and fair disclosures by Peabody and other fossil fuel companies will lead investors to think long and hard about the damage these companies are doing to our planet." *Id.*

283.    Peabody agreed to the Assurance of Discontinuance (Exhibit 1) in order to bring the NYAG's investigation to a close. Although in the Assurance of Discontinuance, Peabody neither admits nor denies the findings, the findings made by the NYAG are specific and detail Peabody's wrongdoings during a period of time that overlaps with the Class Period.

284.    In particular, the NYAG found that in SEC filings, including various annual reports, Peabody denied its ability to reasonably predict the impact to its future business from any future law or regulation relating to greenhouse gas emissions generated from the combustion of coal, in order to address harms from climate change.  Exhibit 1 at ¶ 1.

285.    In its 2011, 2012, 2013 and 2014 SEC Form 10-K Annual Reports, Peabody stated that "Enactment of laws of passage of regulations regarding emissions from the combustion of coal by the U.S. or some of its states or by other countries, other actions to limit such emissions, could result in electricity generators switching from coal to other fuel sources." But, Peabody further stated, in each Form 10-K Annual Report, that it was "not possible for [Peabody] to reasonably predict the impact that any such laws or regulations may have on [Peabody's] results of operations, financial condition or cash flows."  Exhibit 1 at ¶ 2.

286.    Contrary to its public statements, Peabody had in fact made market projections about the impact of potential climate change regulatory actions.   Some of those market projections found that certain such actions could have a severe negative impact on Peabody's future financial condition.  *Id.* at ¶ 3.

287.    For example, in March 2013, Peabody projected that if a specific aggressive regulatory action scenario for existing power plants and future electricity generation were to be implemented in the United States, it would in 2025 reduce the dollar value of sales of Southern Powder River Basin coal by 38% and Illinois Basin Coal by 33%.  *Id.* at ¶ 4.

288.    To further illustrate, in March 2014, Peabody hired an outside consulting firm, which projected that enactment of a $20 per ton carbon tax would reduce the demand for coal as a fuel source in electric power generation in the United States in 2020 by between 38% and 53% compared to 2013 levels.  *Id.* at ¶ 5.

289.   The NYAG found that although Peabody's disclosures denied its ability to reasonably predict the future impacts of any future climate change regulation on its business, Peabody and its consultants actually made market projections in the ordinary course of business of severe impacts from certain potential regulations and did not disclose its market projections to the public.  ***These market projections found that certain potential regulatory scenarios could materially and adversely impact Peabody's future business and financial condition***.  *Id.* at ¶ 6 (emphasis added).

290.   Further, since 1993, the International Energy Agency ("IEA") has made projections about world coal demand based on various scenarios for future would energy development.   For several years, those scenarios have included: the New Policies Scenario, which is IEA's central scenario; the Current Policies Scenario, which the high case for coal usage; and the 450 Scenario, which is the low case for coal usage.   The IEA does not endorse any particular scenario.   As stated in the Executive Summary of its 2014 World Energy Outlook, the IEA recognizes that, as a general matter, coal's "future use is constrained by measures to tackle pollution and reduce $CO_2$ emissions."  *Id.* at ¶ 9.

291.   The New Policies Scenario incorporates policies and measures affecting energy markets which have already been adopted, as well as other relevant commitments that have been announced by governments of the world but where the precise implementation measures have yet to be dully defined.   The IEA considers the New Policies Scenario to be its "central scenario."  *Id.* at ¶ 10.

292.   The Current Policies Scenario, which is the high case for coal usage, assumes that governments do not implement any recent commitments that have yet to be backed-up by legislation and will not introduce other new policies bearing on the energy sector in the future,

83

even those that are likely to be implemented by various nations.  According to the IEA, global energy usage consistent with the Current Policies Scenario would likely result in a global temperature rise of about 6°C.  *Id.* at ¶ 11.

293.    The 450 Scenario, which is the low case for coal usage, incorporates government policies that would, if enacted, limit long-term increases in the average global temperature to two degrees Celsius.  The goal of limiting temperature rise to no more than two degrees Celsius has long been endorsed by nations of the world in international meetings, most recently at the 2010 United Nations Climate Change Conference in Cancun, Mexico.  *Id.* at ¶ 12.

294.    In its 2013 Form 10-K Annual Report, Peabody stated that IEA "estimates in its World Energy Outlook 2013, Current Policies Scenario, that worldwide primary energy demand will grow 43% between 2011 and 2035.  Demand for coal during this time period is projected to rise 44%, and the growth in global electricity generation form coal is expected to be greater than the growth in oil, natural gas, nuclear, geothermal and solar energy combined."  Peabody did not provide the significantly less favorable growth estimates for coal under IEA's central scenario (the New Policies Scenario) or the alternative 450 Scenario.  *Id.* at ¶ 15.  Neither did Peabody provide the less favorable growth estimates during conferences.

295.    For example, at a September 6, 2012 Conference, Defendant Boyce, addressing conference participants stated:

> Coal now accounts for over 30% of global energy consumption, the highest share since 1969. The IEA's forecast a robust 65% increase in global coal use by 2035 under **its current policies scenario**. Under this forecast, coal becomes the largest energy source in the world by 2035, surpassing oil. And the growth in energy from coal would be 30% greater than natural gas. You read a lot of reports. I heard a lot of commentary this morning about [logis], and coal in some kind of a long-term decline. **The data, the analysis, the reports, the facts do not support that at all. A little bit of near-term [chops], but over the long term, there is no change in the fundamental use around the strength of the global coal sector.**

September 6, 2012 Transcript of Barclays CEO Energy/Power Conference at 4 (emphasis added).

296.    Further, even though Peabody mentioned the existence of the New Policies Scenario and the 450 Scenario in its 2013 Form 10-K Annual Report (unlike in prior years), Peabody did not disclose that the New Policy Scenario is that IEA's central scenario, and Peabody also did not disclose that the Current Policies Scenario does not include future regulations of coal and other greenhouse gases that are likely to be implemented by various nations. Exhibit 1 at ¶ 16.

297.    In its 2014 Form 10-K Annual Report, Peabody stated that IEA "estimates in its World Energy Outlook 2014, Current Policies Scenario, that worldwide primary energy demand will grow 50% between 2012 and 2040.  Demand for coal during this time period is projected to rise 51%, and the growth in global electricity generation from coal is expected to be greater than the growth in oil, natural gas, nuclear and solar combined." Again, Peabody did not provide the significantly less favorable growth estimates for coal under IEA's central scenario (the New Policy Scenario) or the alternative 450 Scenario. *Id.* at ¶ 17.

298.    Further, even though Peabody continued to mention the existence of the New Policies Scenario and the 450 Scenario, Peabody again did not state that the New Policy Scenario is the IEA's central scenario, and Peabody also did not disclose that the Current Policies Scenario does not include future regulations of and other greenhouse gases that are likely to be implemented by various nations. *Id.* at ¶ 18.

299.    Peabody's representations regarding the IEA, as discussed above, were not just limited to its annual reports, but were widespread in other communications by Peabody and its senior executives to the investment community and general public, in which they cited the IEA

to support optimistic growth projections for the coal market based solely on Current Policies Scenario. *Id.* at ¶ 19.

300.    For example, in the Q4 2013 Earnings Conference Call, on January 30, 2014 Peabody's Chairman and Chief Executive Officer, Defendant Boyce stated that "IEA and other observers project that coal will surpass oil as the world's largest energy source in the coming years," while not mentioning that such a projection is premised on the IEA's Current Policies Scenario, which is not the IEA's central scenario.  Under the IEA's central scenario, the New Policies Scenario, the promising future for coal announced by the CEO was not projected to occur.  And, under the 450 Scenario, coal's future was projected to be significantly less favorable.  *Id.* at ¶ 20.

301.    This and similar citations to the IEA in support of a promising future for coal were repeated in other documents and presentations by Peabody executives at meetings with investment companies and at industry conferences, and were also included in filings by Peabody in Form 8-Ks with the SEC.  *Id.* at ¶ 21.

302.    The NYAG concluded that Peabody's disclosures denied its ability to reasonably predict the future impact of any climate change regulation on its business, while the company and its consultants projected severe impacts from certain potential regulations that would materially affect Peabody.  The NYAG concluded that these disclosures violated provisions of the Martin Act (Article 23-A of the General Business Law) and violated § 63(12) of the Executive Law.  *Id.* at ¶ 22.  "New York state's Martin Act, designed specifically to attack investor fraud, prohibits 'all deceitful practices contrary to the plain rules of common honesty.'"[18]

---

[18] *See* "Peabody Energy Investigation in Late Stages: New York Attorney General Probe," Nov. 9, 2015, available at http://www.desmogblog.com/2015/11/09/peabody-energy-investigation-late-stages-new-york-attorney-general-probe.

303.    The NYAG also concluded that Peabody's statements concerning the IEA's projections for the future of coal, both in SEC filings and in other communications, were incomplete and omitted less favorable IEA projections for future coal demand.  The NYAG concluded that these statements and omissions violated provisions of the Martin Act (Article 23-A of the General Business Law) and violated § 63(12) of the Executive Law.  Exhibit 1 at ¶ 23.

304.    Indeed, Peabody's misrepresentations regarding its ability to reasonably predict the future impact of any climate change regulation on its business is material given recent laws and regulations with the aim of curbing carbon emissions from the combustion of coal.  As noted above, the U.S. announced a Clean Power Plan on August 3, 2015, and 195 countries, including the U.S., agreed to a historic legally binding global climate deal adopted in Paris in December 2015.

305.    Soon after the revolutionary December 2015 Paris agreement was ratified, the negative effect its regulations would have on the coal industry in general and Peabody specifically began to be realized.  A January 3, 2016 Financial Times article titled "Coal: The king is dead," singled out Peabody, noting "[w]ith an equity capitalism of just $150m against a total enterprise value of $6bn, Peabody's shares resemble deep out-of-the-money call options over its assets."  *See* Financial Times, "Coal: The King is Dead," Jan. 3, 2016, available at http://www.ft.com.

306.    As the article aptly summarized the situation, "the Paris agreement adds but another heavy nail into King Coal's already well-hammered coffin."  *Id.*  "Peabody has $6bn of debt to repay before the equity holders recover a cent," the article continued, concluding, "[i]t is hard to see how they will."  *Id.*

307.    The NYAG's investigation makes clear by the start of the Class Period in December 2012, and during a majority of the Class Period, Peabody and its top executives, including the Defendants here who occupied top level positions in Peabody, knew of the Company's non-disclosures.  Thus, due to the material non-disclosed information, the market did not fully reflect the true value of Peabody Stock during a substantial portion of the Class Period.

**During the Class Period, Objective Criteria, Such as the Company's Z-Score and Unserviceable Debt Predicted Peabody Was Likely To Default Thus Making The Company Stock Price Unreliable**

308.    During the Class Period, the price of Company Stock remained unreliable as market indicators predicted Peabody was likely to default, and accordingly, its stock price would collapse.  A prudent fiduciary therefore would not have relied upon the current price of Peabody Stock as an unbiased indication of the true value of the Company Stock, and accordingly, that the Company Stock was a prudent Plan investment option.

309.    The Z-Score, referenced above, was developed in 1968 by Professor Edward Altman of the Stern School of Business at New York University, and is a bankruptcy prediction model commonly accepted and used by financial analysts.  *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding Federal agency's use of Altman Z-Score analysis for predicting likelihood of bankruptcy and accepting that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).

310.    A Z-Score greater than 2.99 is the "safe zone" meaning a company is unlikely to go bankrupt, a score of 1.88 to 2.99 is the "grey zone," and a score less than 1.88 is the "distress zone" where there is a high probability the company will go bankrupt within two years.  During the Class Period, the Z-Score represented objective evidence that the Company was in severe distress and in imminent danger of filing for bankruptcy:



311.    The Company's debt also presents an insurmountable obstacle.  The problem can be traced to the end of 2011 when Peabody completed the purchase of Australia's Macarthur Coal Ltd. ("Macarthur") for $5.1 billion, folding the results of the acquisition into its Australian Mining business segment.  *See* February 27, 2012 Form 10-K at 38.   The acquisition of Macarthur would prove to be a financial albatross for Peabody the last several years but the negative effects were felt almost immediately.  As result of financing the money needed to purchase Macarthur, Peabody's Debt to Equity Ratio ("D/E Ratio"), skyrocketed from 0.4731 to 1.214.

312.    As 2012 began, Peabody realized that the "higher-margin international assets" of Macarthur were not as profitable, with higher than expected costs expected throughout 2012. *See Peabody Energy seeing higher-than-expected costs at Macarthur operations*, SNL Daily Coal Report, Jan. 26, 2012.  Defendant Boyce noted, "It's also very clear to us that the mines were not being operated to sustainable industry standards."  *Id*.

313.    The Company's debt-equity ratio continued to climb during the Class Period as follows:



314.    On November 9, 2015, Peabody was rated one of the worst dividend stocks because of, among other things, "its deteriorating net income [and] generally high debt management risk."  *See* Laurie Kulikowski, *3 High-Yield Dividend Stocks You Should Sell Now*, TheStreet.com, Nov. 9, 2015.  The article also noted that Peabody's, "net profit margin of -21.47% is significantly below that of the industry average" and the Company's debt-to-equity ratio was very high at 4.8.  *Id*

315.    The January 3, 2016 Financial Times article referenced above noted that Peabody,"[w]ith an equity capitalism of just $150m against a total enterprise value of $6bn," has "shares [that] resemble deep out-of-the-money call options over its assets."  *See See* Financial Times, "Coal: The King is Dead," Jan. 3, 2016, available at http://www.ft.com. The article observed that "Peabody has $6bn of debt to repay before the equity holders recover a cent."  *Id.* It concluded that "[i]t is hard to see how they will."  *Id.*

316.    A recent article explained the looming catastrophe Peabody's debt represents. The author noted that the problem with Peabody "is its overleveraged balance sheet."  *See*

"Peabody Energy is The Next Coal Company to Go Bankrupt," Jan. 28, 2016, *Seeking Alpha*, available at http://seekingalpha.com/article/3841246-peabody-energy-next-coal-company-go-banrupt.  The Company's operating margin "is dilapidated by the expenses associated with the debt load" making bankruptcy extremely probable.  *Id.*

317.   To sum it up, over the last four quarters, Peabody generated $5.98 billion in revenue and the cost of revenue was equal to $5.18 billion.  *Id.*  Technically, that means the Company had a gross profit of $805 million.  But that does not account for variable costs associated with operations, such as rent, insurance or salaries for employees not involved directly in the production chain.  *Id.*  On the other hand, the interest expense generated by the debt load is extremely high.  On a trailing twelve month basis, the interest expense metric is equal to $452 million.  *Id.*  Thus, the interest expense represents 56.14% of the gross profit.  *Id.*  Furthermore, the Company's operating income is negative by $1.2 billion over the last four quarters.  It is thus nearly impossible for Peabody to pay $6.3 billion in principal if its gross profit is barely enough to cover the interest expense.  *Id.* "With a market capitalization of $80 million and $6.3 billion in debt, the game is almost over for Peabody Energy."  *Id.*  In other words, the "bomb is ticking."  *Id.*

318.   Given the objective market evidence predicting the Company's bankruptcy or default, which would cause the Company Stock price to become worthless, the Company's stock price during the Class Period was not an unbiased assessment of its true value.  It was thus imprudent for the Plans' fiduciaries to rely on the price of the Company Stock during the Class Period.

**Defendants Failed to Properly Investigate the Continued Prudence of Peabody Stock and/or Employ a Reasoned Decision-Making Process in Evaluating Company Stock**

319.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).   *See* discussion *supra* in Nature of Action.

320.    When enforcing the duties of prudence and loyalty, courts focus not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction.  A pure heart and an empty head are not defenses to breaches of ERISA's fiduciary duties.  With respect to Peabody Stock, as alleged herein, Defendants failed to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity, to review and properly evaluate Company Stock.

321.    At this stage of the case, prior to engaging in discovery, Plaintiffs believe Defendants – in particular, the Committee - failed to appropriately evaluate the prudence of the Plans' continued investment in Peabody Stock.[19]  It is inconceivable that if they had conducted an adequate investigation they would have continued to allow the Plans to offer Company Stock

---

[19] As the Eight Circuit has found:

> We must be cognizant of the practical context of ERISA litigation.  No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.  Thus, while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of their limited access to crucial information.  If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer.  These considerations counsel careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief at this stage in the litigation most of the facts are in Defendants' hands.

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (Citation omitted).

as an investment option, especially given, as discussed above, the rash of coal company bankruptcies over the last several years, and the action taken by similar fiduciaries at coal companies to divest their retirement plans of company stock.

322.    The Committee's failure to adequately investigate the prudence of Company Stock during the Class Period was a circumstance rendering reliance on the Company Stock price imprudent because by their inaction, the Committee showed they were not even evaluating the Company Stock on *any* basis – let alone, based on its price.

**Peabody Stock Was an Imprudent Investment During the Class Period Due to the Artificial Inflation of Peabody Stock**

### Peabody Stock Was Artificially Inflated During the Class Period

323.    As described *supra*, during a substantial portion of the Class Period Peabody Stock was artificially inflated due to misleading and false representations about, *inter alia*, Peabody's ability to predict the effect of the enactment of laws or passage of regulations regarding emissions from the combustion of coal by the U.S. or some of its states or by other countries, or other actions to limit such emissions on its future financial condition.

### What Defendants Should Have Done As of December 14, 2012

324.    As noted above, the Company issued a press release on December 14, 2012 describing the dire circumstances of the Company and predicting difficult times ahead.  By this point in time, Peabody and the Director Defendants, who had responsibility for appointing and monitoring the Committee, had the fiduciary obligation, and had been given a reasonable opportunity, to inform their appointees and the public at large of the Company's prior misstatements detailed above.  Indeed, according to the NYAG, Peabody had been issuing misstatements since at least 2011.

325.    Upon information and belief, the Director Defendants necessarily had knowledge of the misstatements attributed to Peabody.  Indeed, Defendant Boyce, a PIC Board member and CEO of Peabody, was singled out by the NYAG of having made misstatements during the Class Period.  For example, in the Q4 2013 Earnings Conference Call, on January 30, 2014, Defendant Boyce stated that "IEA and other observers project that coal will surpass oil as the world's largest energy source in the coming years," while not mentioning that such a projection is premised on the IEA's Current Policies Scenario, which is not the IEA's central scenario.  Under the IEA's central scenario, the New Policies Scenario, the promising future for coal announced by the CEO was not projected to occur.  And, under the 450 Scenario, coal's future was projected to be significantly less favorable.  Exhibit 1 at ¶ 20.

326.    Defendant Boyce's misrepresentation fit a pattern of deception that preceded the start of the Class Period.  As noted above, at a September 6, 2012 Barclays CEO Energy/Power Conference Defendant Boyce made similar remarks indicating the positive outlook for coal by relying solely on the IEA's Current Policies Scenario.

327.    Other members of the PIC Board occupied senior positions within the Peabody hierarchy.  As noted, Defendant Crews served as Executive Vice President and Chief Financial Officer of Peabody until his departure in July 2015 and was present at virtually every Earnings Conference Calls with Defendant Boyce.  Defendant Fiehler served as Executive Vice President, and Chief Administrative Officer of Peabody and Defendant Slentz served as Executive Vice President and Chief Human Resources Officer of Peabody.  Thus, the Director Defendants had knowledge of Peabody's misstatements.

328.    Moreover, to the extent members of the Committee were unaware of the Company's misstatements – which is not the case because several members of the Committee,

94

including Defendants Crews, Fiehler, Ford, Forkin, Hull, and Slentz occupied senior positions at Peabody during the Class Period— given the resources available to the Committee members as executives of Peabody, a reasonable investigation by the Committee could and should have uncovered the truth regarding Peabody's disclosures no later than December 14, 2012 and indeed, throughout the Class Period.

329.   Disclosure might not have prevented the Plans from taking a loss on Company Stock it already held; but it would have prevented the Plans from acquiring (through Plaintiffs' uninformed investment decisions and continued investment of matching contributions) additional shares of artificially inflated Company Stock: the longer the concealment continued, the more of the Plans' good money went into a bad investment; and full disclosure would have cut short the period in which the Plans bought Company Stock at inflated prices.

330.   On December 14, 2012, Company Stock was trading at an artificially high $26.56 given the Company's concealment of the truth regarding the financial risks associated with climate change and political regulatory responses.

331.   Rather than do nothing (as they did), Defendants could have taken numerous steps to fulfill their fiduciary duties to the Plans under ERISA.  As set forth more fully below, none of these steps (a) would have violated securities laws or any other laws, or (b) would not have been more likely to harm the Company Stock Fund than to help it.

332.   Defendants could have (and should have) directed that all Company and Plan Participant contributions to the Company Stock fund be held in cash rather than be used to purchase Peabody Stock.  A refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions and would not have required any independent disclosures that could have had a materially adverse effect on the price of Peabody Stock.

333.    Defendants also should have closed the Company Stock itself to further contributions and directed that contributions be diverted from Company Stock into prudent investment options based upon the Plan Participants' instructions or, if there were no such instructions, the Plans' default investment option.

334.    Neither of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws.  Nor would the Plans ceasing to purchase additional Company Stock likely send a negative signal to the market.  Based on the Form 11-Ks filed on behalf of the Plans, the Plans were a net-purchaser of Peabody Stock by an estimated 262,809.96 shares between 2012 and 2013.  The trading volume of Peabody Stock for December 14, 2012 alone, the first day of the Class Period, was 620,600 shares.  *See* finance.yahoo.com.

335.    Given the relatively small number of Peabody shares that might not have been purchased by the Peabody Energy Stock Fund in comparison to the enormous volume of actively traded shares, it is extremely unlikely that this decrease in the number of shares that would have been purchased, considered alone, would have had an appreciable impact on the Peabody share price.

336.    Further, Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Peabody Stock Fund.

337.    The failure to take any of the above steps, except for the belated hiring of an independent fiduciary for the Company Stock Fund in December 2015, effectively caused more

harm to the Plans than good because the net result is that the Company's stock is now trading at a fraction of what it was trading for at the start of the Class Period and is heading toward worthlessness.

## THE RELEVANT LAW:  CLAIMS FOR RELIEF UNDER ERISA

338.   ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."  ERISA § 1102(a)(1).   Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plan is also considered a fiduciary of the Plan.  A person or entity is considered a Plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

339.   At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

340.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

341.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan

by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

342.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

343.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the highest known to the law and entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)     the duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

344.     Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the

98

fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

345.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

346.     Plaintiffs therefore bring this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY MANAGE THE PLANS' ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405  BY THE COMPANY DEFENDANTS AND THE COMMITTEE DEFENDANTS)

347.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

348.     This Count alleges fiduciary breaches against the Company Defendants and the Committee Defendants (the "Prudence Defendants") for continuing to allow the investment of the Plans' assets in Peabody Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because:  (a) the Company's basic risk profile had been so dramatically altered due to changed circumstances that

it was no longer a prudent retirement investment Peabody Stock; and (b) Peabody Stock was artificially inflated during the Class Period.

349.    At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they had or exercised discretionary authority or control over the administration and/or management of the Plans and/or exercised any authority or control over the disposition of the Plans' assets.

350.    Under ERISA, fiduciaries who have or exercise discretionary authority or control over management of a plan or exercise any authority or control over the disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plans were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

351.    Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of Peabody Stock.  An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Peabody Stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses, and would have made different investment decisions.

352.    The Prudence Defendants breached their duties to prudently manage the Plans' assets.  During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plans.

Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plans' Participants.

353.   The Prudence Defendants further breached their duty of prudence by failing to divest the Plans of Company Stock during the Class Period when they knew or should have known that it was not a suitable and appropriate investment for the Plans.

354.   The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information to Plan Participants regarding Peabody's true financial condition and, generally, by conveying inaccurate information regarding the Company's future outlook.  Among other things, during the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Participants in the Plans to follow their natural bias towards investment in the equities of their employer, or as was the case here, the parent company of their employer, by not disclosing negative material information concerning the imprudence of investment in Company Stock.  As such, Participants in the Plans could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plans.

355.   As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of Peabody, any generalized warnings of market and diversification risks that Defendants made to the Plan Participants regarding the Plans' investment in Peabody Stock did not effectively inform the Plan Participants of the past, immediate, and future dangers of investing in Company Stock.

356.   The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plans from

inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plans, yet made no effort to remedy them.

357.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants lost a significant portion of their retirement investments.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plans and themselves.

358.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

## BREACH OF THE DUTY LOYALTY (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405 BY ALL DEFENDANTS)

359.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

360.    This Count alleges fiduciary breaches against all Defendants (the "Loyalty Defendants") for continuing to allow the investment of the Plans' assets in Peabody Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because:  (a) the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment; and (b) Peabody Stock was artificially inflated during the Class Period.

361.    At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

362.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

363.    The duty of loyalty includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

364.    During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company Stock and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

365.    During the Class Period, upon information and belief, certain Defendants, including the Company Defendants, made direct and indirect communications with the Plans' participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock.  These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions).

366.    Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press[20] concerning employees' natural bias toward investing in company stock, including that:

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c)    Employees tend not to change their investment option allocations in the plan once made; and

(d)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

367.    Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plans' Participants. Defendants, however, disregarded their duties of loyalty to the benefit of the Company.

368.    Further, Peabody's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain officers' compensation, including

---

[20] *See, e.g.*, David Blanchett, CFA, CFP, Morningstar Investment Management, "Employer Stock Ownership in 401(k) Plans and Subsequent Company Stock Performance," July 1, 2013 at 7; David K. Randall, *Danger in Your 401(k)*, Forbes.com (August 30, 2010), *available at* www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, *7 Ways to Mess Up Your 401(k)*, MSN.com (December 31, 2007); Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007); Roland Jones, *Why we do such a lousy job with our 401(k)s*, MSNBC.com (June 20, 2006), *available at* www.msnbc.msn.com/id/12976549/; Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.), *available at* www.federalreserve.gov/pubs/feds/2002/200236/ 200236pap.pdf).

Defendants Boyce and Crews was in the form of stock awards and option awards.  For example, in 2014, Defendant Boyce received $4,619,615 in stock awards.  *See* 2014 Proxy Statement (filed Mar. 24, 2015) at 53.  Defendant Crews received $885,969.  *Id.*  As noted above, Defendant Boyce's compensation was more than the median pay for CEOs of peer companies.

369.    Certain officers were also beneficial owners of Peabody, including Defendants Boyce and Crews.  As of March 1, 2015, Defendants Boyce and Crews owned 1,603,487 and 190,244 shares of Peabody, respectively.  *Id.* at 31.

370.    Because of at least some of the Defendants' compensation in Peabody Stock and ownership of Peabody Stock these Defendants had a conflict of interest which put them in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plans' Participants, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plans.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); 29 U.S.C. § 1104(a)(1)(B).  These Defendants, while attempting to shore up Peabody during the Class Period as its stock price inevitably plummeted, abandoned their duties to the Plans and their Participants, and failed to consider at any time during the Class Period what was in the best interest of the Plans and their Participants as they should have done as Plan fiduciaries.

371.    Some Defendants may have had no choice in tying their compensation to Peabody Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plans' Participants' retirement savings tied up to a large extent in Peabody Stock or to take steps to protect the Plans and their Participants.

372.    The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plans from

inevitable losses.  The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

373.    As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plans and its participants, the Plans suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and, indirectly, Plaintiffs and the Plans' other Participants, lost a significant portion of their retirement investments.

374.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404
### BY THE COMPANY AND DIRECTOR DEFENDANTS)

375.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

376.    This Count alleges fiduciary breaches against the Company and Director Defendants (the "Monitoring Defendants").

377.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plans, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

378.     As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

379.     Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

380.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

381.     During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     failing, at least with respect to the Plans' investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock; and

(b)      failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

382.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.

383.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

384.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

385.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT IV**

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES BY FAILING TO
PROVIDE THEM WITH COMPLETE AND ACCURATE INFORMATION
(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404
BY THE COMPANY AND DIRECTOR DEFENDANTS)**

386.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

387.    This Count alleges fiduciary breaches against the Company and Director Defendants (the "Monitoring Defendants").

388.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plans, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

389.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

390.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

391.    During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plans' investment in Company Stock;

(b)     to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in Company Stock; and

(c)      failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

392.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.

393.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

394.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

395.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

396.    The total Peabody Stock price collapse of close to 98% as of the filing of the instant Complaint, which devastated the Plans' assets, could have and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties.

397.    Defendants – who knew or should have known that Peabody Stock was an imprudent retirement investment – chose to, as fiduciaries, continue allowing the Plans to

acquire further Peabody Stock, while taking no timely action to protect their wards as Peabody's condition worsened and the Plan Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plans and its Participants.

398.    To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, the following alternative options – which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent – were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plans than to help it.

399.    First, Defendants could have and should have directed that all Company and Participant contributions to the Peabody Energy Stock Fund be held in cash rather than be used to purchase Peabody Stock.  The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on the price of Peabody Stock.

400.    Second, Defendants should have timely closed the Company Stock itself to further contributions and directed that contributions be diverted from Company Stock into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plans' default investment option.  Defendants have confirmed the feasibility of this action as Gallagher has implemented this process.  Plaintiffs do not allege that the timing of the actions is prudent, only that it confirms the feasibility of such action.

401.    Additionally, because Defendants could and should have concluded that Peabody Stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plans' holdings.

402.    As discussed above, Defendants had numerous options to protect the Plans and their Participants but failed to do so.

403.    As a result of Defendants' breaches, the Plans suffered tens of millions of dollars in losses during the Class Period because substantial assets of the Plans were imprudently invested, or allowed to be invested, by Defendants in Company Stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plans' Participants.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

404.    As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

405.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant such as the Plaintiffs here to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

406.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants in the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative

investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

407.    Plaintiffs, the Plans, and the Class are therefore entitled to relief from Defendants in the form of:  (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

408.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## JURY DEMAND

Plaintiffs demand a jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.    A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Participants during the Class Period;

B.    A Judgment compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits

the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.     A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.     A Judgment awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the Plans' Participants' individual accounts in proportion to the accounts' losses;

E.     A Judgment requiring that Defendants allocate the Plans' recoveries to the accounts of all of the Plans' Participants who had any portion of their account balances invested in Peabody Stock maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price of Peabody Stock;

F.     A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  March 11, 2016                          Respectfully submitted,

                                                **DYSART TAYLOR COTTER**
                                                **MCMONIGLE & MONTEMORE, P.C.**

                                                */s/ Don R. Lolli*
                                                Don R. Lolli          EDMO  #56263MO
                                                4420 Madison Avenue
                                                Kansas City, MO  64111
                                                Telephone:  (816) 931-2700
                                                Facsimile:  (816) 931-7377
                                                Email:  dlolli@dysarttaylor.com

                                                **KESSLER TOPAZ**
                                                **  MELTZER & CHECK LLP**
                                                Edward W. Ciolko (*admitted pro hac vice*)
                                                Donna Siegel Moffa (*admitted pro hac vice*)
                                                Mark K. Gyandoh (*admitted pro hac vice*)
                                                Julie Siebert-Johnson (*admitted pro hac vice*)
                                                280 King of Prussia Road
                                                Radnor, PA  19087
                                                Telephone:  (610) 667-7706
                                                Facsimile:  (610) 667-7056
                                                Email:  eciolko@ktmc.com
                                                Email:  dmoffa@ktmc.com
                                                Email:  mgyandoh@ktmc.com
                                                Email:  jsjohnson@ktmc.com

                                                ***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

*/s/ Don R. Lolli*
Don R. Lolli
***Counsel for Plaintiff***

116