```
 1              UNITED STATES DISTRICT COURT FOR THE
       EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, ST. LOUIS
 2

 3   LORI J. LYNN, ET AL.,            )
                                      )
 4                  Plaintiff,        )
                                      )
 5   v.                               )   No. 4:15-cv-00916-AGF
                                      )
 6   PEABODY ENERGY CORP., ET AL.,    )
                                      )
 7                  Defendant.        )

 8

 9                         ORAL ARGUMENT

10

           BEFORE THE HONORABLE AUDREY G. FLEISSIG
11                UNITED STATES DISTRICT JUDGE

12                      NOVEMBER 17, 2016

13   APPEARANCES:

14   For Plaintiff:      Edward W. Ciolko
                         Mark K. Gyandoh
15                       KESSLER AND TOPAZ
                         280 King of Prussia Rd.
16                       Radnor, PA 19087

17                       Don R. Lolli
                         DYSART AND TAYLOR
18                       4420 Madison Ave., Ste. 200
                         Kansas City, MO 64111
19
     For Defendant:      David Tetrick, Jr.
20                       KING AND SPALDING, LLP
                         1180 Peachtree St., N.E.
21                       Atlanta, GA 30309

22                       Sheena R. Hamilton
                         DOWD BENNETT, LLP
23                       7733 Forsyth Blvd., Ste. 1900
                         Clayton, MO 63105

24

25
```

1   REPORTED BY:            PATTI DUNN WECKE, RMR, CRR, CMRS
                            Official Court Reporter
2                           United States District Court
                            111 S. Tenth Street
3                           St. Louis, MO 63102
                            314-244-7984
4

5       PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (THE FOLLOWING PROCEEDINGS WERE HAD ON NOVEMBER

2     17, 2016, AT 9:38 A.M., IN OPEN COURT:)

3          THE COURT:  We are here in the matter of Lori

4     Lynn v. Peabody Energy Corporation et al.  Case number

5     4:15CV916-AGF.  This matter has been scheduled before the

6     Court today for oral argument on the defendant's motion to

7     dismiss, which I think is docket number 83.  And the

8     parties have fully briefed the motion.  I have reviewed the

9     parties' briefs, and I granted the request for oral

10    argument with respect to this matter.  I'd like to have

11    counsel who will be arguing here today please come forward

12    and state their appearance.  So on behalf of the defendant

13    who will be arguing here today?

14         MR. TETRICK:  Good morning.  I'm David Tetrick

15    from King and Spalding.  I'll be arguing on behalf of the

16    defendants this morning.

17         THE COURT:  Okay.  Thank you.

18         MR. CIOLKO:  Good morning, Your Honor.  This is

19    Ed Ciolko from Kessler, Topaz, Meltzer and Check, arguing

20    for the plaintiffs.

21         THE COURT:  Thank you.  And obviously there are

22    other counsel here at counsel table today.  I just want to

23    tell you all that I've allotted slightly more than an hour

24    for this so that you all should keep that in mind as we are

25    proceeding here.  We will of course begin with the

1   defendants.  And I will permit the defendants some brief

2   reply time as well, but I think you all should kind of

3   assume you've got about 20 to 25 minutes to argue with the

4   notion that I'm going to ask you some questions that are

5   going to derail what you plan to say a little bit at times,

6   so we'll feed in a little extra time for that.  Does that

7   work for everyone?

8            MR. CIOLKO:  Yes.

9            MR. TETRICK:  Yes.

10            THE COURT:  All right.  Anything that we need to

11   take up prior to argument?

12            MR. TETRICK:  No, Your Honor.

13            THE COURT:  Good.  As I said, I do want you all

14   to know that I have reviewed the briefs that the parties

15   filed in this matter.  I don't purport to have reviewed

16   every case that was cited in all of those briefs, but

17   obviously we have more work that we will do with respect to

18   this matter after your argument here today.  So you may

19   proceed.

20            MR. TETRICK:  Good morning, and may it please the

21   Court.  My name is David Tetrick and I represent the

22   defendants in this case.  Your Honor, we filed this motion

23   to dismiss chiefly because the plaintiffs' second amended

24   complaint fails to state an ERISA claim under the demanding

25   requirements that the Supreme Court announced in 2014 in

 1   it's Fifth Third v. Dudenhoeffer case.

 2          COURT REPORTER:  I'm sorry, I couldn't hear

 3   that.

 4          THE COURT:  Fifth Third, F-I-F-T-H  T-H-I-R-D.

 5   And if I could get you to speak up a little bit I think

 6   that would help.

 7          MR. TETRICK:  Yes, Your Honor.  I'm getting over

 8   a cold and I can't quite hear myself yet.  I want to make

 9   sure that I'm not yelling at the Court.

10          THE COURT:  This is good.

11          MR. TETRICK:  I will refer to this case as

12   Dudenhoeffer to make it slightly easier than Fifth Third.

13   But in Dudenhoeffer, as we set forth in the briefing, the

14   Supreme Court articulated two distinct types of tests for

15   these ERISA company stocks or stock drop cases like the one

16   that brings us before the Court today.  And the Supreme

17   Court set this up under Rule 12.  It is a motion to dismiss

18   argument.  And it tests the pleadings.  It tests the claims

19   that a fiduciary should have known from public information

20   that a particular investment in a 401(k) plan was a

21   imprudent investment by one standard; it tests a claim that

22   a defendant should have known based upon inside information

23   that the investment was an imprudent one based on a

24   different standard.

25          THE COURT:  Now, I don't get the sense from the

1    review of the plaintiffs' memorandum here that they believe

2    that those two must be distinct.  I understand that those

3    two claims were analyzed separately by the Supreme Court,

4    but on what do you rely for the proposition that they must

5    be distinct and that there cannot be a combination of

6    public and nonpublic to support a claim?

7              MR. TETRICK:  I would point to two things, Your

8    Honor.  The first being that in the underlying Dudenhoeffer

9    case that the Supreme Court agreed to review, the two

10   claims existed, but nevertheless the Supreme Court pulled

11   them apart and announced very different standards to review

12   those two claims.  I would also point the Court to the

13   Fifth Circuit's recent case in BP, PLC, versus Whitley

14   case, or Whitley versus BP, PLC, where the Fifth Circuit

15   said that it was improper to conflate the two.  And

16   finally, I would refer the Court to the Radio Shack

17   decision that came out about 45 days ago out of the Western

18   District of Texas that also said that the two claims cannot

19   be conflated the way that the second amended complaint in

20   this case attempts to do so.

21             So turning to the public information claim first,

22   Your Honor, which is contained in both Counts One and two.

23   And the bulk of the complaint is devoted to the public

24   information claim which is not altogether surprising

25   because as we'll speak about when we get to the nonpublic

1    information claim, the basis of the nonpublic information

2    claim is a press release by the New York Attorney General

3    that occurred in November 2015.  This case was originally

4    filed in June 2015 as a straightforward public information

5    claim.  Therefore, it is not surprising at all that the

6    overwhelming majority of the allegations in the complaint

7    are based on public information.  And the complaint spends

8    a significant amount of time describing how the price of

9    Peabody Energy Corporation's publicly traded stock was on a

10   steady decline from the beginning of the class period,

11   which is December 2012, all the way through the date that

12   the complaint was filed.  And the plaintiffs include even

13   at paragraph 287 of the complaint a chart that demonstrates

14   the steady decline of Peabody stock over that period.  And

15   the thrust of the complaint is that based upon all of the

16   bad news both for the coal industry on a worldwide basis

17   and how Peabody was affected by the headwinds within the

18   coal industry, that anybody looking at the public

19   information available would have determined that this was

20   an imprudent investment.  That's the thrust of the

21   complaint.

22        The problem with those sets of allegations is

23   that the Supreme Court in Dudenhoeffer was so skeptical of

24   a public information claim even being available under

25   ERISA, and that is why in the Dudenhoeffer case the Supreme

 1    Court set forth a standard that said that claims -- that a

 2    fiduciary should have read the publicly available

 3    information and determined to divest the retirement plan of

 4    company stock are implausible as a general rule.  The Court

 5    did leave open the possibility that special circumstances

 6    might exist that would make such claims plausible, but the

 7    Court declined to define what those special circumstances

 8    were instead leaving it for the lower courts to determine

 9    what those special circumstances might be.

10              THE COURT:  And what do you believe, based upon

11    the case law that has developed since that time, might

12    constitute special circumstances?

13              MR. TETRICK:  I know this much, Your Honor, I

14    know that what is alleged in the second amended complaint

15    has not been found to be enough except in one case that the

16    plaintiffs cite in their brief.  The majority of the cases

17    out there, the overwhelming majority have found that the

18    types of things that are alleged in this complaint are

19    simply not enough.  But to answer the Court's question as

20    to what would be enough in a case where Dudenhoeffer was

21    faithfully applied, I think that you can look to some of

22    the pre-Dudenhoeffer cases, take it back to the early 2000s

23    where these cases first started gaining momentum and those

24    were within the Enron case and within the Worldcom case and

25    some of the early 2000 corporate scandals where

1    corporations that seemingly were very healthy melted down

2    virtually overnight.  And in those cases, what they had in

3    common and what a special circumstance might be would be

4    accounting fraud, restatement of their financials,

5    something that would make the market look at the value of

6    the stock and say we had this entirely wrong, the public

7    information was entirely wrong.

8            In the Eleventh Circuit's case involving Delta

9    Airlines, Smith versus Delta Airlines case that we cited in

10   our brief, that case had been filed in the early 2000s, I

11   believe it was 2004.  And in that case when it eventually

12   reached the Eleventh Circuit, the Eleventh Circuit

13   recognized that accounting irregularities, financial

14   statement fraud, those types of sudden events that cause

15   you to doubt all of the public information that's out

16   there, that's the type of special circumstances that the

17   Supreme Court meant in Dudenhoeffer.  And to be clear,

18   since that time line might have been a little jumbled, the

19   original Smith versus Delta Airlines case was filed

20   in 2004.  And I will take some suspense out of the room by

21   telling you that my colleagues on plaintiffs' side know

22   that case very well.  They were counsel of record in that

23   case.  But even though it was filed in 2004, the Eleventh

24   Circuit opinion that I'm speaking of was in 2015, that is

25   after Dudenhoeffer had come out, and it had to wrestle with

1   the Dudenhoeffer standard as apply to events that had

2   occurred before Dudenhoeffer took place.

3        So, that's what I would look to for special

4   circumstances, and when I look in this complaint here I

5   don't see anything along those lines, something that would

6   make you doubt what is out there publicly.

7        The plaintiffs set forth four special

8   circumstances in the second amended complaint.  The first

9   one is that based on the nonpublic information that the

10  fiduciaries knew or had access to special circumstances

11  existed here.  That conflates the Dudenhoeffer analysis,

12  which says that the fiduciaries as a normal course of

13  things are entitled to rely on things that are publicly

14  available.

15       The remaining -- I should say, the second and

16  third thing that the second amended complaint points to as

17  a special circumstances is in reverse order, the debt level

18  of the company and the Z-score of the company, which is a

19  financial engine that professionals use if they're trying

20  to determine the likelihood of a bankruptcy filing.  Both

21  of those things as we pointed out in our brief, are

22  publicly available.  The debt certainly is, that can be

23  found in financial statements.  And the Z-score itself is

24  just another way of slicing up the publicly available

25  information.

1    The fourth and final special circumstance that

2 the plaintiffs point to is the failure to investigate; that

3 is, that these fiduciaries allegedly did nothing in the

4 face of all of this public information that painted such a

5 dim picture of the prospects for the entire industry, let

6 alone Peabody stock.  The issue there is that it goes to

7 the Dudenhoeffer requirement that the special circumstance

8 must have something that impacts the reliability of the

9 markets valuation of the stock.  A Fiduciaries' failure to

10 investigate even if true, would not move the needle because

11 presumably there would not be a public disclosure saying

12 our fiduciaries have failed to investigate, therefore the

13 market would not react to that failure to investigate.

14    So for all of these reasons, we think that the

15 Dudenhoeffer special circumstances test is not applicable

16 here because none of the special circumstances that the

17 plaintiffs have alleged would have affected reliability of

18 the stock, and therefore the default rule of Dudenhoeffer,

19 that is claims based on public information of the type that

20 are before the Court today are implausible as a general

21 rule.

22    And unless the Court has additional questions

23 about that?

24    THE COURT:  I do.  So is there a time when the

25 economic circumstances of a company become so dire that it

1   becomes an imprudent investment, notwithstanding the -- I

2   mean, putting aside any claim that the stock itself, the

3   price is inflated or, you know, the risk has not been

4   properly assessed by the market.  So looking to the

5   language in Kodak, looking to some of the early language in

6   the opinion in Dudenhoeffer, doesn't the Court assume that

7   even under the stringent rule that they were examining for

8   fiduciaries that there could be a situation where the

9   economic circumstances got so dire that it would be an

10  imprudent investment?

11          MR. TETRICK:  I think that in Dudenhoeffer they

12  describe that as being between a rock and a hard place

13  because there is also a cause of action available under

14  ERISA for selling out of a stock that is within a 401(k)

15  plan and then when the stock rebounds then the fiduciaries

16  could be sued for imprudently getting rid of the stock.

17          THE COURT:  But wasn't the Supreme Court talking

18  about that rock and a hard place in the context of whether

19  to continue to adopt this differential standard, and it

20  rejected that?

21          MR. TETRICK:  No argument, Your Honor, that the

22  Court rejected the presumption of prudence.

23          THE COURT:  Right.  And I'm just looking at the

24  language, you know, before they are analyzing and rejecting

25  each of the arguments that were made to try and continue

1    the presumption, the Court says the proposed presumption

2    makes it impossible for a plaintiff to state a duty of

3    prudence claim no matter how meritorious unless the

4    employer is in very bad economic circumstances.  Now, that

5    language suggests to me that one can get to a point where

6    the economic circumstances are so dire that it would be

7    imprudent for the fiduciaries to continue to purchase the

8    stock even though the market information might be

9    correct.

10           MR. TETRICK:  I read Dudenhoeffer a little bit

11   differently, Your Honor, respectfully.  I read that as

12   commentary on the -- the Court's commentary on the problems

13   with the presumption of prudence and the way that it had

14   grown up; that is, in trying to apply this presumption of

15   prudence the courts of appeal that had taken this up had

16   all come up with slightly different variations on the theme

17   that fiduciaries within an ESOP, a plan that is designed to

18   hold nothing but employer stocks, were entitled to hold on

19   to that employer stock absent dire economic circumstances.

20   And I think that the Supreme Court's commentary was that

21   that presumption of prudence and that dire economic

22   circumstances was wholly at odds with what the statute

23   actually says.

24           The statute actually says that there are

25   delineated fiduciary duties and that the Supreme Court

1   ultimately came down and said those statutory fiduciary

2   duties they apply to all investments.  So I don't read that

3   as a license to make an allegation like the ones that we

4   have here that, yeah, eventually you just had to know that

5   the stock had reached such a place.

6           THE COURT:  So even on the eve of bankruptcy?

7           MR. TETRICK:  Even on the eve of bankruptcy, I

8   don't think that a claim exists under Dudenhoeffer, and I

9   don't think that the second amended complaint here makes

10  out a claim under Dudenhoeffer.  The special circumstances

11  test is supposed to be difficult, and I think it is because

12  the Supreme Court had severe doubts as to whether a claim

13  like this even exists under ERISA, but it left it to the

14  very capable members of the ERISA plaintiffs bar to make

15  out allegations nevertheless that might show the Court that

16  these types of claims, which are implausible as a general

17  rule, might nevertheless survive.

18          Our point is, there's just not enough here.  We

19  are different from Kodak.  When I say "we" Peabody Energy

20  Corporation who either employed my clients or still employs

21  my clients.  Kodak was a company that I think the autopsy

22  result is that it's a company that failed to react to

23  changes in the marketplace, changes in technology, et

24  cetera, whereas Peabody Energy Corporation, notwithstanding

25  its current status as a Chapter 11 debtor, is still in a

1  going business.  Coal has taken a beating over the last

2  several years for sure.  Nevertheless, it still accounts

3  for a significant amount of the energy that is consumed

4  across the planet.  And Peabody is in the course of putting

5  together a plan of reorganization that will take advantage

6  of the demand that is still out there.  There still is a

7  demand for coal in a way that there is very little demand

8  for the Polaroid pictures that I loved so much when I was a

9  kid.

10       THE COURT:  So talk to me about the New York

11  Attorney General's report.

12       MR. TETRICK:  So, on November 9, 2015, the New

13  York Attorney General issued a press release.  Peabody

14  issued a press release on the same day.  And in the New

15  York Attorney General's press release what he said, what

16  General Schneiderman said was that he had determined based

17  on an investigation that Peabody Energy Corporation had

18  violated New York laws prohibiting false and misleading

19  conduct in the company's statements to the public as

20  investors.  And the plaintiffs begin and end their claims

21  about this, which begin at paragraph 281 and conclude at

22  paragraph 307 of the second amended complaint by referring

23  to this press release on November 9.  And they say this is

24  what makes up the material nonpublic information that

25  underpins their nonpublic information claim.  We then have

1    to take that nonpublic information existence of that

2    nonpublic information and run it through the separate test

3    that the Supreme Court set fourth in Dudenhoeffer.

4              And as we said in the briefs, as a fundamental

5    issue there is an Iqbal and Twombly problem with this

6    claim; that is, it is plainly contradictory to the other

7    allegations in the complaint, the majority of the

8    allegations in the complaint, among them being that during

9    the entire class period the company's financial condition

10   when viewed through the lens of objective financial metrics

11   plainly indicates the company's deterioration over the last

12   several years.  In fact, the complaint is chocked full of

13   bad news that the company had disclosed in October of 2015.

14   The complaint even says that on November 9, the same day

15   the press release came out, that Peabody was rated as one

16   of the worse dividend stocks; meaning, that it is

17   implausible and contradictory to the rest of the complaint

18   that this information when disclosed to the market had any

19   impact whatsoever.  In fact, as we pointed out, the company

20   stock actually rose on the day of the press release.  The

21   press release went out in the morning, the company stock

22   closed higher than it had the previous Friday's closing

23   price.  As we also conceded, the price did go down slightly

24   over the coming weeks.

25              THE COURT:  But let's assume for a moment that

 1   we've got what would be a line like this of declining price

 2   (demonstrating).  Is it implausible that when we get to

 3   this day and some nonpublic information is disclosed that

 4   the stock changes and maybe it would have been, you know,

 5   maybe it would have gone a little bit like this, or maybe

 6   then the angle turns slightly steeper (demonstrating).  How

 7   can I assess that on a motion to dismiss?  It seems as

 8   though you are asserting to me that I can determine just on

 9   the face of the pleadings and the public information that's

10   available about the stock price, that that disclosure had

11   no material impact on the price of the stock.  How can I

12   decide that on a motion to dismiss?

13          MR. TETRICK:  Your Honor, I think it's

14   theoretically possible that the facts as you just described

15   them might result in a different outcome; that is, a 45

16   degree downward slope, a disclosure of negative previously

17   nonpublic information that then results in the 45 degree

18   slope turning into --

19          THE COURT:  Forty-six or a forty-eight.

20          MR. TETRICK:  Sixty or sixty-five, whatever the

21   case may be.  If that were the case here, we would not have

22   even suggested to the Court that it could take up this

23   issue under Rule 12.  Here however, the plaintiffs' own

24   second amended complaint provides the very chart that

25   you're speaking about, and it shows that there is almost no

1    difference within the price of the stock period after this

2    disclosure.  And the Eighth Circuit does not prohibit the

3    Court from taking up materiality on a motion to dismiss.

4    It allowed it in Braden v. Wal-Mart case so long as no

5    reasonable jury could disagrees about the materiality.  And

6    we think that by making such a forceful case within the

7    second amended complaint, including the charts and graphs

8    that plaintiffs have so helpfully provided, that they have

9    pled themselves out of that issue.

10           We would, however, nevertheless like the Court to

11   go on to the Dudenhoeffer analysis with regard to the

12   nonpublic information even if it were to agree with us that

13   it could find these claims implausible simply based on the

14   face of the complaint.  We would still prefer that Court

15   turn to the Dudenhoeffer analysis because we think that's

16   where the weakness in these New York Attorney General

17   claims are unquestionably brought to fore.  When you take

18   the Dudenhoeffer analysis and you apply it, the two pieces;

19   that is, if you assume that these fiduciaries were in

20   possession of the same negative material information that

21   the complaint alleges was revealed on November 9, 2015, if

22   you assume that they're in position of that, the question

23   under Dudenhoeffer is what should they have done.  And

24   Dudenhoeffer is clear that there's a two-part test for

25   them.  When I say "them" I mean the plaintiffs.  They have

1    to make allegations that there is something that the

2    fiduciaries could have done that, first, wouldn't have

3    violated the securities laws; and second, is something that

4    a prudent fiduciary would not have concluded was more

5    likely to do more harm than good.  In this case, the

6    Plaintiffs simply have not made out those allegations.

7    They have attempted to make out those allegations but have

8    simply failed.

9         THE COURT:  Well, but haven't they alleged that

10   those actions would have been something like was done

11   later, the appointment of an independent fiduciary who

12   might then make the decision to hold off on further

13   purchases of the company stock until such time as the

14   market would digest and take into account that information?

15        MR. TETRICK:  They have alleged that an

16   independent fiduciary was hired in -- well, an independent

17   fiduciary in February of 2016 decided to divest the plan of

18   company stock.  That doesn't address, however, what these

19   fiduciaries should have done in December of 2012, or the

20   period thereafter.  And it certainly cannot be the case

21   that any allegation that, well, you could have hired an

22   independent fiduciary is enough to get over Rule 12 under

23   Dudenhoeffer, because afterall, any fiduciary of any

24   retirement plan can always choose to hire an independent

25   fiduciary, but that's not required.  ERISA has this tension

1    within it where it allows employees of the employer who

2    sponsors the plan to act as a fiduciary in house.  And so

3    Dudenhoeffer cannot be read to require that an independent

4    fiduciary be hired each time things get rocky, otherwise

5    there'd be no point in having these fiduciaries to begin

6    with.  They are there for some of the more beneficial

7    reasons, that is the in-house fiduciaries.

8         THE COURT:  So if you had to fix the time period

9    when this material nonpublic information with respect to

10   the New York Attorney General was possessed by the

11   fiduciaries, when would that be?

12        MR. TETRICK:  I think the Court has to assume

13   from the very beginning of the class period because that's

14   what the complaint says, which is why I fix on 2012 and

15   forward when the stock was at a much higher place than it

16   was even when the independent fiduciary was hired.

17        Your Honor, I think it's worth pointing out that

18   the plaintiffs' articulation of Dudenhoeffer is quite

19   different than one that I have just told you the Court

20   should apply.  And they set forth in their opposition brief

21   that Dudenhoeffer means that another fiduciary could

22   conclude that their alternative actions would have -- would

23   not have done more harm than good.  I think that that's

24   lowering the bar here and the Fifth Circuit happens to

25   agree with me in Whitley versus BP.  And I would ask the

1    Court to take a look at the Fifth Circuit's articulation of

2    what Dudenhoeffer meant with the benefit of another case

3    that the Supreme Court decided after Dudenhoeffer, the

4    Amgen case.  And the Fifth Circuit does a very nice job of

5    pulling those things together.  And it wrote that under the

6    Supreme Court's formulation the plaintiff bears the

7    significant burden of proposing alternative course of

8    action so clearly beneficial that a prudent fiduciary could

9    not conclude that it would be more likely to harm the fund

10   than help it.

11          Here are two things that plaintiff say meet that

12   standard.  One is that our fiduciaries should have begun

13   directing all of the contributions both from employer and

14   the employee that were designated to go to the employer

15   stock fund, the fiduciary should have changed that and

16   started sending them to cash instead, presumably without

17   telling anybody notwithstanding what the direction of these

18   participants was with regard to how they wanted their money

19   invested.  Presumably these fiduciaries should have instead

20   diverted the money to a cash fund.

21          And the second is freezing the fund altogether.

22   The problem with the first is that it is a -- it creates a

23   problem with regard to the relationship between the

24   fiduciaries and the participants if that is not disclosed;

25   that is, we are not following your directions, we are going

1    to move things that you want to go into employer stock into

2    cash.  You have to disclose that.  The securities law say

3    you can't just disclose it to the participants because it's

4    a publicly traded stock, so you'd have to disclose this to

5    the market.  Of course, ERISA fiduciaries do not have the

6    type of access to disclosures to the markets.  ERISA

7    fiduciaries are not in business of filing 8(k)s on behalf

8    of their employer sponsor for example.  There are 80 plus

9    years worth of regulations and case law built up around

10   when and how you disclose things like that.

11           So that would have required going through the

12   securities function.  It would have required a disclosure

13   to the market.  And before the participants could have

14   caught up as the Fifth Circuit pointed out in Whitley, it's

15   more likely than not -- a reasonable fiduciary could

16   conclude that it's more likely than not that the

17   fiduciaries would have looked at that and said that's going

18   to hurt our people more than it's going to help them if the

19   market reacts poorly before they can move.  And it would be

20   before they could move, because as the SEC has pointed out

21   in the briefs that the plaintiffs attached to their

22   opposition brief, it is not lawful to simply freeze

23   contributions.  You can't just stop buying stock that a

24   participant wants you to buy, you also have to stop selling

25   stock as well until such point as you disclose that to the

1  market.  And the SEC confirmed in that brief what we said

2  in our brief which is once you get into that regime of

3  freezing a employer stock fund, you have to go through the

4  disclosure requirements, you have to go through the black

5  out requirements, and you'd put your participants in a

6  situation where everybody else in the market knew that a

7  group of employees had decided that the employer stock fund

8  was no longer prudent because the SEC regime requires that

9  you explain why you've taken this conduct at a time when

10  the participants couldn't do anything about it.  The Fifth

11  Circuit says that that is simply not enough to overcome

12  Dudenhoeffer.

13       So, looking at our second amended complaint there

14  is just not enough here to reach that high standard that

15  the plaintiffs are required to clearly articulate in the

16  words of the Fifth Circuit, and we would ask that the Court

17  apply that same standard.

18       THE COURT:  Thank you.

19       MR. TETRICK:  Thank you, Your Honor.

20       THE COURT:  Hear from the plaintiffs.

21       MR. CIOLKO:  Good morning again, Your Honor, if

22  it please the Court.

23       THE COURT:  Good morning.

24       MR. CIOLKO:  My friend, Mr. Tetrick, is in

25  excellent order.  I also have a cold, so I'm going to ask

1    for the benevolence of the courtroom court reporter.  I

2    also tend to speak quickly --

3            THE COURT:  Well, we'll stop you if you start

4    doing that.

5            MR. CIOLKO:  Thank you.  So if I'm speaking

6    deliberately it's not because I'm confused, it's because

7    I'm trying to learn lessons my wife is teaching me.

8            First thing I'll say is, Your Honor, your

9    analysis of Dudenhoeffer and the point that you made is

10   spot on and are ones that we made in not just the Kodak

11   case, but in other cases such as LandAmerica, in a couple

12   of cases that we haven't done ourselves, the Braden case in

13   front of your court.  But the essential point was, Your

14   Honor said, okay, Dudenhoeffer's main job was to look at

15   this presumption of prudence that had become stricter and

16   stricter and stricter.  And as your court noted, how could

17   it be that only the worse possible situation, the most dire

18   financial implosion could cause a fiduciary to have

19   responsibility to act.  We need something better to

20   separate the wheat from the chaff.  And the Court uses a

21   much better analogy.  But essentially how do we do that;

22   meritorious claims versus nonmeritorious claims.

23           And it's true that merely -- I don't disagree

24   with what the Court -- I might not have used the same

25   words, but surely there does need to have special

1    circumstances for a fiduciary of a publicly traded company

2    to remove company stock as a 401(k) plan option.  If I may

3    just read quickly from Dudenhoeffer in the section where

4    they start to discuss the nonpublic information claim which

5    is the larger part of the claim in this case.

6            THE COURT:  You're saying the nonpublic

7    information is the larger part of the claim in your case?

8            MR. CIOLKO:  I'm sorry, the public information.

9            THE COURT:  Okay, because I didn't read your

10   complaint that way.

11           MR. CIOLKO:  I was still getting my notes out of

12   my head from Mr. Tetrick, sorry.  Justice Breyer who

13   started off -- just for full disclosure, Fifth Third

14   Dudenhoeffer case was our firm's case, and I did a fair

15   amount of the briefing all the way up when I second chaired

16   the argument.  So you could feel the tension back and forth

17   on certain issues.  Justice Breyer was quite clear that in

18   one of our special circumstances where fiduciaries are

19   being presented with public material again and again and

20   again that would show the almost inevitable decline of

21   value in the stock but just ignore it and take no action,

22   you have a claim in and of itself.

23           In the decision itself, the Court does say:  In

24   our view where a stock is publicly traded allegations that

25   a fiduciary should have recognized from publicly available

1    information alone that the market was over or undervaluing

2    the stock are implausible as a general rule at least in the

3    absence of special circumstances.

4          And it goes on, In other words, a fiduciary

5    usually is not imprudent to assume that a major stock

6    market provides the best estimate of the value of the

7    stocks traded on it that is available to him.  Which is

8    essentially the primary argument defendants make if there

9    is a publicly traded price, there cannot be a claim for

10   imprudence for holding that investment of company stock.

11         THE COURT:  Well, I think what the defendants say

12   is if there is a publicly available price there cannot be

13   such a claim absent special circumstances indicating that

14   the market is not reflecting that information.

15         MR. CIOLKO:  That's true.  Your Honor, I would

16   only disagree as to the fact that there's two different

17   sections, one is in absence of special circumstances.  Then

18   later in the decision it gives an example of what would be

19   a special circumstances which is something -- which are

20   events that would make a particular market inefficient or

21   in an appropriate measure.  That's just one special

22   circumstance.

23         THE COURT:  And what is the example that you

24   believe the Supreme Court offers?

25         MR. CIOLKO:  I believe the Supreme Court does

1    offer one example, not exclusive.

2            THE COURT:  And what is that?

3            MR. CIOLKO:  That is if a plaintiff were to prove

4    that a market were insufficiently efficient or did not take

5    in all relevant information or was not a reliable indicator

6    of the value of stock of a share of stock of a publicly

7    traded company, it's possible that a plaintiff would bring

8    a public information claim, but that's not the exclusive

9    special circumstance, that's one example.  I'll get into

10   why I think some of the things that we've talked about are

11   special examples.

12           If I may, the Court in my previous quote that

13   ended in essentially the best estimate of the value of the

14   stocks traded on it is that a fiduciary is not imprudent to

15   rely on a price of stock -- on a stock's price, I

16   apologize.  And it cites to a very famous ERISA case

17   written by Judge Posner in the Seventh Circuit, Summers

18   versus State Street.  If you go to the very point, the very

19   citation at Summers, if you bear with me for a second.

20   This is another ERISA company stock case.  The Court

21   states, Thus at every point in the long slide of United

22   stock price, that price was the best estimate available, it

23   is to State Street or the UAL committee of a company's

24   value.  So neither fiduciary was required to act on the

25   assumption that the market was overvaluing United.  So

1    Justice Breyer is taking directly Judge Posner's statement

2    to support beginning of the special circumstances

3    discussion.  Then Justice Posner goes on, What is true

4    however is that the fall in the market price of United

5    Airlines there was increasing the risk borne by the owners

6    of the stock, the participants in ESOP.  There's always

7    risk in the sense of variance of returns to owning common

8    stock because the fortunes of a company are uncertain and

9    stock holders, unlike bond holders and other owners of the

10   companies debt, do not have fixed entitlement.  Some

11   companies however are risker than others.  Of particular

12   relevance to this case, the higher the ratio of fixed

13   interest debt to equity is the riskier the position of the

14   equity holders common holders are.

15          Essentially, Judge Posner is saying there are

16   circumstances where there's a publicly traded company and

17   it trades at a certain price, but it has been falling

18   precipitously, and for irreversible reasons having to do

19   with the economy, the particular industry that the company

20   is involved in.  If there's a high enough debt equity ratio

21   in other words, this investment is no long an appropriate

22   investment for this vehicle.  And I think what's not

23   discussed because it wasn't really a point of discussion

24   except for one line in the Dudenhoeffer cases, all of these

25   cases, ERISA is based in trust law and what dictates the

1     administrators of a plan is the purpose of the plan.  The

2     purpose of this plan, if you'll read the investment policy

3     statement, is to aid in the long term retirement savings of

4     its participants.

5            So I think I would just like to speak more

6     plainly than I have.  In some ways Polaroid was a sadder

7     story than Peabody.  And in some ways Peabody is a much

8     worse case.  In Polaroid, which I was also involved in that

9     case, there was a chance along the way for the company to

10    divest and diversify into different technologies; it

11    decided not to, and it paid the price for hanging on to a

12    technology that was beloved but out of date.  When you are

13    a mining company, a coal mining company that's essentially

14    permanently being overtaken by natural gas in both supply

15    and price, when coal companies are being divested by

16    sovereign wealth funds, the largest in the world, by

17    CalSTRS and CalPERS in the State of California, when the

18    press covering it is essentially saying coal as we know it

19    is dead, along with U.S. Government making regulations

20    making it more and more expensive to dig up coal which is

21    deeper and deeper.  That is a much -- that is a much harder

22    case for a company to come back from.  There's no --

23    there's so much invested in this one product -- there's two

24    types of coal -- but there is no chance like Polaroid had

25    to diversify its intellectual portfolio into other

1   products.  There's holes in the ground, big holes in the

2   ground where they get coal, and some of the biggest buyers

3   in China and India are going to Indonesia, or in their own

4   countries and producing their own coal.  What I'm saying

5   is, when you have a 99 percent drop in the class period,

6   when you have an Alt-Z score which takes fundamentals in a

7   unique way but a way that's been blessed by financial and

8   analytical professionals across the board as well as D.C.

9   Circuit as an excellent indicator of potential bankruptcy,

10  when you have a company, Patriot Coal, that you spun off in

11  2007 twice filed for bankruptcy for the same reasons, you

12  know, declining sales, increased costs ending of high

13  priced contracts, natural gas overtaking in volume and in

14  price the place in the electrical grid and forecast that

15  that's not going to end in the foreseeable future, and two

16  other coal companies, Arch Coal and Walter Energy also

17  filing for bankruptcy, Arch Coal and Patriot Coal also

18  before they filed for bankruptcy hired an independent

19  fiduciary, looked at their company stock fund, and sold the

20  shares.  At some point along the line when a company such

21  as this is falling and there's no end in sight, and it's

22  sad because the company had lost 31,000 employees since

23  2009, it lost 20 or 30 billion dollars in market capital,

24  if this isn't the case where the fiduciaries of a plan

25  should have taken some action to protect their workers who

1    were losing their jobs by simply removing the company stock

2    investment, I don't know what is.

3        THE COURT:  So -- but your complaint posits that

4    that action should have been taken in December of 2014,

5    right?

6        MR. CIOLKO:  December of 2012.

7        THE COURT:  2012, excuse me.  So what is it about

8    December of 2012 that makes that the moment when a

9    fiduciary should know that this is when it's got to happen?

10       MR. CIOLKO:  That's a good question, Your Honor,

11   and if we get a chance to go through discovery the dates

12   may change because internal documents may show a year here,

13   six months there, but to us we were conservative.  There

14   were certainly red flags that went back as far as 2009, and

15   10, and 11, and 12 for the problems that the coal industry

16   were having.  In 2001 when the company went public,

17   President Bush was pushing coal as the big new -- not new,

18   the old is new energy source and climate control was not

19   really at a forefront as it is now.

20       THE COURT:  And there is certainly the

21   possibility that in the United States someone who could be

22   elected who is not terribly concerned about or believes in

23   global warming and could create a regulatory environment

24   that is much more hospitable to coal, correct?  Can you

25   envision such a possibility?

1              MR. CIOLKO:  Your Honor, I envisioned this

2    question and it's a good one.  But what the President-elect

3    cannot do is roll back every regulation.  What the

4    President-elect cannot do is stop the natural gas industry

5    from continuing to dominate.  What the President-elect

6    can't do is stop China from completing their infrastructure

7    and using their own mines and cheaper coal from Indonesia.

8    There's some things they can do, but all this is -- and

9    this is just -- it's an interesting question, interesting

10   talk, but it almost doesn't matter because a fiduciary has

11   to look at the circumstances as they exist at that time.

12   And you could argue, a fiduciary even as recently as year

13   ago if they were to prognosticate who would be in the White

14   House a year from now may not have thought that it was the

15   most likely to be President-elect, and hopefully he does

16   very well.  But you have to judge the propriety of

17   investing in company stock during those circumstances.

18              It's interesting the most indepth discussions

19   that you see in cases before and after Dudenhoeffer with

20   regards to divestment of company stock, employer stock and

21   401(k) plans are usually found when a company actually

22   takes action to divest company stock and then they get sued

23   by the employees who want to keep it in.  In the Tatum case

24   which has been up and down in the Fourth Circuit has gone

25   deep into the case towards trial, you'll see that the

1   experts and the courts say you have to look at the totality

2   of the circumstances including the changing risk to the

3   company.  This is a completely different company now that

4   has gone bankrupt.  It's almost -- what troubles me the

5   most -- and my colleagues are going to say you forget to

6   hit the three biggest things -- but what troubles me the

7   most is what I truly believe is that we filed this suit

8   belatedly after all of its major competitors either filed

9   for bankruptcy and/or got their own independent fiduciary

10   and got rid of imprudent stock; they did it here.  It's

11   very clear from February 26, 2016, Gallagher informed

12   participants by letter that it had decided to freeze and

13   subsequently eliminate the Peabody stock fund as an

14   investment option in its plan.  Gallagher concluded that

15   maintaining the stock fund as an investment option is no

16   longer consistent with the fiduciary responsibility

17   provisions of ERISA.  Gallagher further stated that its

18   decision simply reflects its judgment as a fiduciary, that

19   it is in the interest of the plan's participants to

20   eliminate their exposure within the plans through the stock

21   fund to the risks facing the company in Peabody stock.  Do

22   my colleagues and their company disagree with that?  How is

23   it possible for an IF to come to that conclusion?  It's not

24   challenged by anyone, and it's used more and more because a

25   lot of the fiduciaries in this plan, or CEOs, CFOs, CIOs --

1    and not to cast any aspersions, you are inherently

2    conflicted.  There was a lot of arguments made at the

3    Supreme Court, you know, you don't want to send any bad

4    signals by selling the stock, it will get even worse.  And

5    we can put that aside.  For a company like this, you could

6    have stock price of one day and you know the stock price is

7    going to be lower the next day and the next day because you

8    know what the financials look like and what the news is

9    going to look like.

10           When they finally divested the stock here, there

11   was no reaction, no appreciable reaction by the stock

12   market.  And these other companies, Patriot Coal and Arch

13   Coal when they divested, they divested for all the same

14   reasons over all the same years, over industry collapse and

15   the rise of natural gas and supply of natural gas, and the

16   climate control worries around the world that were limiting

17   significant huge institutional holders of coal stock,

18   therefore limiting the ability for the company to raise

19   money, so they had to do it through debt.  And we do have

20   lovely charts.  If you see the chart, besides the Z-Altman

21   chart, on the flip side you see the debt equity ratio.

22           THE COURT:  But isn't the Alt-Z score and the

23   debt equity ratio, aren't those public pieces of

24   information that the market is digesting?

25           MR. CIOLKO:  Yes, it is, Your Honor.  It's

1    digesting, but for this plan, the fiduciaries -- this isn't

2    like a Schwab account.  These fiduciaries have a

3    responsibility, have a responsibility to put the people in

4    the best position to save for retirement over time.  While

5    this stock is at five year, as Judge Posner said if it

6    continues to decrease and the debt continues to increase

7    you are at a higher risk of bankruptcy, of your stock being

8    worth nothing.  It simply can't be that any publicly traded

9    investment vehicle, any one, pick one, in any plan can

10   never be found an imprudent investment because it's

11   publicly traded.  That goes against cases that we cite, it

12   goes against common sense, that cannot be what the Supreme

13   Court wanted.  I mean think about that.  If you have a poor

14   performing mutual fund, but it's publicly traded and you

15   know what the price is and you have an investment policy

16   statement which every company has to have, every publicly

17   traded company that has a 401(k) plan, and it says we'll

18   monitor the investments for imprudence.  Well, what does

19   that mean?  If something has a publicly traded price then

20   can it be a sale?  Supreme Court in Tibble made it pretty

21   clear that plan fiduciaries have a constant duty to monitor

22   investments and change them if something were cheaper or

23   became a better alternative.  There's cases in defined

24   benefit pension cases or if the portfolio of investments

25   aren't diversified enough, that's a violation of the

1    fiduciary duty.

2              THE COURT:  But that is not a requirement within

3    ESOP, and indeed the statutory framework specifically

4    recognizes that there is no obligation --

5              MR. CIOLKO:  I'm sorry, I was just giving an

6    example of -- an extreme example of it can't be that price

7    alone eliminates fiduciary responsibility.

8              THE COURT:  I understand, but we are dealing with

9    a more unique environment when we are dealing with an

10   ESOP.

11             MR. CIOLKO:  Here is one other thing that I think

12   some courts confuse about ESOPS.  This isn't a pure ESOP.

13   There's other investment alternatives in the plan.  Some

14   companies choose to call the stock fund, which is one of a

15   number of investments, an ESOP.  What that means is

16   probably there's some tax advantages to calling it that for

17   the provider, but what it really is is an investment, one

18   investment of many in a menu chosen, selected, and

19   monitored by the defendant's fiduciaries.  It's hard for me

20   to get past that other coal companies while maybe not as

21   quick as they should, realized that there was an issue

22   here, realized that the patient was dying in the words of

23   Judge Posner, and did at least something.  And of course

24   you can freeze a stock, freeze further purchase of a stock,

25   that's completely within the fiduciary's discretion, and

1    even if individuals might not want that, they're

2    fiduciaries, they have responsibility to the entire plan.

3    The Honeywell judge in one of the seminal ERISA company

4    stock decisions say why would you throw good money after

5    bad.  And this disclosure, talking about the nonpublic part

6    of our case, this was discussed at the Supreme Court as

7    well, and it made very clear that an 8(k) disclosure of

8    material information can be done within weeks, if not

9    sooner.  This isn't some huge undertaking.  Everything is

10   electronic now, everything is filed, and people will see

11   it.  And we did prove that if we -- and I'm skipping to the

12   nonpublic because I'm not sure how much time I have.

13             THE COURT:  And a fiduciary would have to try and

14   assess whether freezing further purchases of that stock and

15   making that public disclosure would do more harm to the

16   stockholdings in the plan already than good, right?

17             MR. CIOLKO:  That's exactly right, Your Honor,

18   and that's exactly what the independent fiduciary did in

19   this case.  The fiduciaries could have done it themselves.

20   Now, they hired independent fiduciary to have a fresh set

21   of eyes.  I think one of the most interesting avenues of

22   discovery here will be the process by which the third party

23   administrator was hired and their process analyzing of why

24   this is no longer a prudent stock.  Yes, and I think we've

25   alleged that when this stock was sold it had no bad effects

1   on the stock price as a whole, there was no real effect.

2   And that's the real concern.  Amgen at the Supreme Court in

3   the Ninth Circuit, is a disclosure of material fact would

4   cause more harm than good is divestment of a large piece of

5   company stock from the company's own plan going to send a

6   message to the country that, well, if they're divesting it

7   we should all divest.  But that's all based on public and

8   nonpublic information that becomes public.  To me, and I

9   have an MBA, one of things that we were taught is you get

10  out of a bad investment as quickly as you can.  And if a

11  stock is artificially inflated over a period of time, the

12  longer that's inflated the harder that fall is going to

13  be.

14          THE COURT:  And what do you allege in this

15  complaint suggests that the stock price here was

16  artificially inflated?

17          MR. CIOLKO:  We suggest that for four years in

18  their 11(k) Peabody specifically said that they are unable

19  to prognosticate what effects ill or not of regulatory

20  changes having to do with climate change or regulatory

21  modifications that the United States Government might do.

22  They set it for four years and then it turns out that they

23  indeed modeled a number of different scenarios internally

24  what would happen if they put a coal tax on for 40 dollars

25  a ton, what would happen if there was a restriction on the

1   type of coal emitting clean -- how much would it cost to

2   refit certain number of refineries.  They did it, and they

3   violated the Martin Act in the New York AG's mind.  And why

4   there wasn't a 10(b) securities case not filed, I'm not

5   sure.  The other side of my partners and the Plaintiff's

6   bar is pretty good about that, and it could be that this

7   stock was continually going down.

8           THE COURT:  Clearly you're not suggesting that

9   the public wasn't generally aware of the change in the

10  regulatory environment with respect to climate change and

11  clean coal, and, I mean, there was -- even I knew about

12  that during the time period.

13          MR. CIOLKO:  It's the timing of it, Your Honor.

14  A lot of those regulations came into effect in 13, 14, 15,

15  and they were being discussed in 2010 and 2011 at the UN.

16  But they've been trying to have -- it took 15 years to

17  get --

18          THE COURT:  And how can they know, given that

19  it's taken 15 years for it to happen, how can they know

20  that it's going to happen at all?

21          MR. CIOLKO:  I think by the point in -- I think

22  the point was that they are saying that we cannot -- that

23  we are unable to figure out under different scenarios what

24  would happen if this regulation were taking place or what

25  have you.  And there was regulations out there, and the

 1   truth was that they were able and in fact did run different

 2   tests and scenarios to see what the effect on operations

 3   and the profits of the company.

 4           THE COURT:  When is it that those scenarios were

 5   run that should have given them -- I mean, I assume that

 6   your claim is that once they ran those scenarios that they

 7   should have disclosed the possible risk of those scenarios

 8   in their next public filings?

 9           THE DEFENDANT:  Yes, Your Honor, and the results

10   of those.

11           THE COURT:  When was that?

12           MR. CIOLKO:  I don't have that in front of me.

13   We don't know the full number of tests, but I believe it

14   was 2013 and 2011, throughout the class periods.  I mean, I

15   think why the New York's AG went after the company is

16   because, you know, high level executives of the company

17   even as late as 2013 or 14 are telling people that climate

18   change is this modeled, you know, hysteria; in other words

19   trying to tell their investors that you shouldn't worry so

20   much about how it's going to affect us.  And the fact that

21   he's saying this in the face of some very public things I

22   think really just makes the admission of the fact that we

23   have run a number of tests and a number of them came out

24   with negative consequences, we will continue to do so and

25   update, I would think that would be immaterial to

1    investors.

2          THE COURT:  And what is your response to the

3    defendants' arguments that you can't demonstrate that it

4    had any impact on the price?

5          MR. CIOLKO:  Well, I think my colleague did admit

6    that after an initial blip, and I think this is the

7    question Your Honor was asking Mr. Tetrick, well, this

8    comes out and they figure maybe the first reaction is okay

9    they didn't pay a fine so it's not going to immediately

10   affect the company.  Or just sometimes when an

11   investigation is over there is an uptick and announced that

12   there's an agreement that we will not make these statements

13   in the future and then the investigation's over.  So you'll

14   get a slight uptick of maybe automatic buyers,

15   institutional buyers.  But then over the next week there

16   was a decrease, I believe between four and eight percent of

17   the stock price.  What you have to remember, Your Honor,

18   and I think Mr. Tetrick did a very good job of saying,

19   look, this stock was slowly and steadily moving.  Well,

20   maybe it would have been a little bit steeper and stronger.

21         THE COURT:  Well, does your evidence suggest that

22   after that disclosure the trend was indeed steeper?

23         MR. CIOLKO:  I believe our allegations were in

24   the immediate week or two afterwards, there was a material

25   decrease in the price of the stock.

1          THE COURT:  And do you believe that that

2     materiality is something that I can assess at this stage of

3     the case?

4          MR. CIOLKO:  I think to be perfectly honest, I

5     think there are cases where you could be able to.  I think

6     what we would need is a bit more discovery.  This isn't a

7     securities case so a bit more discovery about what was

8     going on in that investigation, what else was put out, what

9     other news or nonnews were put out during that time period.

10    We believe eight percent in and of itself without a

11    counterexplanation, I think the defendants said there was

12    other news or other things that could have affected it.  I

13    think both sides would benefit from looking at that more

14    closely.

15         I think Your Honor's -- our firm has done these

16    cases for 15 years.  And this particular question, I'm

17    going back to the public information question, is a very

18    important one for a very small subset of cases for

19    companies that are in dire straights, that are careening

20    into bankruptcy whether because of fraud or because the

21    industry has just passed them by.

22         THE COURT:  Now, I gather from your brief and

23    correct me if I'm misunderstanding it, that you believe

24    that there can be a public information claim separate and

25    apart from any special circumstances, public information

1   with special circumstances claim.

2           MR. CIOLKO:  Your Honor --

3           THE COURT:  I mean, I got the sense that you were

4   arguing that those two were divorced, that there's just

5   this public information claim and then we've got our public

6   information with special circumstances.

7           MR. CIOLKO:  What I was really trying to do, we

8   were trying to do, is weave in the good decisions that

9   we've gotten in these very specific cases that are much

10  like this case here, not like BP where the company went on

11  and in 10 years they'll be in the huge black again, or even

12  Fifth Third, which was the Dudenhoeffer case, was not a

13  company that was facing a dire bankruptcy like cases.

14  Because this question is so new, and I apologize to the

15  Court because this is my own personal doing, whether like

16  we're saying like the Altman-Z score, which not everybody

17  understands, which might not be completely public, the high

18  debt to equity ratio, the combination of things, whether

19  they all come together as a special circumstance or you

20  read them as a public information claim of its own, Kodak's

21  laid out, I believe, and I think I believe in a very short

22  opinion the LandAmerica case thought of itself not as

23  exactly a special situation, but it really was.  I would

24  like the Court to think of this as our allegations with

25  regard to the plain public information case is a special

1    circumstance in and of itself, everything that's made up

2    within that is a special circumstance.

3              THE COURT:  I'm sorry, I lost you there.

4              MR. CIOLKO:  All the allegations we made, I

5    think, with regards to whether the public information case

6    is a viable one, whether you call it a separate public

7    information case, which is viable for X, Y and Z reasons,

8    or it's a public information case that is supported by

9    those things in other special circumstances we listed in

10   the Court.  I think the combination of those factors

11   creates a special circumstance singular for the Court where

12   in this case a fiduciary should have acted.  And to us, we

13   look at this and say the company you just spin off went

14   bankrupt twice and sold their company stock, one of your

15   prime competitors did the same thing, yet you waited until

16   we sued you, we believe, to go out and hire independent

17   fiduciary.  How is it okay for an independent fiduciary to

18   look at public information and say this is just not prudent

19   given these totality of circumstances?  The same test that

20   the Tatum court for divestment of employer securities.

21             So how can you read Dudenhoeffer as saying that

22   that's appropriate and it would be imprudent according to

23   this independent fiduciary to continue to invest the

24   company stock, but members of this same class are hurt

25   can't bring their claim?  That would seem to be an

1    impossible reading application of Dudenhoeffer.  And I

2    think the Dudenhoeffer Court, which was focused mainly on

3    getting rid of the presumption of prudence, and also having

4    to deal with -- there's two types of ERISA cases, and there

5    really hadn't been an ERISA case of this type in four or

6    five years and that wasn't even directly on point.

7         THE COURT:  Well, the defendants identified what

8    they characterized as the four main special circumstances

9    that the plaintiffs have identified in their complaint; do

10   you agree with that characterization?

11        MR. CIOLKO:  I'd have to have them read back to

12   me.  I imagine one was the Alt-Z score.

13        THE COURT:  One was the Alt-Z score and the debt

14   level, the failure to investigate.

15        MR. CIOLKO:  Correct.

16        THE COURT:  And then the nonpublic information.

17   Are those -- I mean, tell me what you believe the special

18   circumstances are that I should be evaluating.

19        MR. CIOLKO:  Those, especially the first three,

20   and the special circumstances aren't just those three

21   indicators.  The special circumstances are those indicators

22   within what's happening to the company and the broader

23   industry.  In other words, a special circumstance could be

24   what Justice Breyer said, which is one of our special

25   circumstances, which is the fiduciaries of a company who

1    also happen to be executives as here, just ignored tons and

2    tons of negative information from every analyst that

3    covered their company and the industry, they just ignored

4    them and took no action.  That in and of itself, as Justice

5    Breyer said, I would think that's easily a claim.  That's

6    one of our special circumstances, our claim is.  And again,

7    we don't have access to all the documents that the

8    defendants do with regards to the fiduciary process.  What

9    we can glean from their SEC filings and other documents

10   there was nothing done to evaluate this claim until after

11   they received the lawsuit.

12        THE COURT:  So you don't think that that claim is

13   derivative of your public/nonpublic information claims?

14   That's one of the arguments that the defendants make.  That

15   you're going to have to make out your claim under your

16   public or nonpublic information claim, and that any failure

17   to monitor is derivative of that.

18        MR. CIOLKO:  Failure to monitor other fiduciaries

19   is its own claim and may be derivative of the actions from

20   other claims, which is a separate claim in our case.  But,

21   no, I think the failure to take any action, the failure to

22   investigate regularly is in and of itself a breach of

23   procedural prudence.  And a breach of procedural prudence

24   can in and of itself lead to a finding of fiduciary

25   liability if there is causation and harm from the lack of

1    attention.   Now, there's procedural imprudence, if this

2    were a company that dropped ten dollars and then came up

3    five dollars and we made the same claim that you didn't

4    look at the company's stock, that may be true, but there

5    would be no harm and no liability.   Here we think that

6    there was complete, that there was complete inaction so the

7    procedures that are outlined by DOL regulations and are

8    enshrined in the statute weren't followed until they got

9    sued, so the procedural violation which is a separate claim

10   of procedural imprudence, you didn't do your job, you

11   didn't look at these investments in regular meetings.

12           THE COURT:   All right.   I'm going to ask you to

13   wrap it up in the next two or three minutes and then I

14   still have a few questions for you because we're about out

15   of time.

16           MR. CIOLKO:   Sure.   Bear with me for one

17   second.

18           THE COURT:   All right.

19           MR. CIOLKO:   I'm sure I left out a fair amount,

20   Your Honor, but the briefs from both sides I think are well

21   done and lay out the arguments, so I'd be happy to answer

22   any more questions the Court has.

23           THE COURT:   Talk to me about the basis for these

24   plaintiffs to assert claims under the Big Ridge and the

25   Peabody Western plans.

1           MR. CIOLKO:   Sure, Your Honor.   There's a line of

2    case law starting with the Four Bush case in the Fifth

3    Circuit that make it clear that a plaintiff who is in one

4    plan can bring a claim for investment imprudence for

5    particular investment in that plan that's also in other

6    plans sponsored by that same employer; in other words, in

7    our Marc case, Judge Chesler found that we had participated

8    in one of three Marc-Plans, but because the same

9    investment, the company stock plan, and the same rules

10   applied with regards to investments across the board, our

11   plaintiff not just still had standing as a class

12   representative but also had standing to sue the company on

13   their behalf because they were all clients in the same

14   place that were hurt by the same conduct by the same

15   people.   Here, not just do you have -- you have the three

16   main plans, and I'll note that the Big Ridge Plan was

17   merged into the larger PIC Plan during the class period, so

18   I would think that solves some of Mr. Tetrick's questions.

19          You have the same issue here is the provision of

20   company stock as an investment, the claims are the same,

21   the ultimate defendants are the same or largely

22   overlapping, and more telling is the company itself merged

23   all the company stock fund investments from the three plans

24   into one trust.   This is a master trust for all three plans

25   for company stocks holdings.   So it doesn't matter if a

 1   participant from any of these plans invested in Peabody

 2   stock, it all wound up in the same trust run by the same

 3   trustee.  So they were intermingled and whatever harms were

 4   caused to the value of those shares -- and that was the

 5   decision made by the fiduciaries of the plans, so I don't

 6   really see practically speaking how out clients wouldn't

 7   have standing for the two smaller plans.  They were

 8   essentially all mixed together by the defendants and

 9   defendants' plans by their own actions.

10            THE COURT:  So let me make sure I am

11   understanding what you are saying.  Let's look at December

12   of 2012.  Are you asserting that the price of the company

13   stock at that point in time was inflated?

14            MR. CIOLKO:  It was inflated or artificially

15   maintained by information not provided to the plan

16   participants.

17            THE COURT:  What?

18            MR. CIOLKO:  The information in the 10(k) the

19   misinformation in the 10(k) that the company was not able

20   to prognosticate the effects of any regulatory changes.

21            THE COURT:  What else?

22            MR. CIOLKO:  That's it, Your Honor.

23            THE COURT:  So that is the only factor that the

24   Plaintiffs are pointing to that alleges an artificial

25   inflation of the stock?

 1          MR. CIOLKO:  Yes, Your Honor.  I'm not saying

 2   that discovery won't broaden that, but that's to me a

 3   pretty big material fact.

 4          THE COURT:  I understand.  I just want to

 5   understand what the argument is because the sense I get

 6   when I read the complaint is that based upon all of the

 7   public information any prudent fiduciary should have known

 8   based on the public information in December of 2012, that

 9   that was an unreasonably risky investment for a prudent

10   fiduciary to continue to maintain in the plan.

11          MR. CIOLKO:  Yes, Your Honor.

12          THE COURT:  And that that continued in January of

13   2013, and June of 2013, and as the stock continued to go

14   down that based on the public information and the changing

15   economic environment in which Peabody and other coal

16   companies were functioning, that it simply became an

17   imprudent investment.

18          MR. CIOLKO:  That's true, Your Honor, as well as

19   their other -- the other major coal companies in the

20   country experiencing the same thing and doing what --

21          THE COURT:  But that just provides evidence of

22   that position, right?  Other coal companies are

23   experiencing the same thing.

24          MR. CIOLKO:  Well, that's right.  And then

25   Peabody had a few extra things.  They had made a huge

 1    purchase in an Australia mining company that turned out to

 2    be a huge debt burden on their shoulders.  I think that

 3    even compared to the coal index, the Peabody stock

 4    underperformed the coal index which obviously did not

 5    perform well during this time and S&P 500 had steadily

 6    improving.  And the way you measure damages you take the

 7    money invested investment alternative and how much that

 8    would have made in an alternative investment and that's how

 9    you figure out ERISA damages.

10         And I would say the Alt-Z score which is not

11    something that your everyday person would know about, it

12    wasn't just under -- and they use a lot of different

13    metrics combining numerical ratios taken from financials --

14    it wasn't just right below the part where there's a scare

15    that the company will go bankrupt.  By the middle of the

16    class period it's essentially like Def-Con 4 warning, like

17    this company is in dire danger.  This is basically a call

18    to institutional investors to get rid of the stock.

19              THE COURT:  But that's public information, right?

20              MR. CIOLKO:  Correct.

21              THE COURT:  And any institutional investor

22    especially looking at a company in this industry would be

23    aware of that.

24              MR. CIOLKO:  Right, and take action and divest.

25              THE COURT:  And one assumes that with that being

1    public information that the market has also taken that into

2    account?

3                MR. CIOLKO:  It has, Your Honor, but a market

4    price on one day reflects one day.  What you need to do, I

5    think, look at a market price over time and the totality of

6    circumstances over time, which is what the Tatum Court did,

7    and say at some point there reaches, okay, this is worth

8    two dollars but in two weeks you're going to have a stock

9    that's worth five dollars, and given whether its Altman-Z

10   score or projected earnings, it could be either -- in five

11   years it could be either six dollars or four dollars just

12   generally moving around.  Here you have stock that maybe

13   it's worth five dollars today.  There's a five percent

14   chance that maybe in four or five years it gets back up to

15   10 or 15, but there's a 90 percent chance it goes to zero.

16   That is a different situation.  That's what I think what

17   Judge Posner -- I think Judge Breyer purposely cited to

18   that portion of Judge Posner's decision in Summers to give

19   folks at least an idea of where to go to look for special

20   circumstances.

21               So to me it's when you're citing that case for

22   the proposition that the price is the price, and the next

23   three paragraphs go on to say, well, the price is the price

24   but you have to look at what's going into the price and

25   what's going into the risk, like, not every five dollar

 1  stocks are made the same.  And I want to reiterate, taken

 2  to its greatest extent, if the Court were to take in

 3  Mr. Tetrick's view, admitted view I think, any publicly

 4  traded vehicle, if it's publicly traded, cannot be found to

 5  be an imprudent investment for a 401(k) plan.

 6          THE COURT:  Okay.  I'm out of time for you.

 7          MR. CIOLKO:  Especially remember the purpose of

 8  the plan.

 9          THE COURT:  All right.  Give you five minutes to

10  respond.

11          MR. TETRICK:  Thank you, Your Honor, and I don't

12  think I'll need the entire five minutes unless the Court

13  has additional questions.

14          I've heard a lot of discussion over the last few

15  minutes about what the Supreme Court must have meant or

16  should have meant or should have said in the Dudenhoeffer

17  case.  And I would remind the Court that four courts of

18  appeals have taken up the Dudenhoeffer standard under

19  special circumstances test.  And in all four of those cases

20  the courts of appeals have determined that the plaintiffs

21  did not make out special circumstances.  The BP case out of

22  Fifth Circuit.  The Lehman case, which is known as Rinehart

23  in the Second Circuit.  The GM case, which is known as

24  Pfeil P-F-E-I-L in the Sixth Circuit.  And the Smith case,

25  which is Delta Airlines in Eleventh Circuit.         The

1    last two that I mentioned, the GM and the Delta case are

2    particularly instructive here because they both involve

3    companies where there was speculation on the front page of

4    the Wall Street Journal for a very long time before they

5    filed for bankruptcy, before they eventually filed for

6    bankruptcy.  It wasn't a sudden implosion like we saw in

7    Lehman for example.

8         In the Eleventh Circuit case, the Smith case, the

9    Eleventh Circuit accurately said that the crux of the

10   plaintiffs' prudence claim is that the Delta fiduciaries

11   should have foreseen that Delta stock would continue to

12   decline.

13        The danger of these claims as recognized by the

14   Supreme Court is that you risk putting these fiduciaries in

15   a position of trying to outsmart the market.  The Tatum

16   case out of the Fourth Circuit that we just talked about or

17   my colleague just spoke about is an example of that danger.

18   That involved a situation where the fiduciaries chose to

19   divest a plan of company stock only to see it recover and

20   then get sued as a result.

21        The Supreme Court has set a high standard here

22   both under the special circumstances for public information

23   claims and under the nonpublic information claims.  The

24   plaintiffs' counsel have established that they are very

25   well experienced.  They've handled a lot of these cases.

1   They know what they're doing.  The Court can take some

2   solace in the fact that a very tough test has been met by

3   some very good lawyers on the plaintiffs' case, on the

4   plaintiffs' side, and this complaint simply fell short.

5   This Court should follow the example of the four courts of

6   appeals that have taken up these types of claims and apply

7   Dudenhoeffer for what it says as opposed to what the

8   plaintiffs say it must mean.

9           And unless the Court has any additional

10  questions, I would thank the Court for its time and

11  attention and ask that it dismiss the second amended

12  complaint.

13          THE COURT:  All right.  Thank you.  Fine job by

14  both sides.  And we will take the matter under submission.

15          (COURT ADJOURNED AT APPROXIMATELY 12:09 P.M.)

16

17

18

19

20

21

22

23

24

25

1              <u>REPORTER'S CERTIFICATE</u>

2

3           I, Patti Dunn Wecke, Registered Merit Reporter,

4     hereby certify that I am a duly appointed official court

5     reporter of the United States District Court for the

6     Eastern District of Missouri.

7           I further certify that the foregoing is a true

8     and accurate transcript of the proceedings held in the

9     entitled cause, and a true and correct transcription of my

10    stenographic notes.

11          I further certify that this transcript,

12    containing pages 1 - 55 inclusive, was delivered

13    electronically and that this reporter takes no

14    responsibility for missing or altered pages of this

15    transcript when same transcript is copied by any party

16    other than this reporter.

17          Dated at St. Louis, Missouri, this 13th day of

18    December, 2016.

19                        /s/Patti Dunn Wecke, RMR, CRR, CMRS
                                 Official Reporter
20

21

22

23

24

25